JAMES L. DAY (WSBA #20474)
LESLEY BOHLEBER (WSBA #49150)
BUSH KORNFELD LLP
601 UNION STREET, SUITE 5000
SEATTLE, WA 98101
Tel: (206) 292-2110
jday@bskd.com;
lbohleber@bskd.com

HONORABLE WHITMAN L. HOLT

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re | Chapter 11 |
| AMITY COURT LLC, | Case No. 25-00240-WLH |
| Debtor. | DECLARATION OF STANLEY XU IN SUPPORT OF FIRST DAY MOTIONS |

Stanley Xu declares as follows:

1.    I am the authorized person and indirect 50% owner of Amity Court LLC (the "Debtor"). I have personal knowledge of the facts set forth in this declaration and I am competent to testify to the same. I make this declaration in support of the Debtor's first day motions in this case (together, the "Emergency Motions"), including:

   A. Debtor's Emergency Motion for Order Approving Adequate Assurance to Utilities (the "Utilities Motion");

   B. Debtor's Emergency Motion for Order (1) Authorizing Interim Use of Cash Collateral, (2) Granting Adequate Protection, and (3) Setting Final Hearing (the "Cash Collateral Motion"); and

   C. Debtor's Emergency Motion for Order Authorizing Continued Use of Prepetition Bank Account and Checks (the "Bank Account Motion").

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2876 ib19fh01v0

25-00240-WLH11    Doc 10    Filed 02/19/25    Entered 02/19/25 16:03:51    Pg 1 of 189

Capitalized terms not otherwise defined in this declaration have the same meaning as in the Emergency Motions.

**Background on Debtor's Operations**

2. The Debtor's sole member is X & C Holdings LLC ("XC Holdings"). My wife, Nanling Chen, and I are each 50% members and co-managers of XC Holdings. I am the person primarily responsible for all business and management decisions of the Debtor.

3. The Debtor has no employees.

4. The Debtor owns a two-story 17,286 SF office building located at 14400 NE Bellevue-Redmond Road, Bellevue, Washington, 98007, with a legal description of

That portion of the Southwest Quarter of the Northeast Quarter of Section 27, Township 25 North, Range 5 East, Willamette Meridian, in King County, Washington, described as follows:

Beginning on the East line of said subdivision at its intersection with the Northerly line of the Bellevue-Redmond Road;

Thence North 00°58'16" East along said East line 280.00 feet to the True Point of Beginning; Thence North 88°16'05" West parallel to the North line of said section 150.00 feet;

Thence South 00°58'16" West parallel to the East line of said subdivision to the Northerly margin of Northup Road (Bellevue-Redmond Road);

Thence Easterly along said margin to the East line of said subdivision;

Thence North 00°58'16" East along said East line to the True Point of Beginning.

Situate in the County of King, State of Washington.

(the "Property").

DECLARATION OF STANLEY XU IN SUPPORT OF FIRST DAY
MOTIONS – Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2876 ib19fh01v0

5.     The Debtor purchased the Property in September 2021 for $9.5 million, $5 million of which was financed by Axos Bank ("Axos"). An appraisal prepared on September 30, 2024 by Colliers International, which Axos caused to be prepared, values the real property and improvements at $7,780,000. A true and correct copy of the appraisal is attached hereto as Exhibit A.

6.     Currently, 22 of the 24 offices are leased generating approximately $35,000 in rents each month (the "Rents"). The Property is managed by Longwell Company pursuant to a Commercial Property Management Agreement, dated August 15, 2021, between Longwell Company ("Longwell") and the Debtor.  My wife and I are also each 50% owners of Longwell Company. I am the president and my wife is the vice president of Longwell Company.

The Axos Loan

7.     On or about September 22, 2021, Axos made a loan to the Debtor in the amount of $5,000,000 (the "Loan"), evidenced by a Secured Promissory Note (the "Note") and secured by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of even date (the "Deed of Trust") that encumbers the Property. True and correct copies of the Note and Deed of Trust are attached to this declaration as Exhibits B and C, respectively.

8.     XC Holdings, Nanling, and I each executed a Guaranty Agreement, dated September 22, 2021. A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit D.

9.     Under Section 4.5 of the Note, the Debtor was entitled to extend the maturity date of the loan for one year, from October 1, 2024, through October 1, 2025.

DECLARATION OF STANLEY XU IN SUPPORT OF FIRST DAY
MOTIONS – Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

The Debtor made the required extension request by letter dated July 15, 2024, but Axos never responded to the letter, and never advised the Debtor what, if anything, it needed to do to consummate the extension. Ultimately, Axos did not extend the Loan, despite the rights the Debtor held under Section 4.5 of the Note.

10.     On January 24, 2025, Axos filed a Complaint for Appointment of General Receiver (the "Complaint") in the Superior Court of the State of Washington for King County, in the case styled *Axos Bank v. Amity Court* LLC, case no. 25-2-02385-1-SEA (the "Receivership Action"). On January 27, 2025, Axos moved for the appointment of general receiver.

11.     The Debtor filed this bankruptcy case to preserve the equity in the Property and to consummate a sale of the Property to pay Axos in full.

12.     As of January 3, 2025, Axos alleges the estimated total amount due on the Loan is $5,629,380.77. I have been unable to verify the payoff amount because I have not received monthly statements from Axos detailing the amount of interest due, despite repeated requests to Axos.

**Use of Cash Collateral**

13.     The Debtor seeks to use Cash Collateral, as that term is defined in the Debtor's Emergency Motion for Order (1) Authorizing Interim Use of Cash Collateral, (2) Approving Adequate Protection and (3) Setting Final Hearing in accordance with the budget (the "Budget") attached to this declaration as Exhibit E. No payments will be made to insiders under the proposed budget, with one exception: the property manager is Longwell, a related entity having common ownership with the Debtor.

DECLARATION OF STANLEY XU IN SUPPORT OF FIRST DAY
MOTIONS – Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2876 ib19fh01v0

1    14.    As of the Petition Date, the Debtor was holding cash in the amount of

2    $33,279.06.

3    15.    The Budget contains the projected cash expenses for the interim period

4    and for final Cash Collateral use. The Budget tracks the Debtor's working cash

5    collateral base, which secures Axos' prepetition liens.

6    16.    The Debtor has insufficient funds to operate unless it uses Cash Collateral,

7    as it holds no unencumbered funds and does not have sources of unencumbered funds.

8    The present circumstances require the Debtor to use Cash Collateral in order to

9    maintain its ongoing business for the benefit of its estate and creditors.  The use of

10    Cash Collateral will allow the Debtor to continue to operate and to preserve the

11    Property, thereby allowing creditors the best opportunity to recover on their claims.

12    17.    To assure that Axos' interests are adequately protected and to assure no

13    diminution in value of its collateral, the Debtor proposes to grant (to the extent

14    necessary) the Replacement Liens in Postpetition Collateral of the same type in which

15    its prepetition lien attached to the Prepetition Collateral, in the same priority and

16    validity as its prepetition liens, as necessary to secure the diminution in Axos' interests,

17    if any, as a result of the Debtor's use of Cash Collateral.

18    18.    The Debtor will also provide for maintenance of insurance on the

19    Prepetition Collateral.

20    19.    The Cash Collateral Motion must be heard on an emergency basis to avoid

21    irreparable harm to the Debtor and its estate. Without immediate use of cash collateral,

22    the Debtor will not have the funds necessary to pay the expenses necessary for the

23

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2876 ib19fh01v0

1  continued operation of the Debtor's business and the management and preservation of

2  the Debtor's assets and property.

3  **Utilities**

4        20.    The Utility Providers listed on <u>Exhibit A</u> to the Utilities Motion provided

5  utility services to the Debtor prior to the Petition Date.  The continuation of those utility

6  services is crucial to the Debtor's continued operations and reorganization, and the

7  Debtor may suffer irreparable harm if the relief requested in the Utilities Motion is not

8  granted.  The Debtor intends to timely and fully pay all post-petition amounts owed to

9  its Utility Providers.

10        21.    As adequate assurance of future payment to the Utility Providers, the

11  Debtor proposes to establish and fund an account in the amount of $1,530.64.  This

12  amount is equal to approximately two (2) weeks of utility service from all the Debtor's

13  Utility Providers based upon the Debtor's current and historical utility usage and bills

14  as reflected on <u>Exhibit A</u> to the Utilities Motion.  The Utility Account established by

15  the Debtor will serve as a cash security deposit to provide adequate assurance of

16  payment for utility services the Utility Providers provide to the Debtor after the Petition

17  Date.

18        22.    If the Debtor fails to timely pay a Utility Provider for post-petition utility

19  services, the Utility Provider may submit a payment request to the Debtor, certifying

20  that the Debtor failed to pay for post-petition utility services and that such amounts

21  remain outstanding.  The Debtor shall then be required to pay the outstanding amount

22  within seven (7) days following receipt of the payment request from the Utility

23

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2876 ib19fh01v0

1  Provider, subject to the Debtor's right to contest the payment request in this Court or

2  any other court with jurisdiction.

3        23.    Payments from the Utility Account shall be made in the order that the

4  Debtor receives requests and the Debtor shall ensure that the Utility Account is

5  replenished such that its balance remains at or above $1,530.64, or such greater amount

6  as the court may require.

7        24.    The Utilities Motion must be heard on an emergency basis because it is

8  imperative to the Debtor's operations that it continues to receive utility services,

9  unaltered and uninterrupted, in light of the Debtor's provision of adequate assurance to

10  Utility Providers.

11  **The Bank Account**

12        25.    As of the Petition Date, the Debtor maintained one checking account with

13  US Bank, account no. ending 6571) (the "Bank Account"), which the Debtor utilizes as

14  an operating account.

15        26.    The Debtor uses the Bank Account frequently and it is integral to the

16  ordinary operation of the Debtor's business.  The Debtor deposits all rental income and

17  other receipts into the Operating Account and uses that account to pay all business

18  expenses using a combination of checks and electronic transfers.

19        27.    Continued use of the Debtor's Bank Account and checks will help to

20  ensure a smooth transition into chapter 11 and minimal disruption to the Debtor's

21  operations, thereby increasing the likelihood that the Debtor will be able to successfully

22  reorganize.

23        28.    The Bank Account has not held $250,000 or more in the year prior the

DECLARATION OF STANLEY XU IN SUPPORT OF FIRST DAY
MOTIONS – Page 7

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2876 ib19fh01v0

Docusign Envelope ID: D64E6965-EA05-4AF5-9894-DE48401568D0

Petition Date.

29.    I do not anticipate that the balance in the Bank Account will exceed $250,000 at any point during the chapter 11 proceeding. If the account ever exceeds $250,000, the Debtor will establish an Excess Funds Account and will deposit will deposit any funds in excess of $250,000 in the Excess Funds Account.

30.    The Bank Account Motion must be heard on an emergency basis to avoid the irreparable harm of disruption to and termination of the Debtor's operations. As detailed in the Cash Management Motion, the Debtor's uninterrupted ability to continue to use its pre-petition bank accounts and checks in the ordinary course of business is critical to the Debtor's continued operations post-petition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

SIGNED this 19th day of February, 2025, at Bellevue, Washington.



Stanley Xu

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2876 ib19fh01v0

# EXHIBIT A



# AMITY COURT

14400 Northeast Bellevue-Redmond Road
Bellevue, Washington 98007

APPRAISAL REPORT
Date of Report: September 30, 2024
Colliers File #: SEA240464
Client File #: 24-000246-01-1 / 90099031245



PREPARED FOR
Rachel Hoss
Axos Bank
P.O. Box 919008
San Diego, CA 92122

PREPARED BY
**COLLIERS INTERNATIONAL**
**VALUATION & ADVISORY SERVICES**

# LETTER OF TRANSMITTAL

**COLLIERS INTERNATIONAL
VALUATION & ADVISORY SERVICES**

601 Union Street, Suite 5300
Seattle, WA 98101 USA
MAIN +1 206 343 7477
FAX +1
WEB www.colliers.com/valuationadvisory

September 30, 2024

**Rachel Hoss
Axos Bank
P.O. Box 919008
San Diego, CA 92122**

**RE:** Amity Court
14400 Northeast Bellevue-Redmond Road
Bellevue, Washington 98007

Colliers File #: SEA240464

Client File #: 24-000246-01-1 / 90099031245

Ms. Hoss:

This appraisal report satisfies the scope of work and requirements agreed upon by Axos Bank and Colliers International Valuation & Advisory Services. At the request of the client, this appraisal is presented in an Appraisal Report format as defined by *USPAP* Standards Rule 2-2(a). Our appraisal format provides a summary description of the appraisal process, subject and market data and valuation analyses.

The purpose of this appraisal is to develop opinions of the As-Is Market Value of the subject property's leased fee interest. At the request of the client, we have also completed an Insurable Replacement Cost Estimate. The following table conveys the final opinion of market value of the subject property that are developed within this appraisal report. Note that the value conclusion is based on the property's underlying land value, which exceeds its value as improved.

| VALUE TYPE | INTEREST APPRAISED | DATE OF VALUE | VALUE |
|---|---|---|---|
| As-Is Market Value | Leased Fee | September 18, 2024 | $7,780,000 |
| **OTHER CONCLUSIONS** | **AS OF SEPTEMBER 18, 2024** | | |
| Insurable Replacement Cost | | | $3,120,000 |

The subject is Amity Court, a multi-tenant low-rise office property totaling 16,796 SF of NRA located on a 0.99-acre site at 14400 Northeast Bellevue-Redmond Road in Bellevue, Washington. The improvements were built in 1978, are in average condition and have a remaining economic life of 2 years based on our estimate.

Colliers International Valuation & Advisory Services, and certain of its subsidiaries, is an independently owned and operated business and a member firm of Colliers International Property Consultants, an affiliation of independent companies with over 500+ offices throughout more than 68 countries worldwide.

The subject property has a multi-tenant design that is currently occupied by third-party tenants, and has a current occupancy level of 78.0%. Although the subject has leases in place, our market value conclusion indicates that the underlying land value currently exceeds that subject's value as-improved. It is anticipated that the subject property will be a candidate for redevelopment upon the expiration of its in-place leases (which extend through July 2026 at the latest). As such, any future leasing in the subject is likely to be short-term. A stabilized occupancy estimate is not relevant in this context.

The analyses, opinions and conclusions communicated within this appraisal report were developed based upon the requirements and guidelines of the current Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute. The report is intended to conform to the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) standards.

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter. *USPAP* defines an Extraordinary Assumption as, "an assignment specific-assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions". *USPAP* defines a Hypothetical Condition as, "that which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis".

The Extraordinary Assumptions and/or Hypothetical Conditions that were made during the appraisal process to arrive at our opinions of value are fully discussed below. We advise the client to consider these issues carefully given the intended use of this appraisal, as their use might have affected the assignment results.

## EXTRAORDINARY ASSUMPTIONS

This Appraisal Report is not contingent on any extraordinary assumptions.

## HYPOTHETICAL CONDITIONS

This Appraisal Report is not contingent on any hypothetical conditions.

## RELIANCE LANGUAGE

Our opinion of value reflects current conditions and the likely actions of market participants as of the date of value. It is based on the available information gathered and provided to us, as presented in this report, and does not predict future performance. Changing market or property conditions can and likely will have an effect on the subject's value.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

The signatures below indicate our assurance to the client that the development process and extent of analysis for this assignment adhere to the scope requirements and intended use of the appraisal. If you have any specific questions or concerns regarding the attached appraisal report, or if Colliers International Valuation & Advisory Services can be of additional assistance, please contact the individuals listed below.

Sincerely,

**COLLIERS INTERNATIONAL
VALUATION & ADVISORY SERVICES**

Joseph Liss
Valuation Specialist
Certified General Real Estate Appraiser
State of Washington License #22003802
+1 323 334 7958
joseph.liss@colliers.com

Reid Erickson, MAI
Executive Managing Director
Certified General Real Estate Appraiser
State of Washington License #1100150
+1 206 965 1106
reid.erickson@colliers.com

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## REPORT ORGANIZATION

## PROPERTY AND ASSIGNMENT OVERVIEW

Executive Summary _____ 1
Area Analysis _____ 11
Exhibits_____ 20
Site Description _____ 25
Improvement Description _____ 27
Assessment & Taxation _____ 29
Zoning Analysis _____ 30
Market Analysis _____ 31
Highest & Best Use _____ 37

## VALUATION _____ 38

Valuation Methods _____ 38
Income Approach _____ 39
Sales Approach _____ 54
Sales Approach Conclusion _____ 59
Land Valuation _____ 60
Land Valuation Conclusion _____ 69
Reconciliation of Value Conclusions _____ 70

## CERTIFICATION

## ASSUMPTIONS & LIMITING CONDITIONS

## ADDENDA

Engagement Letter

Rent Roll

P&L Statements

Subject Data

Valuation Glossary

Qualifications of Appraisers

Qualifications of Colliers International Valuation & Advisory Services

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## GENERAL INFORMATION

| | |
|---|---|
| **Property Name** | Amity Court |
| **Property Type** | Office - Low-Rise Office |
| **Address** | 14400 Northeast Bellevue-Redmond Road |
| **City** | Bellevue |
| **State** | Washington |
| **Zip Code** | 98007 |
| **County** | King |
| **Core Based Statistical Area (CBSA)** | Seattle-Tacoma-Bellevue, WA |
| **Market** | Seattle/Puget Sound |
| **Submarket** | Suburban Bellevue |
| **Latitude** | 47.626030 |
| **Longitude** | -122.148762 |
| **Number Of Parcels** | 1 |
| **Assessor Parcel** | 272505-9147 |
| **Total Taxable Value** | $8,190,100 |
| **Census Tract Number** | 0237.02 |

## SITE INFORMATION

| **Land Area** | **Acres** | **Square Feet** |
|---|---|---|
| Usable | 0.99 | 43,200 |
| Unusable | 0.00 | 0 |
| Excess | 0.00 | 0 |
| Surplus | 0.00 | 0 |
| **Total** | **0.99** | **43,200** |
| **Topography** | Sloping at street grade | |
| **Shape** | Generally Rectangular | |
| **Access** | Average/Good | |
| **Exposure** | Average | |
| **Current Zoning** | BelRed-Commercial/Residential District (BR-CR) | |
| **Flood Zone** | Zone X (Unshaded) | |
| **Seismic Zone** | Very High Risk | |

## IMPROVEMENT INFORMATION

| | |
|---|---|
| **Gross Building Area SF (GBA)** | 17,386 SF |
| **Net Rentable Area (NRA)** | 16,796 SF |
| **Floor Plate SF** | 8,693 SF |
| **Total Number Of Stories** | 2 |
| **Year Built** | 1978 |
| **Quality** | Average |
| **Condition** | Average |
| **Building Class** | D |
| **Type Of Construction** | Wood frame |
| **Land To Building Ratio** | 2.5 : 1 |
| **Site Coverage Ratio** | 20.1% |
| **Parking Type** | Surface |
| **Number of Parking Spaces** | 73 |
| **Parking Ratio (Spaces/1,000SF NRA)** | 4.3/1,000 SF NRA |

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

1

## HIGHEST & BEST USE

| | |
|---|---|
| **As Vacant** | Development Of A Multifamily Residential Property As Market Conditions Warrant |
| **As Improved** | Continued Use As An Office For The Interim Until Expiration Of In-Place Leases Allows For Redevelopment Of The Site As A Multifamily |

## EXPOSURE TIME & MARKETING PERIOD

| | |
|---|---|
| **Exposure Time** | Six Months or Less |
| **Marketing Period** | Six Months or Less |

## TENANCY INFORMATION

| | |
|---|---|
| **Tenancy** | Multi-Tenant Occupied By Third-Party Tenants |
| **Occupancy** | 78.0% |
| **Occupied SF** | 13,096 SF |
| **Vacant SF** | 3,700 SF |
| **Number of Tenants in Occupancy** | 21 |
| **Number Of Vacant Spaces** | 3 |
| **Direct Capitalization NOI** | $294,115 |
| **Total Contract Income (Occupied Space)** | $17.78/SF |
| **Total Market Income (Occupied Space)** | $17.00/SF |
| **Contract Income As % of Market Income** | 105% |

## VALUATION SUMMARY

| VALUATION INDICES | AS-IS MARKET VALUE |
|---|---|
| **INTEREST APPRAISED** | **LEASED FEE** |
| **DATE OF VALUE** | **SEPTEMBER 18, 2024** |
| **INCOME CAPITALIZATION APPROACH** | |
| **Direct Capitalization** | **$4,610,000** |
| Direct Capitalization $/SF | $274/SF |
| NOI Proforma | $294,115 |
| NOI $/SF | $17.51/SF |
| Capitalization Rate | 6.25% |
| **INCOME CONCLUSION** | **$4,610,000** |
| Income Conclusion $/SF | $274/SF |
| **SALES COMPARISON APPROACH** | |
| **SALES CONCLUSION** | **$4,520,000** |
| Sales Conclusion $/SF | $269/SF |
| **FINAL VALUE CONCLUSION** | |
| **FINAL VALUE** | **$7,780,000** |
| **LAND VALUATION** | |
| **LAND VALUE** | **$7,780,000** |
| Value/SF | $180.00 |
| **OTHER CONCLUSIONS** | |
| **Insurable Replacement Cost** | **$3,120,000** |
| Insurable Replacement Cost/SF | $179/SF |

## AERIAL PHOTOGRAPH



© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## SUBJECT PHOTOGRAPHS



**SOUTH ELEVATION**



**NORTH AND EAST ELEVATIONS**



**EAST ELEVATION AND ENTRANCE**



**MAIN LOBBY AND STAIRS**



**TYPICAL CORNER OFFICE**



**TYPICAL OFFICE (VACANT)**

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES                                  4



**TYPICAL OFFICE AREA**



**TYPICAL OFFICE AREA**



**STREET VIEW NORTHEAST ALONG BEL-RED ROAD**



**STREET VIEW SOUTHWEST**

25-00346-WLH11    Doc 10    Filed 02/19/25    Entered 02/19/25 16:03:51    Pg 19 of 189

## PROPERTY IDENTIFICATION

The subject is Amity Court, a multi-tenant low-rise office property totaling 16,796 SF NRA located on a 0.99-acre site at 14400 Northeast Bellevue-Redmond Road in Bellevue, King County, Washington. The assessor's parcel number is: 272505-9147.

The legal description of the subject property is as follows:

> Beginning on the East line of said subdivision at its intersection with the Northerly line of the Bellevue-Redmond Road; Thence North 00°58'16" East along said East line 280.00 feet to the True Point of Beginning; Thence North 88°16'05" West parallel to the North line of said section 150.00 feet; Thence South 00°58'16" West parallel to the East line of said subdivision to the Northerly margin of Northup Road (Bellevue-Redmond Road); Thence Easterly along said margin to the East line of said subdivision; Thence North 00°58'16" East along said East line to the True Point of Beginning.

## SCOPE OF WORK

The scope of work for this appraisal assignment is outlined below:

- The appraisers analyzed the regional and local area economic profiles including employment, population, household income, and real estate trends.

- The appraisers confirmed and analyzed legal and physical features of the subject, and how they impact the functionality and overall competitive position of the property.

- The appraisers completed an office supply/demand market analysis of the Seattle/Puget Sound market and Suburban Bellevue sub-market. Conclusions were drawn regarding the subject property's competitive position given its physical and locational characteristics, the prevailing economic conditions and external influences.

- The appraisers conducted Highest and Best Use analysis and conclusions were drawn for the highest and best use of the subject property As-Vacant and As-Improved.

- The appraisers confirmed and analyzed financial features of the subject property. This information, as well as trends established by confirmed market indicators, was used to forecast performance of the subject property.

- Selection of the valuation methods was based on the identifications required in USPAP relating to the intended use, intended users, definition and date of value, relevant property characteristics and assignment conditions. This appraisal developed the Income (Direct Capitalization) and Sales Comparison approaches to value, which were adjusted and reconciled as appropriate.

- Reporting of this appraisal is in an Appraisal Report format as required in USPAP Standard 2. The appraiser's analysis and conclusions are summarized within this document.

- We understand the Competency Rule of USPAP and the authors of this report meet the standards.

- No one provided significant real property appraisal assistance to appraisers signing this certification.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES                            6

## SOURCES OF INFORMATION

The following sources were contacted to obtain relevant information:

| SOURCES OF INFORMATION | |
|---|---|
| **ITEM** | **SOURCE** |
| Tax Information | King County Tax Records |
| Zoning Information | City of Bellevue Zoning Code |
| Site Size Information | King County Property Records |
| Building Size Information | King County Property Records |
| Flood Map | InterFlood |
| Demographics | Pitney Bowes/Gadberry Group - GroundView® |
| Comparable Information | See Comparable Datasheets for details |
| Legal Description | Quit Claim Deed from King County Register of Deeds |
| Other Property Data | King County Property Records |
| Rent Roll (Dated 9/13/2024) | Owner |
| Income/Expense Statements | Owner |

## SUBJECT PROPERTY INSPECTION

The following table illustrates the Colliers International professionals involved with this appraisal report and their status related to the property inspection.

| SUBJECT PROPERTY INSPECTION | | | |
|---|---|---|---|
| **APPRAISER** | **INSPECTED** | **EXTENT** | **DATE OF INSPECTION** |
| Joseph Liss | Yes | Interior/Exterior | September 18, 2024 |
| Reid Erickson, MAI | No | - | - |

Not all suites were available for inspection. It is our understanding that the remaining (non-inspected) tenant spaces are in similar condition to those inspected, with no interior deferred maintenance present in the other units.

## CLIENT IDENTIFICATION

The client of this specific assignment is Axos Bank.

## PURPOSE

The purpose of this appraisal is to develop opinions of the As-Is Market Value and Prospective Value Upon Stabilization of the subject property's leased fee interest. At the request of the client, we have also completed an Insurable Replacement Cost Estimate.

## INTENDED USE

The intended use of this appraisal is for loan underwriting and-or credit decisions by Axos Bank and-or participants.

## INTENDED USERS

Intended users of this report include Axos Bank and-or affiliates. Use of this report by third parties and other unintended users is not permitted. This report must be used in its entirety. Reliance on any portion of the report independent of others, may lead the reader to erroneous conclusions regarding the property values. Unless approval is provided by the authors no portion of the report stands alone.

## ASSIGNMENT DATES

| | |
|---|---|
| Date of Report | September 30, 2024 |
| Date of Inspection | September 18, 2024 |
| Valuation Date - As-Is | September 18, 2024 |

## PERSONAL AND/OR INTANGIBLE PROPERTY

No personal property or intangible items are included in this valuation.

## PROPERTY AND SALES HISTORY

**Current Owner**

The subject title is currently recorded in the name of Amity Court LLC, who acquired title to the property on September 15, 2021, as recorded in document number 20210915000496 of the King County Deed Records. This appears to be only a reassignment between entities of the same owner. The last arms-length sale was dated August 18, 2021 for $9,500,000. This appears to have been an above-market price, based on our value conclusion.

**Three-Year Sales History**

The subject property has not transferred during the past three years of the effective date of value stated in this report.

**Subject Sale Status**

The subject property is not under a current agreement of sale or option and is not currently offered for sale on the open market.

## DEFINITIONS OF VALUE

Given the scope and intended use of this assignment, the definition of Market Value is applicable. The definition of Market Value, along with all other applicable definitions for this assignment, is located in the Valuation Glossary section of the Addenda (see Interagency Guidelines definition).

## PROPERTY RIGHTS APPRAISED

The property rights appraised constitute the leased fee interest.

## VALUE SCENARIOS

The valuation scenarios developed in this appraisal report include the As-Is Market Value of the subject property's leased fee interest. At the request of the client, we have also completed an Insurable Replacement Cost Estimate.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES                        8

## REGIONAL MAP



## LOCAL AREA MAP



## REGIONAL ANALYSIS

The Seattle-Tacoma-Bellevue, WA Metropolitan Statistical Area is in western Washington. The population was 4,018,762, according to the 2020 U.S. census. The MSA, also known as the Seattle metropolitan area, is comprised of three counties: King, Snohomish, and Pierce. The largest cities in the MSA are Seattle, Tacoma, Bellevue, and Everett. The Seattle metropolitan area is in the Puget Sound region, an arrangement of peninsulas and islands in the coastal area of the Pacific Northwest.



The most prominent industries in the Seattle metropolitan area are older industrial companies, as well as technological, aerospace, and service industries. The Port of Seattle is the third largest container gateway in North America. Several Fortune 500 companies are headquartered in the region, including Starbucks, Nordstrom, Costco, Microsoft, and Amazon. Notable biotechnology companies, such as Corixa and Immunex, are behind large development projects in the region. The Boeing Company's largest division operates aircraft manufacturing plants that are a notable source of employment.

In the southern portion of the MSA, the economy is largely dependent on industrial and manufacturing businesses. Tacoma is home to both Simpson Investment Company and to the U.S. Oil and Refining Company. The Seattle-Tacoma-Bellevue, WA MSA is also considered a hub for healthcare, with the presence of important medical foundations, research centers, and hospitals. The Bill & Melinda Gates Foundation, Fred Hutchinson Research Center, and Washington Global Health Alliance are all headquartered in the region. The St. Joseph Medical Center, Multicare Health System, The University of Washington Medical Center, and Harborview Medical Center are prominent hospitals that serve the area.

## DEMOGRAPHIC ANALYSIS

The following is a demographic study of the region sourced by Pitney Bowes/Gadberry Group - GroundView®, an on-line resource center that provides information used to analyze and compare the past, present, and future trends of geographical areas. Demographic changes are often highly correlated to changes in the underlying economic climate. Periods of economic uncertainty necessarily make demographic projections somewhat less reliable than projections in more stable periods. These projections are used as a starting point, but we also consider current and localized market knowledge in interpreting them within this analysis. Please note that our demographics provider sets forth income projections in constant dollars which, by definition, reflect projections after adjustment for inflation. We are aware of other prominent demographic data providers that project income in current dollars, which do not account for inflation. A simple comparison of projections for a similar market area made under the constant and current dollar methodologies can and likely will produce data points that vary, in some cases, widely. Further, all forecasts, regardless of demographer methodology(ies), are subjective in the sense that the reliability of the forecast is subject to modeling and definitional assumptions and procedures.

| REGIONAL AREA DEMOGRAPHICS | | | | | | | |
|---|---|---|---|---|---|---|---|
| YEAR | US | WA | CBSA | YEAR | US | WA | CBSA |
| **POPULATION** | | | | **NUMBER OF HOUSEHOLDS** | | | |
| 2020 Total Population | 331,511,481 | 7,724,031 | 4,027,487 | 2023 | 129,837,191 | 3,044,531 | 1,596,864 |
| 2023 Total Population | 334,487,687 | 7,816,676 | 4,037,629 | 2028 | 134,514,493 | 3,183,732 | 1,664,192 |
| 2028 Total Population | 342,734,214 | 8,142,724 | 4,195,324 | CAGR | 0.7% | 0.9% | 0.8% |
| 2020 - 2023 CAGR | 0.3% | 0.4% | 0.1% | **AVERAGE HOUSEHOLD SIZE** | | | |
| 2023 - 2028 CAGR | 0.5% | 0.8% | 0.8% | 2023 | 2.51 | 2.52 | 2.48 |
| **POPULATION DENSITY** | | | | 2028 | 2.49 | 2.51 | 2.48 |
| 2023 Per Square Mile | 93 | 115 | 663 | CAGR | (0.21%) | (0.06%) | (0.05%) |
| 2028 Per Square Mile | 95 | 120 | 689 | **HOUSING UNITS** | | | |
| **MEDIAN AGE** | | | | Owner Occupied | 81,813,679 | 1,883,807 | 924,384 |
| 2023 | 38.82 | 38.16 | 37.30 | Renter Occupied | 48,023,512 | 1,160,724 | 672,480 |
| 2028 | 39.66 | 38.95 | 38.05 | **AVERAGE HOUSEHOLD INCOME** | | | |
| CAGR | 0.43% | 0.41% | 0.40% | 2023 | $106,372 | $122,114 | $142,647 |
| **MEDIAN HOME VALUE** | | | | 2028 | $129,361 | $146,350 | $168,629 |
| 2023 | $244,554 | $396,052 | $517,711 | CAGR | 4.0% | 3.7% | 3.4% |
| **PER CAPITA INCOME** | | | | **MEDIAN HOUSEHOLD INCOME** | | | |
| 2023 | $42,322 | $48,514 | $57,484 | 2023 | $74,269 | $88,635 | $105,203 |
| 2028 | $52,008 | $58,320 | $68,112 | 2028 | $91,864 | $107,640 | $127,655 |
| CAGR | 4.2% | 3.8% | 3.5% | CAGR | 4.3% | 4.0% | 3.9% |

Source: Pitney Bowes/Gadberry Group - GroundView ®

## Population

According to Pitney Bowes/Gadberry Group - GroundView®, a Geographic Information System (GIS) Company, the Seattle-Tacoma-Bellevue metropolitan area had a 2023 total population of 4,037,629 and experienced an annual growth rate of 0.1%, which was lower than the Washington annual growth rate of 0.4%. The metropolitan area accounted for 51.7% of the total Washington population (7,816,676). Within the metropolitan area the population density was 663 people per square mile compared to the lower Washington population density of 115 people per square mile and the lower United States population density of 93 people per square mile. The 2023 median age for the metropolitan area was 37.30, which was 4.07% younger than the United States median age of 38.82 for 2023. The median age in the metropolitan area is anticipated to grow by 0.40% annually, increasing the median age to 38.05 by 2028.

## Education

The Seattle metropolitan area is home to several institutions of higher education. The most prominent university in the area is the University of Washington, one of the oldest on the west coast. The University of Washington has an annual enrollment of approximately 45,200 students and its research budget has surpassed $1 billion. The institution has been consistently ranked among the top 20 universities internationally by the Academic Ranking of World Universities and is renowned for its graduate programs in medicine and clinical psychology. The region is also home to Everett Community College, a college that offers degrees in science, business, and general studies. The annual enrollment for the college is of approximately 19,600 students and its main campus is in north Everett. Bellevue College is another institution of higher learning in the MSA, with an annual enrollment of 37,000 students. The college offers four-year bachelor's degrees focused on scientific disciplines, healthcare technology management, imaging sciences, and information systems.

## Household Trends

The 2023 number of households in the metropolitan area was 1,596,864. The number of households in the metropolitan area is projected to grow by 0.8% annually, increasing the number of households to 1,664,192 by 2028. The 2023 average household size for the metropolitan area was 2.48, which was 1.27% smaller than the United States average household size of 2.51 for 2023. The average household size in the metropolitan area is

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

12

anticipated to decrease by 0.05% annually, reducing the average household size by 2028. The Seattle-Tacoma-Bellevue metropolitan area had 42.11% renter occupied units, compared to the lower 38.12% in Washington and the lower 36.99% in the United States.

## Income Trends

The 2023 median household income for the metropolitan area was $105,203, which was 41.7% higher than the United States median household income of $74,269. The median household income for the metropolitan area is projected to grow by 3.9% annually, increasing the median household income to $127,655 by 2028. As is often the case when the median household income levels are higher than the national average, the cost of living index is also higher. According to the American Chamber of Commerce Researchers Association (ACCRA) Cost of Living Index, the Seattle-Tacoma-Bellevue, WA MSA's cost of living is 146.5 compared to the national average score of 100. The ACCRA Cost of Living Index compares groceries, housing, utilities, transportation, health care and miscellaneous goods and services for over 300 urban areas.



**Consumer Spending Seattle-Tacoma-Bellevue**

Health Care, 22.31%
Hsld Furnishings, 11.55%
Auto Maint., 0.37%
Apparel, 7.47%
Computers, 2.64%
Education, 5.43%
Entertainment, 15.36%
Food at Home, 21.98%
Eating Out, 12.88%



**Consumer Spending Comparison Average Household**

Legend: United States, Washington, Seattle-Tacoma-Bellevue

Categories: Apparel, Computers, Education, Entertainment, Food at Home, Eating Out, Health Care, Hsld Furnishings, Auto Maint.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

13

## EMPLOYMENT

Total employment has increased annually over the past decade in the state of Washington by 1.80% and increased annually by 1.84% in the area. From 2022 to 2023 unemployment experienced a slight change in Washington and increased by 0.2% in the area. In the state of Washington unemployment has increased over the previous month by 0.4% and increased by 0.2% in the area.

| EMPLOYMENT & UNEMPLOYMENT STATISTICS 2014 - 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **TOTAL EMPLOYMENT** | | | | | **UNEMPLOYMENT RATE** | | |
| | Washington | | Seattle-Tacoma-Bellevue, WA Metropolitan Statistical Area | | United States* | Washington | Seattle-Tacoma-Bellevue, WA Metropolitan Statistical Area |
| Year | Total | % Δ Yr Ago | Total | % Δ Yr Ago | | | |
| 2014 | 3,287,904 | 1.8% | 1,848,821 | 2.3% | 6.2% | 5.9% | 5.1% |
| 2015 | 3,361,249 | 2.2% | 1,889,699 | 2.2% | 5.3% | 5.4% | 4.6% |
| 2016 | 3,459,527 | 2.9% | 1,945,781 | 3.0% | 4.9% | 5.2% | 4.3% |
| 2017 | 3,554,754 | 2.8% | 1,988,062 | 2.2% | 4.4% | 4.6% | 4.0% |
| 2018 | 3,645,992 | 2.6% | 2,042,198 | 2.7% | 3.9% | 4.4% | 3.7% |
| 2019 | 3,794,004 | 4.1% | 2,119,427 | 3.8% | 3.7% | 4.2% | 3.2% |
| 2020 | 3,560,168 | (6.2%) | 1,976,449 | (6.7%) | 8.1% | 8.5% | 8.4% |
| 2021 | 3,667,123 | 3.0% | 2,048,202 | 3.6% | 5.3% | 5.2% | 4.7% |
| 2022 | 3,806,848 | 3.8% | 2,142,067 | 4.6% | 3.6% | 4.1% | 3.5% |
| 2023 | 3,860,883 | 1.4% | 2,179,394 | 1.7% | 3.6% | 4.1% | 3.7% |
| **CAGR** | **1.80%** | - | **1.84%** | - | - | - | - |

Source: U.S. Bureau of Labor Statistics    *Unadjusted Non-Seasonal Rate



The preceding chart depicts unemployment trends in the region, Washington, and the U.S. Overall levels of unemployment in the region experienced a minor increase throughout the past three months. By the end of July 2024, unemployment in the region was 0.1% lower than Washington's and 0.5% higher than the national average.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

| TOP EMPLOYERS | | |
|---|---|---|
| **EMPLOYER NAME** | **EMPLOYEES** | **INDUSTRY** |
| Amazon.com Inc. | 87,000 | Wholesale/Retail Trade |
| The Boeing Company | 66,797 | Manufacturing |
| Microsoft Corporation | 55,119 | Professional/Scientific/Technical Services |
| Joint Base Lewis-McChord | 54,025 | Public Administration |
| University of Washington Seattle | 53,305 | Education |

Source: https://www.bizjournals.com

The preceding chart depicts the top employers in the Seattle-Tacoma-Bellevue, WA MSA. Principal employers are spread throughout diverse sectors, including wholesale/retail trade, manufacturing, and professional/scientific/technical services. The largest employer is Amazon.com Inc., the multinational technology company that focuses on e-commerce, cloud computing, digital streaming, and artificial intelligence. The Boeing Company is the second largest employer. Boeing is a multinational corporation that designs, manufactures, and sells aerospace products around the world. Microsoft Corporation is the third largest employer. Microsoft is a multinational technology company headquartered in Redmond, which develops, manufactures, licenses, supports and sells computer software/hardware and services.

## AIRPORT STATISTICS

The following chart summarizes the local airport statistics.

| SEATTLE-TACOMA INTERNATIONAL AIRPORT (SEA) | | |
|---|---|---|
| **YEAR** | **ENPLANED PASSENGERS** | **% CHG** |
| 2012 | 16,121,123 | - |
| 2013 | 16,690,295 | 3.5% |
| 2014 | 17,888,080 | 7.2% |
| 2015 | 20,148,980 | 12.6% |
| 2016 | 21,887,110 | 8.6% |
| 2017 | 22,639,124 | 3.4% |
| 2018 | 24,024,908 | 6.1% |
| 2019 | 25,001,762 | 4.1% |
| 2020 | 9,462,411 | (62.2%) |
| 2021 | 17,430,195 | 84.2% |
| 2022 | 22,157,862 | 27.1% |

Source: U.S. Department of Transportation

## SUMMARY

The Seattle-Tacoma-Bellevue, WA MSA has a diverse economical foundation. The large concentration of technological and service-based industries in the region has an undeniably positive impact on the MSA's economic stability. The region is home to numerous company headquarters in the healthcare and biotechnology sectors, adding a strong component of innovation and competitiveness to the local economy. The strength of the Seattle metropolitan area's economy and the varied means of employment that attracts permanent residents, tourists, and businesses are main factors for the region's commercial growth. All these are positive trends that show signs of improvement recently and in the near future.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## LOCAL AREA ANALYSIS

In this section of the report, we provide details about the local area and describe the influences that bear on the real estate market as well as the subject property. Below are insights into the local area based on fieldwork, interviews, demographic data and experience working in this market.

## LOCAL AREA PROFILE

The subject property is in Bellevue, Washington, within King County. According to the 2020 census, the population was 151,854. The city is in the eastern portion of the county, east of Seattle across Lake Washington. Bellevue is connected to Seattle by two floating bridges: the Evergreen Point Floating Bridge, and the Lacey V. Murrow Memorial Floating Bridge on Interstate 90. The city is bordered by Lake Washington and the cities of Clyde Hill and Medina to the west, Lake Sammamish to the east, Kirkland to the north and Newcastle to the south. Bellevue is served by Interstates 90 and 405. The Port of Seattle, the second largest container port in the United States, is approximately 13 miles southwest of Bellevue. Air transportation is provided by Seattle-Tacoma International Airport, approximately 21 miles southwest of Bellevue's central business district.

## DEMOGRAPHIC PROFILE

Below is a demographic study of the area, sourced by Pitney Bowes/Gadberry Group - GroundView®, an on-line resource center that provides information used to analyze and compare the past, present, and future trends of properties and geographical areas. Please note that our demographics provider sets forth income projections in constant dollars which, by definition, reflect projections after adjustment for inflation. We are aware of other prominent demographic data providers that project income in current dollars, which do not account for inflation. A simple comparison of projections for a similar market area made under the constant and current dollar methodologies can and likely will produce data points that vary, in some cases, widely. Further, all forecasts, regardless of demographer methodology(ies), are subjective in the sense that the reliability of the forecast is subject to modeling and definitional assumptions and procedures.

## LOCAL AREA DEMOGRAPHICS

| DESCRIPTION | 1 MILE | 3 MILES | 5 MILES | DESCRIPTION | 1 MILE | 3 MILES | 5 MILES |
|---|---|---|---|---|---|---|---|
| **POPULATION** | | | | **AVERAGE HOUSEHOLD INCOME** | | | |
| 2010 Population | 16,652 | 102,336 | 214,846 | 2023 | $157,859 | $187,630 | $194,632 |
| 2020 Population | 21,086 | 126,197 | 262,353 | 2028 | $183,841 | $213,607 | $220,004 |
| 2023 Population | 21,540 | 127,180 | 263,475 | Change 2023-2028 | 16.46% | 13.84% | 13.04% |
| 2028 Population | 23,981 | 136,076 | 277,279 | **MEDIAN HOUSEHOLD INCOME** | | | |
| Change 2010-2020 | 26.63% | 23.32% | 22.11% | 2023 | $125,504 | $148,198 | $157,965 |
| Change 2020-2023 | 2.15% | 0.78% | 0.43% | 2028 | $154,991 | $183,651 | $191,974 |
| Change 2023-2028 | 11.33% | 6.99% | 5.24% | Change 2023-2028 | 23.49% | 23.92% | 21.53% |
| **POPULATION 65+** | | | | **PER CAPITA INCOME** | | | |
| 2020 Population | 2,500 | 16,601 | 34,571 | 2023 | $72,323 | $82,378 | $82,335 |
| 2023 Population | 2,562 | 16,837 | 34,906 | 2028 | $85,399 | $94,966 | $94,058 |
| 2028 Population | 3,009 | 19,590 | 40,416 | Change 2023-2028 | 18.08% | 15.28% | 14.24% |
| Change 2020-2023 | 2.48% | 1.42% | 0.97% | **2023 HOUSEHOLDS BY INCOME** | | | |
| Change 2023-2028 | 17.45% | 16.35% | 15.79% | <$15,000 | 9.9% | 6.0% | 4.9% |
| **NUMBER OF HOUSEHOLDS** | | | | $15,000-$24,999 | 2.8% | 3.4% | 3.1% |
| 2010 Households | 7,251 | 43,697 | 89,675 | $25,000-$34,999 | 3.3% | 2.7% | 2.9% |
| 2020 Households | 9,554 | 53,161 | 106,937 | $35,000-$49,999 | 5.6% | 4.4% | 4.4% |
| 2023 Households | 10,094 | 55,121 | 110,288 | $50,000-$74,999 | 9.2% | 7.9% | 7.8% |
| 2028 Households | 11,366 | 59,774 | 117,334 | $75,000-$99,999 | 11.9% | 8.7% | 8.1% |
| Change 2010-2020 | 31.76% | 21.66% | 19.25% | $100,000-$149,999 | 15.4% | 17.4% | 16.5% |
| Change 2020-2023 | 5.65% | 3.69% | 3.13% | $150,000-$199,999 | 16.6% | 13.4% | 14.0% |
| Change 2023-2028 | 12.60% | 8.44% | 6.39% | $200,000 or greater | 25.2% | 36.0% | 38.2% |
| **HOUSING UNITS (2023)** | | | | **MEDIAN HOME VALUE** | $716,170 | $907,652 | $956,861 |
| Owner Occupied | 2,663 | 22,780 | 54,056 | **AVERAGE HOME VALUE** | $841,551 | $1,091,942 | $1,190,823 |
| Renter Occupied | 7,423 | 32,329 | 56,200 | **HOUSING UNITS BY UNITS IN STRUCTURE** | | | |
| **HOUSING UNITS BY YEAR BUILT** | | | | 1, detached | 1,611 | 19,999 | 49,414 |
| Built 2010 or later | 2,335 | 7,894 | 14,901 | 1, attached | 884 | 3,089 | 6,450 |
| Built 2000 to 2009 | 798 | 6,838 | 14,782 | 2 | 120 | 807 | 1,239 |
| Built 1990 to 1999 | 1,045 | 6,297 | 15,233 | 3 or 4 | 929 | 3,128 | 5,521 |
| Built 1980 to 1989 | 1,530 | 7,879 | 17,164 | 5 to 9 | 1,359 | 5,040 | 8,552 |
| Built 1970 to 1979 | 2,633 | 11,285 | 20,646 | 10 to 19 | 637 | 3,476 | 6,821 |
| Built 1960 to 1969 | 1,384 | 9,054 | 15,021 | 20 to 49 | 1,259 | 4,357 | 8,091 |
| Built 1950 to 1959 | 233 | 4,947 | 9,068 | 50 or more | 3,279 | 15,163 | 23,665 |
| Built 1940 to 1949 | 1 | 351 | 1,404 | Mobile home | 7 | 17 | 456 |
| Built 1939 or earlier | 133 | 577 | 2,069 | Boat, RV, van, etc. | 0 | 33 | 46 |

Source: Pitney Bowes/Gadberry Group - GroundView ®

## Transportation Routes

Major traffic arteries are shown in the chart below:

## MAJOR ROADWAYS & THOROUGHFARES

| HIGHWAY | DIRECTION | FUNCTION | DISTANCE FROM SUBJECT |
|---|---|---|---|
| Interstate 405 | north-south | Interstate Highway | This is within three miles of the subject property. |
| State Route 520 | east-west | Local Highway | This is within one mile of the subject property. |
| Interstate 90 | east-west | Interstate Highway | This is within four miles of the subject property. |
| Interstate 5 | north-south | Interstate Highway | This is within 10 miles of the subject property. |
| **SURFACE STREETS** | **DIRECTION** | **FUNCTION** | **DISTANCE FROM SUBJECT** |
| Northeast Bellevue-Redmond Road | east-west | Secondary Arterial | The subject property fronts this street. |

Public transportation is available near the subject property. The immediate area is served by King County Metro with bus stops on Bel-Red Road, 148th Avenue Northeast, and 140th Avenue Northeast.

## Economic Factors

Bellevue is home to the headquarters of large corporations, many of which are within the technology sector. It has since become a high-technology and retail center on the eastside of Lake Washington, with approximately 140,000 job opportunities. A diversified mix of industries exists in Bellevue, with retail and service sectors being the most prominent. In the service sector, a high concentration of real estate companies, engineering firms,

financial institutions and accounting firms are based in the city. There are many high-technology firms in Bellevue with market incursions in software development and network services. Companies in the city include Microsoft, Expedia, Puget Sound Energy, and PACCAR. The city has numerous commercial districts, including three high-end shopping centers aside from Bellevue Square: Factoria Mall, Crossroads Mall, and the Overlake Shopping District.

## Community Services
Community services and facilities are readily available in the surrounding area. These include public services such as fire stations, hospitals, police stations, and schools (all ages).

## IMMEDIATE AREA PROFILE

This section discusses uses and development trends in the immediate area that directly impact the performance and appeal of the subject property.

### Predominant Land Uses
Significant development in the immediate area consists of office and industrial uses along major arterials that are interspersed with multi-family complexes and single-family residential development removed from arterials.

The subject property is in northern Bellevue, approximately one mile south of State Route 520 and three miles east of Interstate 405. Retail uses in the area include Supreme Dumplings, IHOP, 85°C Bakery Cafe, Asian Family Market Bellevue, and Sun Sui Wah Seafood Restaurant. Office uses consist of King East DCFS Office, Washington State Department of Social and Health Services Office, Bellevue Mini City Hall, Bellevue Resource Management, and Washington State Department of Labor and Industries. Industrial development near the subject includes Data Blanket Incorporated, Columbia NW Pharmaceuticals, Second May International, Advanced Micro Devices Incorporated, and Dynotag Incorporated. Residential uses in the immediate area are mobile homes, single-family, and multi-family properties, including Modera Overlake, Colonial Square Apartment Homes, Cascadian Apartments, Highland Village Apartments, and The Village at Overlake Station. Schools within a two-mile radius include Sarodgini Academy Private Elementary School, Bellevue Children's Academy, Stevenson Elementary School, Odle Middle School, and Puesta Del Sol Elementary School. The subject is approximately 13 miles northeast of Renton Municipal Airport and four miles north of Eastern Washington University at Bellevue College. Overlake Medical Center is approximately two miles southwest of the subject.

## SUBJECT PROPERTY ANALYSIS

The following discussion draws context and analysis on how the subject property is influenced by the local and immediate areas.

### Subject Property Analysis
The uses adjacent to the property are noted below:

- › **North -** Retail Development
- › **South -** Northeast Bellevue-Redmond Road, Single-Family Residential Neighborhood
- › **East –** Medical Office Development
- › **West –** Bellevue Family YMCA

### Access
The subject site has frontage on an arterial. Based on our field work, the subject's access is rated average/good compared to other properties with which it competes.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

**Visibility**

The subject is clearly visible in both directions along the street. The visibility of the property is not hampered by adjacent properties, trees or other obstructions. In comparison to competitive properties, the subject property has average visibility.

**Subject Conclusion**

Trends in the local and immediate areas, adjacent uses and the property's specific location features indicate an overall typical external influence for the subject, which is concluded to have a good position in context of competing properties.

## SUMMARY

Bellevue is considered a business hub across Lake Washington from Seattle. The city has a dynamic business community and is home to a diverse group of industries. Bellevue has a strategic location with convenient connections to well-traveled transportation networks. The condition and appeal of the market is good.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES                                     19

## PLAT MAP



## GIS AERIAL MAP



25-00246-WLH11    Doc 10    Filed 02/19/25    Entered 02/19/25 16:03:51    Pg 35 of 189

## ZONING MAP



25-00340-WLH11   Doc 18   Filed 02/18/25   Entered 02/19/25 16:03:51   Pg 36 of 189

## FLOOD MAP



**MAP DATA**

FEMA Special Flood Hazard Area: **No**
Map Number: 53033C0360G
Zone: **X**
Map Date: **August 19, 2020**
FIPS: 53033

**MAP LEGEND**

| | |
|---|---|
| Areas inundated by 500-year flooding | Protected Areas |
| Areas inundated by 100-year flooding | Floodway |
| Velocity Hazard | Subject Area |

## FLOOR PLANS



**FIRST FLOOR**



**SECOND FLOOR**

## SITE DESCRIPTION

**General Description**    The subject site consists of 1 parcel. As noted below, the subject site has 43,200 SF (0.99 AC) of land area. The area is estimated based on the assessor's parcel map, and may change if a professional survey determines more precise measurements.

**Assessor Parcel**    272505-9147

**Number Of Parcels**    1

| Land Area | Acres | Square Feet |
|---|---|---|
| Primary Parcel | 0.99 | 43,200 |
| Unusable Land | 0.00 | 0 |
| Excess Land | 0.00 | 0 |
| Surplus Land | 0.00 | 0 |
| **Total Land Area** | **0.99** | **43,200** |

**Shape**    Generally Rectangular - See Plat Map For Exact Shape

**Topography**    Sloping at street grade

**Drainage**    Assumed Adequate

**Utilities**    All available to the site

| Street Improvements | Street | Direction | No. Lanes | Street Type | Curbs | Sidewalks | Streetlights | Center Lane | Gutters |
|---|---|---|---|---|---|---|---|---|---|
| Northeast Bellevue-Redmond Road | Secondary Stree | two-way | two-lane | minor arterial | ✓ | ✓ | ✓ | ✓ | ✓ |

**Frontage**    The subject has approximately 160 feet of frontage on Northeast Bellevue-Redmond Road.

**Accessibility**    The accessibility of the subject is rated as average/good. The subject is accessed from one street, with the main entrance and primary point of ingress/egress being Northeast Bellevue-Redmond Road. Major transportation arterials within proximity to the subject include State Route 520 and Interstate 405, providing linkage to the surrounding area.

**Exposure**    The subject has average exposure, as it is located along a minor arterial. The project's exposure rating takes into account its average visibility and its average traffic count.

**Seismic**    Very High Risk

**Flood Zone**    Zone X (Unshaded). This is referenced by Community Number 530074, Panel Number 53033C0369G, dated August 19, 2020. Zone X (unshaded) is a moderate and minimal risk area. Areas of moderate or minimal hazard are studied based upon the principal source of flood in the area. However, buildings in these zones could be flooded by severe, concentrated rainfall coupled with inadequate local drainage systems. Local stormwater drainage systems are not normally considered in a community's flood insurance study. The failure of a local drainage system can create areas of high flood risk within these zones. Flood insurance is available in participating communities, but is not required by regulation in these

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

zones. Nearly 25-percent of all flood claims filed are for structures located within these zones. Minimal risk areas outside the 1-percent and .2-percent-annual-chance floodplains. No BFEs or base flood depths are shown within these zones. (Zone X (unshaded) is used on new and revised maps in place of Zone C.)

**Site Rating**

Overall, the subject site is considered a good office site in terms of its location, exposure, and access to employment, education and shopping centers, recognizing its location along a minor arterial.

**Easements**

A preliminary title report was not available for review. During the on-site inspection, no adverse easements or encumbrances were noted. This appraisal assumes that there is no negative value impact on the subject improvements. If questions arise regarding easements, encroachments, or other encumbrances, further research is advised.

**Soils**

A detailed soils analysis was not available for review. Based on the development of the subject, it appears the soils are stable and suitable for the existing improvements.

**Hazardous Waste**

We have not conducted an independent investigation to determine the presence or absence of toxins on the subject property. If questions arise, the reader is strongly cautioned to seek qualified professional assistance in this matter. Please see the Assumptions and Limiting Conditions for a full disclaimer.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## IMPROVEMENT DESCRIPTION

The subject improvements consist of a 2-story office building (no elevator), and its supportive parking area. The information presented below is a basic description of the existing improvements using sources deemed dependable for this analysis. It is assumed that there are no hidden defects, and that all structural components are functional and operational, unless otherwise noted.

| | |
|---|---|
| **Property Type** | Office - Low-Rise Office |
| **Design** | Multi-Tenant Occupied By Third-Party Tenants - 24 Tenant Spaces |
| **Number of Buildings** | 1 |
| **Number of Stories** | 2 |
| **Net Rentable Area (NRA)** | 16,796 SF |
| **Gross Building Area (GBA** | 17,386 SF |
| **Floor Plate** | 8,693 SF |
| **Building Class** | D |
| **Site Coverage Ratio** | 20.1% |
| **Land to Building Ratio** | 2.5 : 1 |
| **Parking** | 73 (Surface) 4.3/1,000 SF NRA |
| **Year Built** | 1978 |
| **Age/Life Analysis** | |
| Actual Age | 46 Years |
| Effective Age | 43 Years |
| Economic Life | 45 Years |
| Remaining Life | 2 Years |
| **Quality** | Average |
| **Condition** | Average |
| | |
| **Basic Construction** | Wood frame |
| **Foundation** | Poured concrete slab |
| **Framing** | Wood post and beam |
| **Exterior Walls** | Wood Siding |
| **Roof** | Sealed membrane |
| **Insulation** | Assumed to be standard and to code for both walls and ceilings |
| **Heating** | Warmed and cooled air |
| **Air Conditioning** | HVAC |
| **Lighting** | Fluorescent and Incandescent |
| **Interior Walls** | Drywall |
| **Electrical** | Assumed adequate and to-code. |
| **Ceilings** | 2 x 4 acoustical tile |

| | |
|---|---|
| **Windows** | Standard windows; glass in aluminum frames |
| **Doors** | Glass in metal frame, interior doors are hollow wood/metal in metal frames |
| **Flooring** | Commercial carpet |
| **Plumbing** | Standard plumbing for a low-rise office building |
| **Fire Protection** | The subject has smoke alarms but does not have a fire sprinkler system. |
| **Security** | Video surveillance and alarm system |
| **Elevators** | None noted |
| **Landscaping** | Asphalt paving, concrete sidewalks, concrete curbing, pole mounted lights and low maintenance sprinklered landscaping |
| **Signage** | There is a monument style sign visible along Northeast Bellevue-Redmond Road at the entrance to the subject. |
| **Parking** | The subject property has an asphalt paved parking lot that is in good condition. The subject's parking lot provides a ratio of 4.2 spaces per 1,000 SF, which is a moderate to high ratio for office uses. |
| **Deferred Maintenance** | Based on our interview with the property manager and the onsite inspection by the field appraiser, no observable deferred maintenance exists. |
| **Functional Design** | The subject improvements offer average utility to the tenants. The quality and condition of the property are suitable for lower-rent suites and shorter lease terms, and will attract primarily tenants who are looking for the cheapest rent possible and will not object to a 2nd-floor walk-up office. The site coverage and parking ratios are within market standards. Overall, the subject has a functional design considering the site and building configurations. |

## ASSESSMENT & TAXATION

The subject property is located within the King County municipality. The assessed value and property tax for the current year are summarized in the following table.

| ASSESSMENT & TAXES | | | | | | |
|---|---|---|---|---|---|---|
| Tax Year | 2023 Payable 2024 | | | Levy Rate | | $7.80884 |
| Levy Code | 0330 | | | Taxes Current | | Yes |
| Taxes SF Basis | Net Rentable Area | | | | | |
| **APN** | **LAND** | **IMPV** | **TOTAL** | **EXEMPTIONS** | **TAXABLE** | **BASE TAX** |
| 272505-9147 | $5,832,000 | $2,358,100 | $8,190,100 | $0 | $8,190,100 | $63,955 |
| **Totals** | **$5,832,000** | **$2,358,100** | **$8,190,100** | **$0** | **$8,190,100** | **$63,955** |
| **Total/SF** | **$347.23** | **$140.40** | **$487.62** | **$0.00** | **$487.62** | **$3.81** |
| Additional Tax Charges | | | | | | |
| Noxious Weed | | | | | | $6.63 |
| Conservation | | | | | | $12.6 |
| **Total Additional Tax Charges** | | | | | | **$19.3** |
| **Total Additional Tax Charges Per SF** | | | | | | **$0.00** |
| **Total Base Tax & Additional Tax Charges** | | | | | | **$63,974** |
| **Total Base Tax & Additional Tax Charges Per SF** | | | | | | **$3.81** |

Source: King County Assessment & Taxation

### Subject Property Analysis

The total taxable value for the subject property is $8,190,100 or $487.62/SF. There are no exemptions in place. Total taxes for the property are $63,974 or $3.81/SF. The current assessed value is 105.3% of our concluded market value. The assessed value included both land and improvement value, whereas our value conclusion is based on land value and the site's redevelopment potential. The assessor's estimate does not yet reflect the declining viability of the improvements, which can only command rental income at the low end of market range.

As part of the scope of work, we researched assessment and tax information related to the subject property. The following are key factors related to local assessment and taxation policy. Real property in King County is assessed at 100% of market value. Real property is reassessed annually. The next scheduled reassessment date is January 1, 2025. In addition to scheduled reassessments, properties in King County are reassessed upon conversion, renovation or demolition.

According to the King County treasury's office, real estate taxes for the subject property are current as of the date of this report.

## ZONING ANALYSIS

The zoning characteristics for the subject property are summarized below:

| ZONING SUMMARY | |
| --- | --- |
| Municipality Governing Zoning | City of Bellevue Planning & Zoning Department |
| Current Zoning | BelRed-Commercial/Residential District (BR-CR) |
| Permitted Uses | Uses including but not limited to: office uses, retail uses, hotels and motels, care facilities, residential uses, and |
| Prohibited Uses | Any other use not listed as permitted nor compatible with the district purpose and intent. |
| Current Use | Low-Rise Office |
| Is Current Use Legally Permitted? | Yes |
| Zoning Change | Not Likely |

| ZONING REQUIREMENTS | |
| --- | --- |
| Conforming Use | The existing improvements represent a conforming use within this zone |
| Minimum Gross Floor Area (SF) | 28,000 |
| Minimum Building Height (Feet) | 45 |
| Minimum Yard Setbacks | |
| Front (Feet) | 0 |
| Rear (Feet) | 0 |
| Side (Feet) | 0 |
| Maximum Lot Coverage | 75% |
| Maximum Building Height (Feet) | 70 |
| Base Floor Area Ratio (FAR) | 1 |
| Parking Requirement | |
| Spaces Per 1,000 SF | 3.00 |
| Spaces Required | 50 |
| Spaces Provided | 73 |

Source: City of Bellevue Planning & Zoning Department

## Zoning Conclusions

Based on the interpretation of the zoning ordinance, the subject property is an outright permitted use that could be rebuilt if unintentionally destroyed.

## MARKET ANALYSIS

This section provides a study of office supply/demand conditions for the Seattle/Puget Sound market and Suburban Bellevue submarket, competitive dataset analysis, market participant interviews and transaction trends. These findings are used to support our conclusions for the competitive position, general vacancy and exposure period for the subject property.

## SEATTLE/PUGET SOUND OFFICE MARKET

The following is an analysis of supply/demand trends in the Seattle/Puget Sound office market using information provided by CoStar, widely recognized as a credible source for tracking market statistics. The table below presents historical data for key market indicators.

| SEATTLE/PUGET SOUND HISTORICAL STATISTICS  (LAST TEN YEARS) | | | | | |
|---|---|---|---|---|---|
| PERIOD | SUPPLY | NEW CONSTRUCTION | NET ABSORPTION | VACANCY | ASKING RENT |
| 2014 | 199,399,178 SF | 692,715 SF | 3,245,532 SF | 8.9% | $28.21/SF |
| 2015 | 204,078,446 SF | 4,679,268 SF | 5,870,275 SF | 7.9% | $29.80/SF |
| 2016 | 208,815,781 SF | 4,737,335 SF | 5,034,873 SF | 6.9% | $31.05/SF |
| 2017 | 211,996,612 SF | 3,180,831 SF | 3,182,169 SF | 7.3% | $31.55/SF |
| 2018 | 214,278,704 SF | 2,282,092 SF | 4,838,224 SF | 6.2% | $31.71/SF |
| 2019 | 218,953,581 SF | 4,674,877 SF | 5,229,450 SF | 5.8% | $33.00/SF |
| 2020 | 224,528,331 SF | 5,574,750 SF | 1,465,371 SF | 6.3% | $34.11/SF |
| 2021 | 228,278,654 SF | 3,750,323 SF | (1,178,982) SF | 9.0% | $33.58/SF |
| 2022 | 229,810,127 SF | 1,531,473 SF | (1,017,490) SF | 10.0% | $34.15/SF |
| 2023 | 234,838,625 SF | 5,028,498 SF | (4,473,338) SF | 12.6% | $34.99/SF |
| CAGR | 1.6% | - | - | - | 2.2% |

*Supply numbers based on information which is amended/updated on an on-going basis by Costar.
Source: Costar®

Over the past ten years the Seattle/Puget Sound office market was stable where there was balance in prevailing office supply/demand conditions, until 2020, after which time demand collapsed. Over the 10-year time period the market inventory significantly increased by 18.1%. Further there was moderate increase in the vacancy rate (3.8% change, although rising sharply after 2020) and considerable increase of the asking average rent (24.0% change).

The following table summarizes the trailing four quarter performance of the Seattle/Puget Sound market.

| SEATTLE/PUGET SOUND TRAILING FOUR QUARTER PERFORMANCE | | | | | |
|---|---|---|---|---|---|
| PERIOD | SUPPLY | NEW CONSTRUCTION | NET ABSORPTION | VACANCY | ASKING RENT |
| 2023 Q3 | 233,004,235 SF | 1,279,632 SF | (765,587) SF | 12.9% | $34.73/SF |
| 2023 Q4 | 234,838,625 SF | 1,834,390 SF | (1,058,904) SF | 14.1% | $34.45/SF |
| 2024 Q1 | 236,380,791 SF | 1,542,166 SF | (936,121) SF | 15.0% | $34.35/SF |
| 2024 Q2 | 236,437,261 SF | 56,470 SF | 28,577 SF | 15.0% | $34.24/SF |

Source: Costar®

Over the past four quarters the Seattle/Puget Sound office market has experienced an increase of supply. Demand has been very weak until recently, and vacancy has risen. Asking rents have fallen slightly in the past year.

Key supply/demand statistics for the most recent quarter, last year and historical averages are summarized below.

| SEATTLE/PUGET SOUND MARKET TREND ANALYSIS | | | |
|---|---|---|---|
| | Q2 2024 | 2023 | Last 10 |
| Total SF | 236,437,261 | 234,838,625 | 217,497,804 |
| Vacant SF | 35,547,271 | 29,589,667 | 17,560,773 |
| Market Vacancy | 15.0% | 12.6% | 8.1% |
| Construction Grow th Rate | 0.02% | 2.1% | 1.6% |
| Absorption Rate | 0.01% | (1.9%) | 0.9% |
| Average Asking Rent/SF | $34.24 | $34.99 | $32.22 |

Source: Costar®

**Seattle/Puget Sound Market Conclusion**

Based on the preceding analysis, the Seattle/Puget Sound office market is oversupplied and struggling with weak demand. While the most recent market data may show the beginnings of a recovery, vacancy remains high and only time will tell if a recovery can actually take hold.

## SUBURBAN BELLEVUE OFFICE SUBMARKET OVERVIEW

The following is an analysis of supply/demand trends in the Suburban Bellevue office submarket using information provided by CoStar. The table below presents historical data for key market indicators.

| SUBURBAN BELLEVUE HISTORICAL STATISTICS (LAST TEN YEARS) | | | | | |
|---|---|---|---|---|---|
| PERIOD | SUPPLY | NEW CONSTRUCTION | NET ABSORPTION | VACANCY | ASKING RENT |
| 2014 | 7,065,247 SF | 0 SF | 120,885 SF | 8.9% | $30.24/SF |
| 2015 | 7,065,247 SF | 0 SF | 127,918 SF | 7.1% | $30.86/SF |
| 2016 | 7,071,027 SF | 5,780 SF | 65,286 SF | 6.3% | $31.07/SF |
| 2017 | 7,167,258 SF | 96,231 SF | 157,918 SF | 5.0% | $32.12/SF |
| 2018 | 7,167,258 SF | 0 SF | 27,819 SF | 4.5% | $32.51/SF |
| 2019 | 7,167,258 SF | 0 SF | 2,043 SF | 4.3% | $34.90/SF |
| 2020 | 7,949,030 SF | 781,772 SF | 599,482 SF | 4.9% | $35.74/SF |
| 2021 | 8,176,816 SF | 227,786 SF | 226,596 SF | 6.4% | $36.00/SF |
| 2022 | 8,222,016 SF | 45,200 SF | 127,549 SF | 5.0% | $37.63/SF |
| 2023 | 8,878,853 SF | 656,837 SF | (55,000) SF | 10.4% | $39.68/SF |
| CAGR | 2.3% | - | - | - | 2.8% |

*Supply numbers based on information w hich is amended/updated on an on-going basis by Costar.
Source: Costar®

Over the past ten years the Suburban Bellevue office submarket was stable where there was balance in prevailing office supply/demand conditions. Over this time period the submarket inventory significantly increased by 25.7%. Further there was significant positive absorption (19.8% change), moderate increase in the vacancy rate (1.5% change) and considerable increase of the asking average rent (31.2% change).

The following table summarizes the trailing four quarter performance of the Suburban Bellevue submarket.

| SUBURBAN BELLEVUE TRAILING FOUR QUARTER PERFORMANCE | | | | | |
|---|---|---|---|---|---|
| PERIOD | SUPPLY | NEW CONSTRUCTION | NET ABSORPTION | VACANCY | ASKING RENT |
| 2023 Q3 | 8,547,016 SF | 0 SF | 58,060 SF | 9.3% | $39.79/SF |
| 2023 Q4 | 8,878,853 SF | 331,837 SF | 2,369 SF | 12.6% | $39.14/SF |
| 2024 Q1 | 9,096,853 SF | 218,000 SF | 163,226 SF | 12.9% | $37.92/SF |
| 2024 Q2 | 9,096,853 SF | 0 SF | (10,716) SF | 13.1% | $38.19/SF |

Source: Costar®

Over the past four quarters the Suburban Bellevue office submarket has experienced an increase of supply. There was also positive net absorption, increase in vacancy rates and decrease of asking rent in the marketplace.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

Key supply/demand statistics for the most recent quarter, last year and historical averages are summarized below.

| SUBURBAN BELLEVUE MARKET TREND ANALYSIS | | | |
|---|---|---|---|
| | Q2 2024 | 2023 | Last 10 |
| Total SF | 9,096,853 | 8,878,853 | 7,593,001 |
| Vacant SF | 1,187,503 | 918,961 | 475,246 |
| Market Vacancy | 13.1% | 10.4% | 6.3% |
| Construction Grow th Rate | 0.0% | 7.4% | 2.3% |
| Absorption Rate | (0.1%) | (0.6%) | 1.6% |
| Average Asking Rent/SF | $38.19 | $39.68 | $34.08 |

Source: Costar®

## Suburban Bellevue Submarket Conclusion

Based on the preceding analysis, the Suburban Bellevue office submarket is somewhat oversupplied, although demand has been much stronger than the region overall. Bellevue's office stock is much more recent than the older office buildings in downtown Seattle that are at the core of the office market's affliction. Demand remains inconstant and recently soft, but the local market has stronger prospects than the region overall.

## INFLATION IMPACT / MACROECONOMY OVERVIEW

Over the past two years, macroeconomic conditions have slowed commercial real estate activity and tightened debt markets.  GDP growth has moderated.  CPI trends indicate a continued but slower pace of inflation, reflecting the impact of tighter monetary policy. Inflation reached a high of 9.1% in June 2022 and declined to 3.0% in July 2024.  Although above the goal of 2.0% targeted as normal for a healthy economy, the inflation break has paved the way for a shift in interest rates.  With employment growth slowing, the unemployment rate has increased to 4.3% in July 2024.  Macroeconomic changes of this nature suggest a softening economy or the potential for recession.  Bond markets are pricing at a level that suggests a federal funds rate cut may be imminent.  Some analysts have predicted an emergency inter-meeting federal funds rate cut may occur prior to the scheduled September meeting.  Likewise, many economists believe the certainty of multiple rate cuts in 2024 has increased. The following charts summarize the current inflation rates in the United States.



**Federal Funds Effective Rate**



In the July 2024 meeting, the Federal Reserve announced that it would keep its benchmark interest rate unchanged at 5.25% to 5.5%. However, statements from the Chair suggested a September rate cut was being considered, and indeed the September meeting announced a -0.50% decrease (not reflected in the chart above).

The higher cost of capital weighed on investment decisions in the real estate market from midyear 2022 through early 2024.  As rates have moderated back downward to prompt more transaction activity in the form of recapitalizations, refinancing, and outright sales transactions, investment activity is expected to increase.  The market for commercial real estate is still responding to these changes and their impact is not yet fully understood.

## IMPACT OF TREASURY RATE CHANGES

As of August 5, 2024, the 10-Year Treasury was at 3.768%.  This shift marks a decrease from a high of 5% in the 4th Quarter of 2023 and a trend in the 4.25 to 4.5% range through most of 2024.  The August 2024 rapid decline of the 10-year treasury reflect the lowest levels since June 2023.



The following table reflects changes in the US Treasury note over the past 30 days, illustrating the 50-basis point drop in the last week.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES



While it remains unclear as to how the market will react overall, the expectation is that the drop will be a catalyst for transaction volume. Initial feedback from investors conveys that the lower 10-year treasury reflects the market's anticipation of what the Federal Reserve will do relative to the Federal Funds Rate. Nonetheless, the 10-year Treasury is a benchmark for lending and has resulted in lower lending rates in the past week, which is anticipated to have an influence on buyer/seller actions.

The outcome of those actions remains to be seen along with how the economic factors driving the rate adjustments may impact demand going forward. We have weighed the adjustment in rates in our capitalization rate conclusion, recognizing more clarity on the market's reaction will take more time to manifest fully.

## TRANSACTION TRENDS

The trends informing the subject's value involve both medical office leasing trends, and trends of redevelopment toward higher-density multifamily residential uses.

As shown in the market analysis above, local office vacancy is rising, indicating weak demand for medical office space. For a property such as the subject, which includes a sizable parking area, potential buyers would surely see the subject as a current or future redevelopment candidate.

Multifamily residential development on the sites of formerly lower-density retail or office uses has long been the most favored development trend in the Puget Sound region. This remains true at present, even though in the past year the pace of new construction has slowed dramatically under the pressures of extreme inflation of costs in labor and materials, as well as financial burdens stemming from high interest rates. As of late September 2024, the Federal Reserve has just decreased interest rate by 50 basis points. Market participants expect this to spur new transactions and some new enthusiasm.

While new multifamily construction remains diminished regionally, it is still occurring in certain hotspots, including in the subject's area in Bellevue.

In the open market, the subject property type would command most interest from regional developers, who would wait for in-place rents to expire before preparing the site for redevelopment.

## SUBJECT PROPERTY ANALYSIS

The subject is an Office (Low-Rise Office) asset with a total net rentable area of 16,796 SF. The market generally classifies the subject as a small investment property, although the property is also viewed as a medium-term redevelopment candidate. As such, any new leases in the vacant suites would not be likely to exceed a few years in duration, i.e., new leases would not extend beyond the longest in-place lease through July 2026. Rental income for the property would be viewed as interim income.

## GENERAL VACANCY CONCLUSION

As summarized in the table below this market analysis relied on various published data sources and field research for assessing how supply/demand conditions influence the long-term vacancy estimate of the subject property.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES
35

| GENERAL VACANCY CONCLUSION | | | |
|---|---|---|---|
| CoStar | 2024 Q3 | **LAST YR** | 10 YR AVG |
| Seattle/Puget Sound Market | 15.0% | 12.6% | 8.1% |
| Suburban Bellevue Submarket | 13.1% | 10.4% | 6.3% |
| **Subject** | 22.0% | 22.0% | n/a |
| **GENERAL VACANCY RATE CONCLUSIONS** | | | 0.0% |

Because the subject improvements are nearing the end of their economic life, any future leasing is likely to be short-term and below-market. Because the subject's primary value is in its land, a general vacancy deduction is not relevant.

## EXPOSURE TIME & MARKETING PERIOD

Exposure time is best established based the recent history of marketing periods for comparable sales, discussions with market participants and information from published surveys. The following table summarizes the information that was taken into consideration to develop an estimate of exposure time and marketing period for the subject property:

| EXPOSURE TIME & MARKETING PERIOD | | | | | | | |
|---|---|---|---|---|---|---|---|
| SOURCE | QUARTER | RANGE | | | AVG | LAST Q | LAST YR |
| **PriceWaterhouse Coopers** | | | | | | | |
| National Secondary Office | 3Q 24 | 3.0 | to | 12.0 | 6.8 | 6.8 | 6.7 |
| Seattle Office | 3Q 24 | 3.0 | to | 9.0 | 5.8 | 5.5 | 5.0 |
| **Comparable Sales Dataset** | | 0.0 | to | 8.0 | 3.5 | | |
| **AVERAGE** | | **2.0** | **to** | **9.7** | **5.4** | **6.2** | **5.9** |

The preceding information generally supports an exposure time range from 3 to 12 months for Office (Low-Rise Office) properties. However, a developer would take immediate interest in the subject, and marketing would likely require less than 6 months. The availability of acquisition financing also factors into exposure time and marketing period. Our review of the local capital market indicate that adequate financing options would have been available to consummate a sale of the subject on the date of value.

**Exposure Time Conclusion**
Six Months Or Less

**Marketing Period Conclusion**
Six Months Or Less

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## HIGHEST AND BEST USE ANALYSIS

This section develops the highest and best use of the subject property as-vacant and as-improved. The highest and best use, or most probable use, must be legally permissible, physically possible, financially feasible, and maximally productive.

**As-Vacant Analysis**

Permitted uses of the subject's BelRed-Commercial/Residential District (BR-CR) zoning were listed in the Zoning Analysis section. Regarding physical characteristics, the subject site is generally rectangular in shape and has sloping topography with average/good access and average exposure. The subject site has frontage on an arterial. The immediate area is developed with office and retail development along major arterials that is interspersed with multi-family complexes and single-family residential development removed from arterials. Based on our observations of land development trends for sites with similar zoning and physical characteristics as the subject and analysis of current supply/demand trends, the highest and best use of the subject site as-vacant is development of a multifamily residential property as market conditions warrant.

**As-Improved Analysis**

The subject's Office (Low-Rise Office) use (as-improved) is permitted outright by the BR-CR zoning. The subject's improvements were constructed in 1978 and have a remaining economic life of 2 years based on our estimate. As such, the improvements are nearing the end of their economic life, and the underlying land value already exceeds the value as-improved.

While the subject is encumbered by in-place leases extending through July 2026, it is already the case that the subject's underlying land value exceeds its value as improved (refer to our Land Valuation section later in this report). As such, the Highest & Best Use of the property is concluded to be continued use as an office property for the interim until expiration of in-place leases allows for demolition of the improvements and redevelopment with a multifamily residential use.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## VALUATION METHODS

The following presentation of the appraisal process deals directly with the valuation of the subject property. The paragraphs below describe the standard approaches to value that were considered for this analysis.

### Income Approach

The two fundamental methods of this valuation technique include Discounted Cash Flow and Direct Capitalization.

Characteristics specific to the subject property warrant that this valuation technique is developed. Development of the Income Approach is a specific scope requirement of this assignment. The subject is an investment property; therefore, the Income Approach represents the decision making process of knowledgeable buyers and sellers of this property type. The Direct Capitalization method is used in this analysis. Discounted Cash Flow analysis does not contribute substantially to estimating value beyond the direct capitalization method and is not used in this analysis.

### Sales Comparison Approach

Characteristics specific to the subject property warrant that this valuation technique to be developed. Development of the Sales Comparison Approach is a specific scope requirement of this assignment. Sufficient sales data is available to provide a credible value estimate by the Sales Comparison Approach. Based on this reasoning, the Sales Comparison Approach is presented within this appraisal.

### Land Valuation

Characteristics specific to the subject property do not warrant that a site value is developed. Development of the subject site value is not a specific scope requirement of this assignment. Therefore, this appraisal does not provide valuation of the subject site.

### Cost Approach

Characteristics specific to the subject property do not warrant that this valuation technique is developed. Development of the Cost Approach is not a specific scope requirement of this assignment. The Cost Approach has limited applicability due to the age of the improvements and lack of market based data to support an estimate of accrued depreciation. Based on the preceding information, the Cost Approach will not be presented.

### Reconciliation of Value Conclusions

The Income (Direct Capitalization) and Sales Comparison approaches are used to value the subject property, which will be reconciled into the final opinions of market value in the Analysis of Value Conclusions section.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## INCOME APPROACH

As previously discussed within the Valuation Methods section, the Direct Capitalization method is used in this analysis, and Discounted Cash Flow analysis is not developed.

## DIRECT CAPITALIZATION

The first step in the direct capitalization method is to estimate the subject's durable rental income through reconciliation of the subject's in-place lease terms and market rent analysis. Next, we analyze other income items including reimbursements and miscellaneous revenue. Then, vacancy allowance and operating expenses are estimated based on analysis of the subject and market indicators. Finally, the resulting net operating income is capitalized at an appropriate supported rate. The implied value may be adjusted to account for non-stabilized conditions or required capital expenditures to reflect an as is value.

## RENTAL INCOME ANALYSIS

In this section, we developed an opinion of the subject's rental income through examination of subject lease terms and market rent analysis. The rental income conclusion was reconciled taking into account such items as durability of in-place contract rents, lease escalations and market terms as measured by rent comparables.

**Rent Roll**

The following Rent Roll Summary reflects a breakdown of the individual tenant spaces and a snapshot of in-place contract rents including lease term, expense structure and base rent.

## RENT ROLL SUMMARY

| SUITE | TENANT NAME | TOTAL NRA (SF) | % OF NRA | TENANT GROUP | LEASE TERMS START | LEASE TERMS END | LEASE TERMS YEARS | EXPENSE STRUCTURE | CURRENT BASE RENT $/SF(MO.) | CURRENT BASE RENT $/SF(YR.) | ANNUAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 100 | Olga Shade | 228 | 1.4% | Office | 12/23 | 10/24 | 0.9 | Triple Net | $1.38 | $16.58 | $3,780 |
| 102 | Conant Lens | 1,044 | 6.2% | Office | 8/19 | 7/26 | 7.0 | Triple Net | $1.75 | $21.06 | $21,984 |
| 103 | Cruise Center | 781 | 4.6% | Office | 6/19 | 5/25 | 6.0 | Triple Net | $1.22 | $14.70 | $11,481 |
| 104 | Wenrui Art Studio | 600 | 3.6% | Office | 9/23 | 8/25 | 2.0 | Triple Net | $1.24 | $14.90 | $8,940 |
| 105 | Kinese Studio | 519 | 3.1% | Office | 10/19 | 9/25 | 6.0 | Triple Net | $1.59 | $19.08 | $9,900 |
| 106 | Mona Foundation | 854 | 5.1% | Office | 6/19 | 5/25 | 6.0 | Triple Net | $2.04 | $24.45 | $20,884 |
| 110 | Syntax Tech | 610 | 3.6% | Office | 4/24 | 5/25 | 1.1 | Triple Net | $1.50 | $18.00 | $10,980 |
| 101A | AMG Financial | 223 | 1.3% | Office | 5/18 | 4/26 | 8.0 | Triple Net | $1.77 | $21.26 | $4,740 |
| 101B | Silver Pacific Homes | 345 | 2.1% | Office | 2/22 | 2/26 | 4.0 | Triple Net | $1.75 | $21.01 | $7,248 |
| 101C | Olga Shade | 573 | 3.4% | Office | 3/24 | 2/26 | 2.0 | Triple Net | $1.25 | $14.99 | $8,592 |
| 108A | S-On Chinese School | 318 | 1.9% | Office | 11/23 | 10/25 | 2.0 | Triple Net | $1.81 | $21.74 | $6,912 |
| 108B | Sudden Beauty | 702 | 4.2% | Office | 3/24 | 3/25 | 1.0 | Triple Net | $0.87 | $10.50 | $7,368 |
| 109A | CYT Makeup | 486 | 2.9% | Office | 7/24 | 7/25 | 1.1 | Triple Net | $1.50 | $18.02 | $8,760 |
| 202 | NSA Motors | 545 | 3.2% | Office | 12/23 | 12/24 | 1.0 | Triple Net | $1.25 | $14.99 | $8,172 |
| 203 | Levite Construction | 684 | 4.1% | Office | 4/24 | 3/26 | 2.0 | Triple Net | $1.25 | $15.00 | $10,260 |
| 204 | Longwell Office II | 995 | 5.9% | Office | 1/23 | 12/24 | 2.0 | Triple Net | $1.50 | $18.00 | $17,910 |
| 205 | US Tiny Bear | 1,102 | 6.6% | Office | 6/24 | 6/25 | 1.1 | Triple Net | $1.25 | $15.01 | $16,536 |
| 206 | InExt Staging | 878 | 5.2% | Office | 1/22 | 1/25 | 3.1 | Triple Net | $1.57 | $18.79 | $16,496 |
| 208 | LuComm Technology | 644 | 3.8% | Office | 3/20 | 2/25 | 5.0 | Triple Net | $1.62 | $19.49 | $12,555 |
| 204A | Anna Lozhinka | 320 | 1.9% | Office | 3/23 | 2/25 | 2.0 | Triple Net | $1.50 | $18.01 | $5,764 |
| 204B | Signature Eyelash | 645 | 3.8% | Office | 5/23 | 10/24 | 1.5 | Triple Net | $1.76 | $21.14 | $13,634 |
| **OCCUPIED SUBTOTALS** | | **13,096** | **78.0%** | | | | | | **$1.48** | **$17.78** | **$232,894** |
| 201 | Vacant | 1,399 | 8.3% | Office | | | | | | | |
| 207 | Vacant | 1,265 | 7.5% | Office | | | | | | | |
| 109B | Vacant | 1,036 | 6.2% | Office | | | | | | | |
| **VACANT SUBTOTALS** | | **3,700** | **22.0%** | | | | | | | | |
| **TOTAL NRA** | | **16,796** | **100.0%** | | | | | | **$1.16** | **$13.87** | **$232,894** |

As indicated in the preceding table the subject property contains 16,796 SF of NRA of which 13,096 SF is currently occupied, and 3,700 SF is currently vacant. The current occupancy level is 78.0%. Because the property's land value is concluded to exceed its value as improved, no stabilized occupancy level is concluded. Future interim leasing of vacant spaces is likely to be shorter-term leases at lower rents (which already describes many current tenants).

**Asking Rent**
Asking rents for vacant spaces are close to the rates of recent leases, i.e., $15-$18/SF/year NNN.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## MARKET RENT ANALYSIS

This section examines competitive comparable properties within the marketplace to establish our opinion of market rent for the subject property. This allows for a comparison of the subject property's contract to what is attainable in the current market.

**Adjustment Process**

Quantitative adjustments are made to the comparable leases. The following adjustments or general market trends were considered for the basis of market rent analysis.

| | |
|---|---|
| Transactional Adjustments | If warranted, the comparable leases were adjusted for varying lease structures, atypical concessions and market conditions. |
| Concession Adjustment | Free rent and TI concessions vary widely in the market, and the subject's suites are generally in market-ready condition, within minimal TIs offered. Comparables with significant TI outlays are adjusted downward as appropriate. |
| Property Adjustments | Quantitative percentage adjustments were made for location and physical characteristics such as size, age, condition, exposure and parking ratio. It should be stressed that the adjustments are subjective in nature and are meant to illustrate our logic in deriving a value opinion for the subject site. |
| Tenant Space Adjustments | The lease comparables were further adjusted to the subject to account for tenant space specific characteristics such as size and space functionality. |

The following table summarizes the market conditions adjustment applied in this analysis.

| MARKET CONDITIONS ADJUSTMENT | | |
|---|---|---|
| Per Year As Of September 2024 | (As-Is) | 2% |

The analysis applies an upward market conditions adjustment of 2% annually reflecting the conditions between the oldest comparable lease date up through the effective valuation date.

## ANALYSIS OF COMPARABLE OFFICE LEASES

The Office lease analysis is used to derive an opinion of market rent and correlating leasing assumptions for the Office MLA category. The following pages present a summation table of the comparables selected for this analysis, a location map and comparable photographs, the lease comparable adjustment process and our market rent conclusion.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## OFFICE LEASE SUMMATION TABLE

| COMPARABLE | SUBJECT | LEASE 1 | LEASE 2 | LEASE 3 | LEASE 4 |
|---|---|---|---|---|---|
| Name | Amity Court | Bellewood Three | Northup North Offices - Building A | Creekside Offices | 12950 Northup Way, Suites A and B |
| Address | 14400 Northeast Bellevue-Redmond Road | 2101 112th Ave NE | 2300 130th Avenue Northeast | 1530 140th Avenue Northeast | 12950 Northup Way, Suites A and B |
| City | Bellevue | Bellevue | Bellevue | Bellevue | Bellevue |
| State | WA | WA | WA | WA | WA |
| Zip | 98007 | 98004 | 98005 | 98005 | 98005 |
| **PHYSICAL INFORMATION** | | | | | |
| Property Type | Office | Office | Office | Office | Office |
| NRA | 16,796 | 6,550 | 17,122 | 20,316 | 57,122 |
| Occupancy | 78.0% | 81.0% | 12.0% | 93.0% | - |
| Location | Average/Good | Good | Good | Average/Good | Average/Good |
| Quality | Average | Average/Good | Good | Average | Average |
| Condition | Average | Average/Good | Average/Good | Average | Average |
| Exposure | Average | Average | Average | Average | Average |
| Access | Average/Good | Good | Good | Average/Good | Average/Good |
| Parking Spaces | 73 | 30 | 79 | 144 | 86 |
| Year Built | 1978 | 1979 | 1985 | 1988 | 1979 |
| **LEASE INFORMATION** | | | | | |
| Tenant Name | | D&Y Music School | SmallTalk | Good USA | Accoustic |
| Commencement Date | | 6/1/2024 | 4/1/2023 | 11/1/2022 | 1/1/2022 |
| Lease Type | | New | New | New | New |
| Lease Status | | Signed | Signed | Signed | Signed |
| Rate Type | | NNN | FSG | Gross | NNN |
| Size (SF) | | 1,216 | 1,717 | 996 | 7,306 |
| % Office | | 0.0% | 0.0% | 0.0% | 100.0% |
| Term (Yrs) | | 3.0 | 5.0 | 4.2 | 5.2 |
| Rent ($/SF/Yr.) | | $32.00 | $38.00 | $21.69 | $13.92 |
| Avg. Escalation/Yr | | 2.0% | 3.0% | 5.0% | - |
| Concessions | | 3 Mos. | 2 Mos. | - | 0 |
| TI's ($/SF) | | $15 | $15 | - | - |
| Options | | No | No | No | No |
| Confirmation Source | | Madison Bay Commercial | Kidder Mathews | Lease Document | First Western Properties |
| Confirmation Name | | Ted Winskill | Todd Gauthier | - | Jake Thurber |

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## COMPARABLE OFFICE LEASE MAP



| COMP | DISTANCE | ADDRESS | LEASE DATE | SF | $/SF |
|------|----------|---------|-----------|-----|------|
| SUBJECT | - | 14400 Northeast Bellevue-Redmond Road, Bellevue, WA | - | - | - |
| No. 1 | 2.0 Miles | 2101 112th Ave NE, Bellevue, WA | 6/1/2024 | 1,216 | $32.00 |
| No. 2 | 0.9 Miles | 2300 130th Avenue Northeast, Bellevue, WA | 4/1/2023 | 1,717 | $38.00 |
| No. 3 | 0.3 Miles | 1530 140th Avenue Northeast, Bellevue, WA | 11/1/2022 | 996 | $21.69 |
| No. 4 | 0.9 Miles | 12950 Northup Way, Suites A and B, Bellevue, WA | 1/1/2022 | 7,306 | $13.92 |

## COMPARABLE OFFICE RENT PHOTOGRAPHS



**COMPARABLE 1**



**COMPARABLE 2**



**COMPARABLE 3**



**COMPARABLE 4**

## OFFICE LEASE ADJUSTMENT TABLE

| COMPARABLE | SUBJECT | LEASE 1 | LEASE 2 | LEASE 3 | LEASE 4 |
|---|---|---|---|---|---|
| Name | Marray Franklyn Building | Bellewood Three | Northup North Offices - Building A | Creekside Offices | 12950 Northup Way, Suites A and B |
| Address | 14400 Northeast Bellevue-Redmond Road | 2101 112th Ave NE | 2300 130th Avenue Northeast | 1530 140th Avenue Northeast | 12950 Northup Way, Suites A and B |
| City | Bellevue | Bellevue | Bellevue | Bellevue | Bellevue |
| NRA | 16,796 | 6,550 | 17,122 | 20,316 | 57,122 |
| Year Built | 1978 | 1979 | 1985 | 1988 | 1979 |
| **LEASE INFORMATION** | | | | | |
| Tenant Name | | D&Y Music School | SmallTalk | Good USA | Accoustic |
| Commencement Date | | 6/1/2024 | 4/1/2023 | 11/1/2022 | 1/1/2022 |
| Lease Type | | New | New | New | New |
| Lease Status | | Signed | Signed | Signed | Signed |
| Rate Type | | NNN | FSG | Gross | NNN |
| Size (SF) | | 1,216 | 1,717 | 996 | 7,306 |
| Term (Yrs) | | 3.0 | 5.0 | 4.2 | 5.2 |
| Rent ($/SF/Yr.) | | $32.00 | $38.00 | $21.69 | $13.92 |
| Avg. Escalation/Yr | | 2.0% | 3.0% | 5.0% | - |
| Concessions | | 3 Mos. | 2 Mos. | - | 0 |
| TI's ($/SF) | | $15 | $15 | - | - |
| **TRANSACTIONAL ADJUSTMENTS** | | | | | |
| Lease Type | | $0.00 | ($9.00) | ($7.00) | $0.00 |
| Concessions | | ($7.67) | ($4.27) | $0.00 | $0.00 |
| Market Conditions[1] | | 1% | 3% | 4% | 6% |
| Subtotal Eff Rent | | $24.48 | $25.46 | $15.25 | $14.69 |
| **PROPERTY ADJUSTMENTS** | | | | | |
| Location | Average/Good | Good | Good | Average/Good | Average/Good |
| *Adjustment* | | -5% | -5% | 0% | 0% |
| Size (Property) | 16,796 | 6,550 | 17,122 | 20,316 | 57,122 |
| *Adjustment* | | 0% | 0% | 0% | 0% |
| Quality | Average | Average/Good | Good | Average | Average |
| *Adjustment* | | -5% | -10% | 0% | 0% |
| Condition | Average | Average/Good | Average/Good | Average | Average |
| *Adjustment* | | -5% | -5% | 0% | 0% |
| Exposure | Average | Average | Average | Average | Average |
| *Adjustment* | | 0% | 0% | 0% | 0% |
| Access | Average/Good | Good | Good | Average/Good | Average/Good |
| *Adjustment* | | -5% | -5% | 0% | 0% |
| Subtotal Property Adj | | -20% | -25% | 0% | 0% |
| **TOTAL ADJUSTED RENT** | | **$19.58** | **$19.10** | **$15.25** | **$14.69** |

| STATISTICS | UNADJUSTED | ADJUSTED | MARKET CONCESSIONS[1] | |
|---|---|---|---|---|
| LOW | $13.92 | $14.69 | Lease Type | Triple Net |
| HIGH | $38.00 | $19.58 | Free Rent | 0 Mos. |
| MEDIAN | $26.85 | $17.17 | TI's | $0/SF |
| AVERAGE | $26.40 | $17.15 | | |

[1] Market Conditions Adjustment - Compound annual change in market conditions: 2%

Date of Value (for adjustment calculations): 9/18/24

## Office Lease Analysis

We have selected four comparable leases from the nearby Bellevue area for analysis of the subject's market rent.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

45

**Lease 1** is a music school lease west of the subject. After downward adjustment for concessions, the property is adjusted downward for superior location closer to downtown Bellevue, and superior quality, condition and access closer to Interstate 405.

**Lease 2** is adjusted downward for lease type to equate to a NNN basis, and downward for concessions. Then the property is adjusted downward for location, quality, condition and access closer to SR-512.

**Lease 3** is adjusted downward for lease type and upward for market conditions, and there are no property adjustments. This is considered one of the stronger comparisons.

**Lease 4** is in a retail/office building. After market conditions adjustment, there are no property adjustments. This is also a strong comparison.

## OFFICE SPACE MARKET RENT CONCLUSION

Leases 3 and 4 are the strongest comparisons. They indicate rents slightly below the average of the subject's in-place leases. However the average of adjusted indications is very close, so **we conclude at a market rent of $17/SF/year NNN,** which is bracketed by the indications. The following table summarizes the analysis of the comparable leases and the Office market rent conclusion.

| | LEASE | ADJUSTMENT | | | | NET | GROSS | OVERALL |
|---|---|---|---|---|---|---|---|---|
| LEASE | RATE | TRANSACTIONAL[1] | ADJUSTED | PROPERTY[2] | FINAL | ADJ % | ADJ % | COMPARISON |
| 1 | $32.00 | ($7.52) | $24.48 | -20% | $19.58 | -39% | 45% | SECONDARY |
| 2 | $38.00 | ($12.54) | $25.46 | -25% | $19.10 | -50% | 63% | SECONDARY |
| 3 | $21.69 | ($6.44) | $15.25 | 0% | $15.25 | -30% | 36% | PRIMARY |
| 4 | $13.92 | $0.77 | $14.69 | 0% | $14.69 | 6% | 6% | PRIMARY |
| LOW | $14.69 | | | | AVERAGE | | | $17.15 |
| HIGH | $19.58 | | | | MEDIAN | | | $17.17 |
| | AVERAGE CONTRACT | | MARKET RANGE | | | CONCLUSION | | |
| Office | $17.78 | | $14.69  -  $19.58 | | | $17.00 | | |

[1]Cumulative [2]Additive (Includes Tenant Adjustments)

## POTENTIAL GROSS RENT

Our analysis and conclusions of the subject's potential gross rent are detailed as follows:

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## POTENTIAL GROSS RENT SUMMARY — AS OF SEPTEMBER 2024

OCCUPIED SPACE

| TENANT | TOTAL NRA (SF) | % OF NRA | TENANT CATEGORY | CONTRACT RENT | MARKET RENT | CONTRACT V MARKET | BASIS FOR PROFORMA | RENT FORECAST $/SF(MO.) | $/SF(YR.) | ANNUAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Olga Shade | 228 | 1.4% | Office | $16.58 | $17.00 | 98% | Contract | $1.38 | $16.58 | $3,780 |
| Conant Lens | 1,044 | 6.2% | Office | $21.06 | $17.00 | 124% | Contract | $1.75 | $21.06 | $21,984 |
| Cruise Center | 781 | 4.6% | Office | $14.70 | $17.00 | 86% | Contract | $1.22 | $14.70 | $11,481 |
| Wenrui Art Studio | 600 | 3.6% | Office | $14.90 | $17.00 | 88% | Contract | $1.24 | $14.90 | $8,940 |
| Kinese Studio | 519 | 3.1% | Office | $19.08 | $17.00 | 112% | Contract | $1.59 | $19.08 | $9,900 |
| Mona Foundation | 854 | 5.1% | Office | $24.45 | $17.00 | 144% | Contract | $2.04 | $24.45 | $20,884 |
| Syntax Tech | 610 | 3.6% | Office | $18.00 | $17.00 | 106% | Contract | $1.50 | $18.00 | $10,980 |
| AMG Financial | 223 | 1.3% | Office | $21.26 | $17.00 | 125% | Contract | $1.77 | $21.26 | $4,740 |
| Silver Pacific Homes | 345 | 2.1% | Office | $21.01 | $17.00 | 124% | Contract | $1.75 | $21.01 | $7,248 |
| Olga Shade | 573 | 3.4% | Office | $14.99 | $17.00 | 88% | Contract | $1.25 | $14.99 | $8,592 |
| S-On Chinese School | 318 | 1.9% | Office | $21.74 | $17.00 | 128% | Contract | $1.81 | $21.74 | $6,912 |
| Sudden Beauty | 702 | 4.2% | Office | $10.50 | $17.00 | 62% | Contract | $0.87 | $10.50 | $7,368 |
| CYT Makeup | 486 | 2.9% | Office | $18.02 | $17.00 | 106% | Contract | $1.50 | $18.02 | $8,760 |
| NSA Motors | 545 | 3.2% | Office | $14.99 | $17.00 | 88% | Contract | $1.25 | $14.99 | $8,172 |
| Levite Construction | 684 | 4.1% | Office | $15.00 | $17.00 | 88% | Contract | $1.25 | $15.00 | $10,260 |
| Longwell Office II | 995 | 5.9% | Office | $18.00 | $17.00 | 106% | Contract | $1.50 | $18.00 | $17,910 |
| US Tiny Bear | 1,102 | 6.6% | Office | $15.01 | $17.00 | 88% | Contract | $1.25 | $15.01 | $16,536 |
| InExt Staging | 878 | 5.2% | Office | $18.79 | $17.00 | 111% | Contract | $1.57 | $18.79 | $16,496 |
| LuComm Technology | 644 | 3.8% | Office | $19.49 | $17.00 | 115% | Contract | $1.62 | $19.49 | $12,555 |
| Anna Lozhinka | 320 | 1.9% | Office | $18.01 | $17.00 | 106% | Contract | $1.50 | $18.01 | $5,764 |
| Signature Eyelash | 645 | 3.8% | Office | $21.14 | $17.00 | 124% | Contract | $1.76 | $21.14 | $13,634 |
| **OCCUPIED SUBTOTAL** | **13,096** | **78.0%** | **-** | | **-** | **-** | | **$1.48** | **$17.78** | **$232,894** |
| **VACANT SPACE** | | | | | | | | **MARKET POTENTIAL RENT (1)** | | |
| Vacant | 1,399 | 8.3% | Office | - | $17.00 | - | Market | $1.42 | $17.00 | $23,783 |
| Vacant | 1,265 | 7.5% | Office | - | $17.00 | - | Market | $1.42 | $17.00 | $21,505 |
| Vacant | 1,036 | 6.2% | Office | - | $17.00 | - | Market | $1.42 | $17.00 | $17,612 |
| **VACANT SUBTOTALS** | **3,700** | **22.0%** | | | | | | **$1.42** | **$17.00** | **$62,900** |
| **TOTAL** | **16,796** | **100.0%** | | | | | | **$1.47** | **$17.61** | **$295,794** |

(1) Potential rent at current market levels, reflected on an annual basis.

In the table above, we applied contract rents to occupied spaces that represent durable income. Market rents were applied to vacant spaces and occupied spaces with tenants that are scheduled to roll-over near-term.

Our conclusions of the subject's rental income in relationship to historical rental income are detailed as follows:

### TOTAL RENTAL INCOME

| YEAR | TOTAL | $/SF | %EGI | ANALYSIS |
|---|---|---|---|---|
| 2023 | $423,148 | $25.19 | 99.9% | The projection is based on the contract rent in place with the vacant space being leased at market rates. Note that the 2023 rent was reported bundled together with NNN charges representing about $10/SF/year. |
| PROFORMA | $295,794 | $17.61 | 60.0% | |

The subject's actual contract rents were compared with market rents within the previously presented Potential Gross Rent Summary table. Overall, the contract rents within the subject property are considered to be representative of market levels in general, which will be factored into our rate selections later in this analysis.

## INCOME & EXPENSE ANALYSIS

In this section, we estimate additional revenue sources, vacancy and credit loss, and applicable operating expenses. The following table summarizes the historical operations of the subject property, along with our estimate of income and expenses on a stabilized basis.

| SUBJECT OPERATING HISTORY | | | | |
|---|---|---|---|---|
| YEAR | 2023 | | PROFORMA | |
| INCOME ITEMS | TOTAL | $/SF | TOTAL | $/SF |
| Base Contract Income | $423,148 | $25.19 | $232,894 | $13.87 |
| Market Rent Vacant Space | $0 | - | $62,900 | $3.74 |
| TOTAL RENTAL INCOME | $423,148 | $25.19 | $295,794 | $17.61 |
| REIMBURSEMENTS | | | | |
| | - | - | $63,974 | $3.81 |
| | - | - | $8,398 | $0.50 |
| | - | - | $37,791 | $2.25 |
| | - | - | $21,835 | $1.30 |
| | - | - | $50,388 | $3.00 |
| | - | - | $14,789 | $0.88 |
| TOTAL REIMBURSEMENTS | $0 | - | $197,175 | $11.74 |
| MISCELLANEOUS | | | | |
| Other Income | $463 | $0.03 | $0 | - |
| TOTAL MISCELLANEOUS | $463 | $0.03 | $0 | - |
| TOTAL GROSS INCOME | $423,611 | $25.22 | $492,970 | $29.35 |
| General Vacancy | - | - | $0 | - |
| Credit & Collection Loss | - | - | $0 | - |
| EFFECTIVE GROSS INCOME | $423,611 | $25.22 | $492,970 | $29.35 |
| EXPENSE ITEMS | | | | |
| Real Estate Taxes | ($57,923) | ($3.45) | ($63,974) | ($3.81) |
| Property Insurance | ($7,116) | ($0.42) | ($8,398) | ($0.50) |
| Repairs and Maintenance | ($35,268) | ($2.10) | ($37,791) | ($2.25) |
| Cleaning and Janitorial | ($21,217) | ($1.26) | ($21,835) | ($1.30) |
| Utilities | ($46,864) | ($2.79) | ($50,388) | ($3.00) |
| Management Fees | ($14,871) | ($0.89) | ($14,789) | ($0.88) |
| Reserves | $0 | - | ($1,680) | ($0.10) |
| TOTAL EXPENSES | ($183,259) | ($10.91) | ($198,855) | ($11.84) |
| NET OPERATING INCOME | $240,352 | $14.31 | $294,115 | $17.51 |

## Expense Reimbursements

The subject's historicals were reported as bundled together with base rent, but clearly corresponds to the reported expenses.

The rental income conclusion assumes a predominantly NNN expense structure where the tenant pays all operating expenses through reimbursement to the owner. These reimbursements were based on the operating expenses that are concluded later in the Income Approach. The subject's reported expense levels are within a typical range, and we forego the analysis of expense comparables, as it has been noted that the subject's land value exceeds its value as improved.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## VACANCY AND CREDIT LOSS

General vacancy was discussed in depth in the market analysis section of this report. Regarding credit loss, investors generally apply credit loss in a range from none to 2% depending on the quality of tenant mix and current economic conditions. As shown below, no general vacancy deduction is relevant, because any future leasing in the subject will likely be short-term.

| VACANCY & CREDIT LOSS | |
|---|---|
| General Vacancy Rate | 0.0% |
| Credit Loss Conclusion | 0.0% |
| **Total** | 0.0% |

## DEVELOPMENT OF CAPITALIZATION RATE

In developing our opinion of the capitalization rate, also known as overall rate (OAR), the following techniques were used:

- Comparable Sales
- Investor Surveys
- Band of Investment Technique

**Comparable Sales**

The following table presents a summary of the comparable sales used ahead in the Sales Comparison Approach, and the capitalization rates from each of those sales (Rate Comparables 1 thru 3). We have included additional sales (Comparables 4 and 5) to further support capitalization rate trends for the subject property.

| | NAME | CITY | SALE DATE | YR BLT | NRA | $/SF | SALE PRICE | NOI | NOI/SF | CAP RATE |
|---|---|---|---|---|---|---|---|---|---|---|
| | **CAPITALIZATION RATE COMPARABLES (OAR)** | | | | | | | | | |
| 1 | Bellevue Forest 1 | Bellevue | February 29, 2024 | 1984 | 6,776 | $520 | $3,522,480 | $223,677 | $33.01 | 6.35% |
| 2 | The 15885 Building | Bellevue | December 26, 2023 | 1999 | 12,444 | $522 | $6,500,000 | $394,550 | $31.71 | 6.07% |
| 3 | Aurora Ave. Office | Seattle | December 7, 2023 | 1953 | 20,093 | $370 | $7,425,000 | $388,216 | $19.32 | 5.23% |
| 4 | Tukwila Office | Tukwila | June 11, 2024 | 1969 | 19,244 | $229 | $4,400,000 | $310,200 | $16.12 | 7.05% |
| 5 | Shoreline Office | Shoreline | May 8, 2024 | 1979 | 17,355 | $242 | $4,200,000 | $252,000 | $14.52 | 6.00% |
| | **LOW** | | December 7, 2023 | | | | | | | **5.23%** |
| | **HIGH** | | June 11, 2024 | | | | | | | **7.05%** |
| | **AVERAGE** | | March 4, 2024 | | | | | | | **6.14%** |
| | **MEDIAN** | | February 29, 2024 | | | | | | | **6.07%** |
| | **SUBJECT** | Bellevue | | 1978 | 16,796 | | | | $17.51 | |

Rates range from a low of 5.23% for a an older office sale along Aurora Ave. north of downtown Seattle, to a high of 7.05% for an office sale in Tukwila. The subject's rate would fall within this range, with the expectation of medium-term redevelopment likely pushing it toward the low end, around the average and median of indications.

25-00240-WLH11   Doc 191   Filed 02/19/25   Entered 02/19/25 16:03:51   Pg 63 of 189

**Investor Surveys**

The following table provides capitalization rate statistics as surveyed by investors that we considered to be relevant to the subject property and our independent market participant interview.

| CAPITALIZATION RATE SURVEYS (OAR) | | | | | | |
|---|---|---|---|---|---|---|
| SOURCE | QUARTER | RANGE | | AVG | LAST Q | LAST YR |
| **PriceWaterhouse Coopers** | | | | | | |
| National Secondary Office | 3Q 24 | 6.50% to 10.25% | | 8.50% | 8.50% | 8.16% |
| Seattle Office | 3Q 24 | 6.25% to 11.00% | | 7.96% | 7.95% | 7.07% |
| **Real Capital Analytics** | | | | | | |
| Tertiary West Office | 2Q 24 | | | 8.79% | - | 6.33% |
| Seattle Office | 2Q 24 | | | - | 8.17% | - |
| **AVERAGE** | | 6.38% to 10.63% | | 8.42% | 8.21% | 7.19% |

Trends from investor surveys are generally higher than our rate comparisons from sales. As noted, the subject's good tenancy is likely only interim income, as redevelopment can be expected with the land value already exceeding the subject's value as improved. As such, future income streams are less applicable to the subject property, and so a lower capitalization rate would be appropriate.

**Band of Investment Technique**

Most properties are purchased with debt and equity capital; therefore, the overall capitalization rate must satisfy the market return requirements of both investment positions. Available financing information from lenders and the sales comparables indicates the following terms:

| BAND OF INVESTMENT ASSUMPTIONS | |
|---|---|
| Loan Amortization Period | 30 Years |
| Interest Rate | 6.50% |
| Loan-to-Value (LTV) Ratio | 70% |
| Mortgage Constant | 7.58% |

Equity dividend rates vary depending upon motivations of buyers and financing terms. The previous terms and an appropriate equity dividend rate are used in the Band of Investments calculations, which are presented on the following chart.

| BAND OF INVESTMENT CALCULATION | | | | | |
|---|---|---|---|---|---|
| Mortgage Component | 70% | x | 7.58% | = | 5.309% |
| Equity Component | 30% | x | 7.00% | = | 2.100% |
| Indicated Capitalization Rate | | | | | 7.409% |
| **INDICATED CAPITALIZATION RATE** | | | | | **7.41%** |

**Debt Coverage Ratio Technique**

An alternate method to calculating capitalization rates based on financing metrics is the Debt Coverage Ratio method, which uses the relationship between the DCR, LTV, and mortgage constant to conclude to a rate value. Based on the assumptions previously discussed, we have concluded to a DCR of 1.30, an LTV of 70% and a mortgage constant of 7.58%. The following calculation indicates the cap rate conclusion by this method:

| DEBT COVERAGE RATIO CALCULATION | |
|---|---|
| Debt Coverage Ratio | 1.30 |
| LTV Ratio | 70% |
| Mortgage Constant | 7.58% |
| **INDICATED CAPITALIZATION RATE** | **6.90%** |

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES 50

**Capitalization Rate Conclusion**

Taking all factors into consideration, the following table summarizes the various capitalization rate indicators and provides the final capitalization rate conclusion.

| CAPITALIZATION RATE CONCLUSION (OAR) | | | | | | |
|---|---|---|---|---|---|---|
| SOURCE | QUARTER | RANGE | | AVG | LAST Q | LAST YR |
| Comparable Sales | | 5.23% to | 7.05% | 6.14% | - | - |
| Investor Surveys | 3Q 24 | 6.38% to | 10.63% | 8.42% | 8.21% | 7.19% |
| Band of Investment Technique | | | | 7.41% | - | - |
| Debt Coverage Ratio | | | | 6.90% | - | - |
| AVERAGE | | 5.80% to | 8.84% | 7.32% | 8.21% | 7.19% |
| CAPITALIZATION CONCLUSION (LEASED FEE) | | | | 6.25% | | |

Rate indications from recent sales are most reliable. Considering that the subject's land value exceeds its value as improved, any investor would regard the subject as a redevelopment candidate and expect that any future leases would be shorter-term and provide interim income before redevelopment. A lower capitalization rate of 6.25% is warranted.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## DIRECT CAPITALIZATION CONCLUSION

The table below summarizes the direct capitalization method and the Income Approach Value conclusion.

| DIRECT CAPITALIZATION SUMMATION TABLE | | | | | |
|---|---|---|---|---|---|
| INCOME ITEMS | %PGI | %EGI | $/SF(MO.) | $/SF(YR.) | TOTAL |
| Base Contract Income | | | $1.48 | $17.78 | $232,894 |
| Market Rent Vacant Space | | | $1.42 | $17.00 | $62,900 |
| TOTAL RENTAL INCOME | | | $1.47 | $17.61 | $295,794 |
| REIMBURSEMENTS | | | | | |
| Real Estate Taxes | | | $0.32 | $3.81 | $63,974 |
| Property Insurance | | | $0.04 | $0.50 | $8,398 |
| Repairs and Maintenance | | | $0.19 | $2.25 | $37,791 |
| Cleaning and Janitorial | | | $0.11 | $1.30 | $21,835 |
| Utilities | | | $0.25 | $3.00 | $50,388 |
| Management Fees | | | $0.07 | $0.88 | $14,789 |
| Reserves | | | - | - | $0 |
| TOTAL REIMBURSEMENTS | | | $0.98 | $11.74 | $197,175 |
| POTENTIAL GROSS INCOME (PGI) | 100.0% | 100.0% | $2.45 | $29.35 | $492,970 |
| VACANCY & CREDIT LOSS | | | | | |
| General Vacancy | 0.0% | | - | - | $0 |
| Credit & Collection Loss | 0.0% | | - | - | $0 |
| TOTAL VACANCY & CREDIT LOSS | 0.0% | | - | - | $0 |
| EFFECTIVE GROSS INCOME (EGI) | 100.0% | 100.0% | $2.45 | $29.35 | $492,970 |
| EXPENSE ITEMS | | | | | |
| Real Estate Taxes | (13.0%) | (13.0%) | ($0.32) | ($3.81) | ($63,974) |
| Property Insurance | (1.7%) | (1.7%) | ($0.04) | ($0.50) | ($8,398) |
| Repairs and Maintenance | (7.7%) | (7.7%) | ($0.19) | ($2.25) | ($37,791) |
| Cleaning and Janitorial | (4.4%) | (4.4%) | ($0.11) | ($1.30) | ($21,835) |
| Utilities | (10.2%) | (10.2%) | ($0.25) | ($3.00) | ($50,388) |
| Management Fees | (3.0%) | (3.0%) | ($0.07) | ($0.88) | ($14,789) |
| Reserves | (0.3%) | (0.3%) | ($0.01) | ($0.10) | ($1,680) |
| TOTAL EXPENSES | (40.3%) | (40.3%) | ($0.99) | ($11.84) | ($198,855) |
| NET OPERATING INCOME (NOI) | 59.7% | 59.7% | $1.46 | $17.51 | $294,115 |
| Capitalization Rate | | | | | 6.25% |
| Capitalized Value | | | | | $4,705,834 |
| INDICATED VALUE | | | | $280/SF | $4,710,000 |
| Lease-Up Costs | | | | From Lease-Up Analysis | |
| Rent Loss | (6.3%) | (6.3%) | ($0.15) | ($1.85) | ($31,011) |
| Expense Carry | (4.3%) | (4.3%) | ($0.11) | ($1.27) | ($21,415) |
| Tenant Improvements | (7.5%) | (7.5%) | ($0.18) | ($2.20) | ($37,000) |
| Leasing Commissions | (1.3%) | (1.3%) | ($0.03) | ($0.37) | ($6,290) |
| Total Lease-Up Costs | (19.4%) | (19.4%) | ($0.47) | ($5.70) | ($95,715) |
| TOTAL LEASE-UP COSTS | (19.4%) | (19.4%) | ($0.47) | ($5.70) | ($95,715) |
| AS-IS MARKET VALUE | | | | $274/SF | $4,610,000 |

Rounded to nearest $10,000

## ADJUSTMENTS TO VALUE

To reflect conditions in effect at the subject property as the date of value, adjustments to the capitalized value were necessary for lease up costs. The following discussion summarizes our support of the value adjustments.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

**Lease-Up Analysis**

Regarding lease-up costs, the subject property has a current occupancy level of 78.0%. While the subject is a redevelopment candidate, some additional (but shorter-term) leasing is likely before the expiration of in-place leases that extend through July 2026. As such, lease-up costs associated with the subject achieving stabilization are warranted in arriving to the As-Is Market Value. Based on our research of prevailing supply/demand conditions and the subject's competitive position in the marketplace, we have projected a period of 12 months for the vacant space to be absorbed. This will require an average absorption rate of 308 SF per month.

The following table summarizes our analysis of lease-up costs for current vacancies. There are 3 vacant tenant suites and 3 tenant suites will be leased to reach stabilized occupancy. The lease-up cost analysis calculates rent loss, tenant improvements, leasing commissions and free rent based on our market leasing assumptions previously supported in the Market Rent Analysis section.

The lease-up costs reflect the actual costs associated with leasing up the vacant space. When warranted an additional provision for entrepreneurial profit is used to mirror investor behavior related to risks of investing in a property with vacancy.

| LEASE-UP COSTS | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VACANT | | MARKET RENT | | RENT LOSS | | EXPENSE | TENANT IMPV. | | LEASING COMMISSION | | | FREE RENT | | TOTAL |
| SUITE | SF | $/MO | $/YR | MONTH | COST | CARRY | TI $/SF | COST | TERM | FEE | COST | MOS. | COST | COST |
| 201 | 1,399 | $1.42 | $17.00 | 8 | $15,855 | $10,949 | $10 | $13,990 | 2 | 5% | $2,378 | 0 | $0 | $43,173 |
| 207 | 1,265 | $1.42 | $17.00 | 6 | $10,753 | $7,425 | $10 | $12,650 | 2 | 5% | $2,151 | 0 | $0 | $32,978 |
| 109B | 1,036 | $1.42 | $17.00 | 3 | $4,403 | $3,041 | $10 | $10,360 | 2 | 5% | $1,761 | 0 | $0 | $19,565 |
| SUBTOTAL | | | | | $31,011 | $21,415 | | $37,000 | | | $6,290 | | $0 | $95,715 |
| TOTAL LEASE UP COSTS | | | | | | | | | | | | | | $100,000 |

Rounded to nearest $10,000

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES                    53

## SALES APPROACH

The Sales Comparison Approach analyzes comparable sales by applying transactional and property adjustments to bracket the subject property within an appropriate unit value comparison. The most relevant unit of comparison is the price per square foot of NRA, as it best reflects the analysis used by buyers and sellers in this market for improved properties with similar design and utility. We completed a thorough search for similar improved sales in terms of property type, location, physical characteristics, and date of sale. Overall, the sales selected represent the best comparables available for this analysis.

**Adjustment Process**

The following adjustments or general market trends were considered for the basis of valuation.

**Transactional Adjustments**

Dollar adjustments to the comparable sales were considered and made when warranted for transactional adjustments including property rights transferred, financing terms, conditions of sale, expenditures after purchase and market conditions. The following table summarizes the market conditions adjustment applied in this analysis.

| MARKET CONDITIONS ADJUSTMENT | | |
|---|---|---|
| Per Year As Of September 2024 | (As-Is) | 0% |

The market has exhibited value stability during the time from the oldest sale date up through the effective valuation date; therefore a market conditions adjustment is not warranted.

**Property Adjustments**

Quantitative percentage adjustments are also made for location and physical characteristics such as size, age, site and parking ratios, access, exposure, quality and condition, as well as other applicable elements of comparison. Where possible the adjustments applied are based on paired data or other statistical analysis. It should be stressed that the adjustments are subjective in nature and are meant to illustrate our logic in deriving a value opinion for the subject site.

**Presentation**

The following Sales Summation Table, Location Map and photographs summarize the improved sales data. Following these items, the comparable sales are adjusted for applicable elements of comparison and the opinion of value by the Sales Comparison Approach is concluded.

## IMPROVED SALES SUMMATION TABLE

| COMPARABLE | SUBJECT | COMPARABLE 1 | COMPARABLE 2 | COMPARABLE 3 | COMPARABLE 4 |
|---|---|---|---|---|---|
| Name | Amity Court | Bellevue Forest 1 | The 15885 Building | Aurora Ave. Office | Pacific Engineering Building |
| Address | 14400 Northeast Bellevue-Redmond Road | 2105 112th Avenue Northeast | 15885 Northeast 28th Street | 4001 Aurora Avenue North | 15445 53rd Ave S |
| City | Bellevue | Bellevue | Bellevue | Seattle | Tukwila |
| State | WA | WA | WA | WA | WA |
| Zip | 98007 | 98004 | 98008 | 98103 | - |
| County | King | King | King | King | King |
| APN | 272505-9147 | 068702-0012 | 673100090 | 193130-0915 | 115720-0035 |
| **PHYSICAL INFORMATION** | | | | | |
| Property Type | Office | Office | Office | Office | Office |
| NRA (SF) | 16,796 | 6,776 | 12,444 | 20,093 | 8,700 |
| Land Area (SF) | 43,200 | 22,211 | 42,465 | 13,504 | 50,887 |
| L:B Ratio | 2.5 | 3.3 | 3.4 | 0.7 | 5.8 |
| Location | Average/Good | Good | Average/Good | Average/Good | Average |
| Quality | Average | Average/Good | Good/Excellent | Average/Good | Average |
| Condition | Average | Average/Good | Good | Average/Good | Average |
| Exposure | Average | Average | Average | Good | Average |
| Access | Average/Good | Good | Average/Good | Average/Good | Good |
| Year Built | 1978 | 1984 | 1999 | 1953 | 1980 |
| **SALE INFORMATION** | | | | | |
| Date | | 2/29/2024 | 12/26/2023 | 12/7/2023 | 3/7/2023 |
| Status | | Recorded | Recorded | Recorded | Recorded |
| Recording Number | | 20240229000345 | 20231221000785 | 20231207000566 | 20230306000752 |
| Marketing Period | | 2 Mos. | 4 Mos. | 8 Mos. | 0 Mos. |
| Rights Transferred | | Leased Fee | Leased Fee | Leased Fee | Fee Simple |
| Transaction Price | | $3,522,480 | $6,500,000 | $7,425,000 | $2,450,000 |
| Analysis Price | | $3,522,480 | $6,500,000 | $7,425,000 | $2,450,000 |
| $/SF NRA | | $520 | $522 | $370 | $282 |
| NOI/SF NRA | $17.51 | $33.01 | $31.71 | $19.32 | - |
| Occupancy | 78.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Capitalization Rate | | 6.35% | 6.07% | 5.23% | - |
| Confirmation Source | | MarKoa | CBRE | NAI Puget Sound | Kidder Mathews |
| Confirmation Name | | Cheryl McIvor | Tim Owens | Rick Page | Brian Clapp |

## SALES LOCATION MAP



| COMP | DISTANCE | ADDRESS | OCC. | SALE DATE | OAR | $/SF |
|------|----------|---------|------|-----------|-----|------|
| SUBJECT | - | 14400 Northeast Bellevue-Redmond Road, Bellevue, WA | - | - | - | - |
| No. 1 | 2.0 Miles | 2105 112th Avenue Northeast, Bellevue, WA | 100.0% | 2/29/2024 | 6.35% | $519.85 |
| No. 2 | 1.1 Miles | 15885 Northeast 28th Street, Bellevue, WA | 100.0% | 12/26/2023 | 6.07% | $522.34 |
| No. 3 | 9.5 Miles | 4001 Aurora Avenue North, Seattle, WA | 100.0% | 12/7/2023 | 5.23% | $369.53 |
| No. 4 | 12.5 Miles | 15445 53rd Ave S, Tukwila, WA | 100.0% | 3/7/2023 | | $281.61 |

## COMPARABLE SALES PHOTOGRAPHS



**COMPARABLE 1**



**COMPARABLE 2**



**COMPARABLE 3**



**COMPARABLE 4**

## IMPROVED SALES ADJUSTMENT TABLE

| COMPARABLE | SUBJECT | COMPARABLE 1 | COMPARABLE 2 | COMPARABLE 3 | COMPARABLE 4 |
|---|---|---|---|---|---|
| Name | Marray Franklyn Building | Bellevue Forest 1 | The 15885 Building | Aurora Ave. Office | Pacific Engineering Building |
| Address | 14400 Northeast Bellevue-Redmond Road | 2105 112th Avenue Northeast | 15885 Northeast 28th Street | 4001 Aurora Avenue North | 15445 53rd Ave S |
| City, State | Bellevue, WA | Bellevue, WA | Bellevue, WA | Seattle, WA | Tukwila, WA |
| Zip | 98007 | 98004 | 98008 | 98103 | - |
| APN | 272505-9147 | 068702-0012 | 673100090 | 193130-0915 | 115720-0035 |
| NRA (SF) | 16,796 | 6,776 | 12,444 | 20,093 | 8,700 |
| Land Area (AC) | 1.0 | 0.5 | 1.0 | 0.3 | 1.2 |
| Land Area (SF) | 43,200 | 22,211 | 42,465 | 13,504 | 50,887 |
| Year Built | 1978 | 1984 | 1999 | 1953 | 1980 |
| **SALE INFORMATION** | | | | | |
| Date | | 2/29/2024 | 12/26/2023 | 12/7/2023 | 3/7/2023 |
| Status | | Recorded | Recorded | Recorded | Recorded |
| Rights Transferred | | Leased Fee | Leased Fee | Leased Fee | Fee Simple |
| Analysis Price | | $3,522,480 | $6,500,000 | $7,425,000 | $2,450,000 |
| $/SF NRA | | $520 | $522 | $370 | $282 |
| NOI/SF NRA | $15.85 | $33.01 | $31.71 | $19.32 | - |
| Occupancy | 78.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **TRANSACTIONAL ADJUSTMENTS** | | | | | |
| Property Rights | | 0% | 0% | 0% | 0% |
| Financing | | 0% | 0% | 0% | 0% |
| Conditions of Sale | | 0% | 0% | 0% | 0% |
| Expenditures After the Sale | | 0% | 0% | 0% | 0% |
| Market Conditions[1] | | 0% | 0% | 0% | 0% |
| Subtotal Transactional Adj Price | | $520 | $522 | $370 | $282 |
| **PROPERTY ADJUSTMENTS** | | | | | |
| Location | Average/Good | Good | Good/Excellent | Average/Good | Average |
| *Adjustment* | | -5% | -10% | 0% | 5% |
| Size | 16,796 | 6,776 | 12,444 | 20,093 | 8,700 |
| *Adjustment* | | -10% | 0% | 0% | -5% |
| Quality | Average | Average/Good | Good/Excellent | Average/Good | Average |
| *Adjustment* | | -5% | -10% | -5% | 0% |
| Condition | Average | Average/Good | Good | Average/Good | Average |
| *Adjustment* | | -5% | -10% | -5% | 0% |
| Exposure | Average | Average | Average | Good | Average |
| *Adjustment* | | 0% | 0% | -10% | 0% |
| Access | Average/Good | Good | Average/Good | Average/Good | Good |
| *Adjustment* | | -5% | 0% | 0% | -5% |
| Subtotal Property Adjustment | | -30% | -30% | -20% | -5% |
| **TOTAL ADJUSTED PRICE** | | **$364** | **$366** | **$296** | **$268** |

| STATISTICS | UNADJUSTED | ADJUSTED |
|---|---|---|
| LOW | $282 | $268 |
| HIGH | $522 | $366 |
| MEDIAN | $445 | $330 |
| AVERAGE | $423 | $323 |

[1] Market Conditions Adjustment: 0%

Date of Value (for adjustment calculations): 9/18/24

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## SALES COMPARABLE ANALYSIS

**Sale 1** is the February 2024 sale of an office property near the interchange of Interstate 405 and SR-520. The property is adjusted downward for superior location closer to downtown Bellevue, for smaller building area, and for quality, condition, and superior access near the freeways.

**Sale 2** is the December 2023 sale of a single-tenant office near the Microsoft campus. The property is adjusted downward for superior location, and superior quality and condition.

**Sale 3** is the December 2023 sale of an older (1953) office building fronting Aurora Ave. north of downtown Seattle. The property is adjusted downward for superior quality and condition, and superior exposure and access.

**Sale 4** is the March 2023 sale of a one-story office in Tukwila. The property is adjusted upward for location, downward for smaller size, and downward for superior access near the interchange of Interstates 5 and 405.

## SALES COMPARISON APPROACH CONCLUSION

Sales 3 and 4 are the best indicators, with lower net and gross adjustments. These sales indicate a value range from $268 to $296/SF. **We conclude within this range at a value of $275/SF.** The following table summarizes the analysis of the comparables, reports the reconciled price per NRA value conclusion, and presents the concluded value of the subject property.

| | | SALES COMPARISON APPROACH CONCLUSION (NRA) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | ANALYSIS | | ADJUSTMENT | | | NET | GROSS | OVERALL |
| COMP | PRICE | TRANSACTIONAL¹ | ADJUSTED | PROPERTY² | FINAL | ADJ % | ADJ % | COMPARISON |
| 1 | $520 | 0% | $520 | -30% | $364 | -30% | 30% | SECONDARY |
| 2 | $522 | 0% | $522 | -30% | $366 | -30% | 30% | SECONDARY |
| 3 | $370 | 0% | $370 | -20% | $296 | -20% | 20% | PRIMARY |
| 4 | $282 | 0% | $282 | -5% | $268 | -5% | 15% | PRIMARY |
| LOW | $268 | | | | | AVERAGE | | $323 |
| HIGH | $366 | | | | | MEDIAN | | $330 |
| | | | SUBJECT SF | $/SF CONCLUSION | | | | VALUE |
| INDICATED VALUE | | | 16,796 | x | $275/SF | = | | $4,620,000 |
| Lease-Up Costs | | | | | | | | From Lease-Up Analysis |
| Rent Loss | | | | | | | | ($31,011) |
| Expense Carry | | | | | | | | ($21,415) |
| Tenant Improvements | | | | | | | | ($37,000) |
| Leasing Commissions | | | | | | | | ($6,290) |
| Total Lease-Up Costs | | | | | | | | ($95,715) |
| TOTAL LEASE-UP COSTS | | | | | | | | ($95,715) |
| AS-IS MARKET VALUE | | | | $269/SF | | | | $4,520,000 |

¹Cumulative ²Additive                                                   Rounded to nearest $10,000

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## LAND VALUATION

The most relevant unit of comparison is the price per square foot, as it best reflects the analysis used by buyers and sellers in this market for land with similar utility and zoning. A thorough search was made for similar land sales in terms of proximity to the subject, size, location, development potential, and date of sale. Overall, the sales selected represent the best comparables available for this analysis.

**Adjustment Process**
The following adjustments or general market trends were considered for the basis of valuation.

**Transactional Adjustments**
Dollar adjustments to the comparable sales were considered and made when warranted for transactional adjustments including property rights transferred, financing terms, conditions of sale, expenditures after purchase such as demolition costs and market conditions. The following table summarizes the market conditions adjustment applied in this analysis.

| MARKET CONDITIONS ADJUSTMENT | | |
|---|---|---|
| Per Year As Of September 2024 | (As-Is) | 0% |

The market has exhibited value stability during the time from the oldest sale date up through the effective valuation date; therefore a market conditions adjustment is not warranted.

**Property Adjustments**
Quantitative percentage adjustments are also made for location and physical characteristics such as size, shape, access, exposure, topography, zoning and overall utility. Where possible the adjustments applied are based on paired data or other statistical analysis. It should be stressed that the adjustments are subjective in nature and are meant to illustrate our logic in deriving a value opinion for the subject site.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## Presentation

The following Land Sales Summation Table, Location Map and plat maps summarize the sales data used in this analysis. Following these items, the comparable land sales are adjusted for applicable elements of comparison and the opinion of site value is concluded.

| LAND SALES SUMMATION TABLE | | | | | | |
|---|---|---|---|---|---|---|
| COMPARABLE | SUBJECT | COMPARABLE 1 | COMPARABLE 2 | COMPARABLE 3 | COMPARABLE 4 | COMPARABLE 5 |
| Name | Amity Court | Alta North City Apt. Site | Great Floors Redevelopment Site | Kirkland US Bank Site | Modera Bridle Trails Land | Bothell Way Redevelopment Site |
| Address | 14400 Northeast Bellevue-Redmond Road | 17712 15th Avenue Northeast | 12802 Bel-Red Road | 177 Central Way | 13033 Northeast 70th Place | 7520 Northeast Bothell Way |
| City | Bellevue | Shoreline | Bellevue | Kirkland | Kirkland | Kenmore |
| State | WA | WA | WA | WA | WA | WA |
| Zip | 98007 | 98155 | 98005 | 98033 | 98033 | 98028 |
| County | King | King | King | King | King | King |
| APN | 272505-9147 | Multiple | 282505-9260; -9268 | 124450-0035 | 124150-0285, 124150-0277 | 0114100-904, -905 |
| PHYSICAL INFORMATION | | | | | | |
| SF | 43,200 | 60,146 | 38,223 | 19,279 | 128,712 | 51,836 |
| Location | Average/Good | Average/Good | Average/Good | Good/Excellent | Average/Good | Fair/Average |
| Exposure | Average | Average | Average | Good | Average | Average |
| Access | Average/Good | Average | Average/Good | Good | Average/Good | Average |
| Shape | Generally | Irregular | Rectangular | Rectangular | Generally | Generally |
| Site Utility Rating | Average | Average | Average | Average | Average | Average |
| SALE INFORMATION | | | | | | |
| Date | | 6/8/2023 | 7/26/2023 | 4/30/2024 | 4/26/2024 | 10/31/2023 |
| Status | | Recorded | Recorded | Recorded | Recorded | Recorded |
| Rights Transferred | | Leased Fee | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Transaction Price | | $9,450,000 | $10,000,000 | $7,000,000 | $23,587,547 | $4,500,000 |
| Analysis Price | | $9,450,000 | $7,500,000 | $7,050,000 | $23,587,547 | $4,500,000 |
| /SF Land | | $157.12 | $196.22 | $365.68 | $183.26 | $86.81 |

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## LAND SALES LOCATION MAP



| COMP | DISTANCE | ADDRESS | SALE DATE | ACRES | SF | $/SF |
|------|----------|---------|-----------|-------|------|------|
| SUBJECT | - | 14400 Northeast Bellevue-Redmond Road, Bellevue, WA | - | 1.0 | 43,200 | - |
| No. 1 | 11.9 Miles | 17712 15th Avenue Northeast, Shoreline, WA | 6/8/2023 | 1.4 | 60,146 | $157.12 |
| No. 2 | 1.0 Miles | 12802 Bel-Red Road, Bellevue, WA | 7/26/2023 | 0.9 | 38,223 | $196.22 |
| No. 3 | 4.4 Miles | 177 Central Way, Kirkland, WA | 4/30/2024 | 0.4 | 19,279 | $365.68 |
| No. 4 | 2.9 Miles | 13033 Northeast 70th Place, Kirkland, WA | 4/26/2024 | 3.0 | 128,712 | $183.26 |
| No. 5 | 10.0 Miles | 7520 Northeast Bothell Way, Kenmore, WA | 10/31/2023 | 1.2 | 51,836 | $86.81 |

## COMPARABLE 1

### LOCATION INFORMATION

| | |
|---|---|
| Name | Alta North City Apt. Site |
| Address | 17712 15th Avenue Northeast |
| City, State, Zip Code | Shoreline, WA, 98155 |
| County | King |
| MSA | Seattle-Tacoma-Bellevue, WA |
| APN | Multiple |

### SALE INFORMATION

| | |
|---|---|
| Buyer | North City Apartments Owner LP |
| Seller | PAR Mark Shoreline LLC and Niko 1 LLC |
| Transaction Date | 06/8/2023 |
| Transaction Status | Recorded |
| Transaction Price | $9,450,000 |
| Analysis Price | $9,450,000 |
| Recording Number | 20230626000412 |
| Rights Transferred | Leased Fee |
| Financing | Conventional |
| Conditions of Sale | Assemblage |

### PHYSICAL INFORMATION

| | |
|---|---|
| Intended Use | Mid-Rise |
| Location | Average/Good |
| Site Size (Net) | 1.38 Acres (60,146 SF) |
| Site Size (Gross) | 1.38 Acres (60,146 SF) |
| Zoning | CB |
| Development Potential | 230 |
| Shape | Irregular |
| Topography | Generally Level |
| Access | Average |
| Exposure | Average |
| Corner | Yes |
| Utilities | No |



### ALTA NORTH CITY APT. SITE

#### ANALYSIS INFORMATION

| Price | $/Acre | $/SF | $/Unit |
|---|---|---|---|
| Gross | $6,842,867 | $157.12 | $41,087 |
| Net | $6,842,867 | $157.12 | $41,087 |

#### CONFIRMATION

| | | |
|---|---|---|
| Name | Confidential | |
| Company | Confidential | |
| Source | Assessor | |
| Date / Phone Number | 04/27/2023 | Confidential |

#### REMARKS

Land assemblage from two different sellers that located about one mile from the future 185th St. Light Rail Station in Shoreline. The property is improved with single story retail buildings. The interim income generated from the leases will off-set the demolition costs. The buyer plans to build a 230-unit apartment property with street level retail.

## COMPARABLE 2

### LOCATION INFORMATION

| | |
|---|---|
| Name | Great Floors Redevelopment Site |
| Address | 12802 Bel-Red Road |
| City, State, Zip Code | Bellevue, WA, 98005 |
| County | King |
| MSA | Seattle-Bellevue-Everett, WA |
| APN | 282505-9260; -9268 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | SC Bellevue RE LLC |
| Seller | Og Bellevue LLC |
| Transaction Date | 07/26/2023 |
| Transaction Status | Recorded |
| Transaction Price | $10,000,000 |
| Analysis Price | $7,500,000 |
| Recording Number | 20230726000381 |
| Rights Transferred | Fee Simple |

### PHYSICAL INFORMATION

| | |
|---|---|
| Intended Use | Redevelopment |
| Location | Average/Good |
| Flood Zone | B and X |
| Site Size (Net) | 0.88 Acres (38,223 SF) |
| Site Size (Gross) | 0.88 Acres (38,223 SF) |
| Zoning | BR-CR |
| Shape | Rectangular |
| Topography | Level |
| Access | Average/Good |
| Exposure | Average |
| Corner | No |
| Utilities | No |



### GREAT FLOORS REDEVELOPMENT SITE

### ANALYSIS INFORMATION

| Price | $/Acre | $/SF | $/Unit |
|---|---|---|---|
| Gross | $8,551,881 | $196.22 | $7,500,000 |
| Net | $8,551,881 | $196.22 | $7,500,000 |

### CONFIRMATION

| | |
|---|---|
| Name | Chad Waldbaum |
| Company | JSH Properties |
| Source | Buyer's Broker |
| Date / Phone Number | 09/21/2023    +1 425 455 0500 |

### REMARKS

This rectangular-shaped parcel has frontage on Bel-Red Road. The Great Floors building was vacant at time of purchase. The seller's broker was Chad Waldbaum with JSH Properties and the buyer's broker was Taylor Hoff with Newmark. According to the seller's broker, the buyer and seller negotiated the purchase price down to $7.5 million to account for environmental cleanup. Mr. Waldbaum also said the original price was established prior to hikes in interest rates. On the other hand, the purchase was an all cash transaction.

## COMPARABLE 3

### LOCATION INFORMATION

| | |
|---|---|
| Name | Kirkland US Bank Site |
| Address | 177 Central Way |
| City, State, Zip Code | Kirkland, WA, 98033 |
| County | King |
| MSA | Seattle-Bellevue-Everett, WA |
| APN | 124450-0035 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | The Cordillera Group |
| Seller | US Bank |
| Transaction Date | 04/30/2024 |
| Transaction Status | Recorded |
| Transaction Price | $7,000,000 |
| Analysis Price | $7,050,000 |
| Recording Number | TBD |
| Rights Transferred | Fee Simple |
| Conditions of Sale | Arms-Length |
| Marketing Time | 12 Months |

### PHYSICAL INFORMATION

| | |
|---|---|
| Intended Use | Residential |
| Location | Good/Excellent |
| Site Size (Net) | 0.44 Acres (19,279 SF) |
| Site Size (Gross) | 0.44 Acres (19,279 SF) |
| Zoning | CBD 1 |
| Development Potential | 34 |
| Density | 76.75 |
| Shape | Rectangular |
| Topography | Level |
| Access | Good |
| Exposure | Good |
| Corner | No |
| Utilities | Yes |



## KIRKLAND US BANK SITE

### ANALYSIS INFORMATION

| Price | $/Acre | $/SF | $/Unit |
|---|---|---|---|
| Gross | $15,914,221 | $365.68 | $207,353 |
| Net | $15,914,221 | $365.68 | $207,353 |

### CONFIRMATION

| | | |
|---|---|---|
| Name | Michael Eney | |
| Company | The Cordillera Group | |
| Source | Buyer | |
| Date / Phone Number | 05/1/2024 | +1 503 957 1107 |

### REMARKS

The Cordillera Group (under the Central Peak 2024, LLC) purchased this development site in central Kirkland. The site was sold by US Bank, who had marketed the site and had been under contract with a different buyer who was planning to develop apartments, but couldn't make the apartment plans feasible and attract financing. The Cordillera Group had bid on the site previously and stepped in to purchase the site.

The Cordillera Group plans to develop the site with 25 to 34 new condominiums with ground level retail (as required by the zoning). Due to the high water-table, the developer reports that digging down to add parking would be difficult, thus resulting in lower unit count and minimal below-grade parking.

## COMPARABLE 4

### LOCATION INFORMATION

| | |
|---|---|
| Name | Modera Bridle Trails Land |
| Address | 13033 Northeast 70th Place |
| City, State, Zip Code | Kirkland, WA, 98033 |
| County | King |
| MSA | Seattle-Bellevue-Everett, WA |
| APN | 124150-0285, 124150-0277 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | Bridle Trails Apartments LLC |
| Seller | Totem Bowl & Investment Inc. |
| Transaction Date | 04/26/2024 |
| Transaction Status | Recorded |
| Transaction Price | $23,587,547 |
| Analysis Price | $23,587,547 |
| Recording Number | 20240430001040 |
| Rights Transferred | Fee Simple |
| Conditions of Sale | Arms-Length |

### PHYSICAL INFORMATION

| | |
|---|---|
| Intended Use | Residential |
| Location | Average/Good |
| Site Size (Net) | 2.96 Acres (128,712 SF) |
| Site Size (Gross) | 2.96 Acres (128,712 SF) |
| Zoning | BCX |
| Development Potential | 369 |
| Shape | Generally Rectangular |
| Topography | Generally Level |
| Access | Average/Good |
| Exposure | Average |
| Corner | Yes |
| Utilities | Yes |



## MODERA BRIDLE TRAILS LAND

### ANALYSIS INFORMATION

| Price | $/Acre | $/SF | $/Unit |
|---|---|---|---|
| Gross | $7,982,249 | $183.26 | $63,923 |
| Net | $7,982,249 | $183.26 | $63,923 |

### CONFIRMATION

| | | |
|---|---|---|
| Name | David Young | |
| Company | JLL | |
| Source | Buyer's Broker | |
| Date / Phone Number | 09/18/2024 | +1 206 607 1719 |

### REMARKS

This sale reflects the price allocated to one parcel of a 2-parcel sale in Kirkland. This parcel contains a bowling alley and small office which are to be demolished for redevelopment with a fully approved 369-unit multifamily housing development that includes 6,700 SF of retail and 425 parking stalls. This was an off-market sale but traded at a price understood by both sides as market-based Information confirmed by buyer's brokers.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES
66

## COMPARABLE 5

### LOCATION INFORMATION

| | |
|---|---|
| Name | Bothell Way Redevelopment Site |
| Address | 7520 Northeast Bothell Way |
| City, State, Zip Code | Kenmore, WA, 98028 |
| County | King |
| APN | 0114100-904, -905 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | TWG Development |
| Seller | Soofian Three Properties |
| Transaction Date | 10/31/2023 |
| Transaction Status | Recorded |
| Transaction Price | $4,500,000 |
| Analysis Price | $4,500,000 |
| Recording Number | 20231026000672 |
| Rights Transferred | Fee Simple |
| Conditions of Sale | Assumed Arms-Length |
| Marketing Time | 10 Months |

### PHYSICAL INFORMATION

| | |
|---|---|
| Intended Use | Mixed Use |
| Location | Average |
| Site Size (Net) | 1.19 Acres (51,836 SF) |
| Site Size (Gross) | 1.19 Acres (51,836 SF) |
| Zoning | Urban Center |
| Shape | Generally Rectangular |
| Topography | Level |
| Access | Average |
| Exposure | Average |
| Corner | No |
| Utilities | No |



## BOTHELL WAY REDEVELOPMENT SITE

### ANALYSIS INFORMATION

| Price | $/Acre | $/SF | $/Unit |
|---|---|---|---|
| Gross | $3,781,513 | $86.81 | $4,500,000 |
| Net | $3,781,513 | $86.81 | $4,500,000 |

### CONFIRMATION

| | | |
|---|---|---|
| Name | CoStar/Assessor/Marketing Brochure | |
| Company | CoStar/Assessor/Marketing Brochure | |
| Source | CoStar | |
| Date / Phone Number | 03/10/2024 | Confidential |

### REMARKS

Sale of a redevelopment site with a 1-story cafe along Bothell Way, at the east end of the town center. Eventual redevelopment with a multifamily mixed-use property is assumed, but no plans are known at present. It was marketed at a price of $3.9M and estimated that over 140 multifamily units could be developed on the site.

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

# LAND SALES ADJUSTMENT TABLE

| COMPARABLE | SUBJECT | COMPARABLE 1 | COMPARABLE 2 | COMPARABLE 3 | COMPARABLE 4 | COMPARABLE 5 |
|---|---|---|---|---|---|---|
| Name | Amity Court | Alta North City Apt. Site | Great Floors Redevelopment Site | Kirkland US Bank Site | Modera Bridle Trails Land | Bothell Way Redevelopment Site |
| Address | 14400 Northeast Bellevue-Redmond Road | 17712 15th Avenue Northeast | 12802 Bel-Red Road | 177 Central Way | 13033 Northeast 70th Place | 7520 Northeast Bothell Way |
| City | Bellevue | Shoreline | Bellevue | Kirkland | Kirkland | Kenmore |
| APN | 272505-9147 | Multiple | 282505-9260; -9268 | 124450-0035 | 124150-0285, 124150-0277 | 0114100-904, -905 |
| SF | 43,200 | 60,146 | 38,223 | 19,279 | 128,712 | 51,836 |
| **SALE INFORMATION** | | | | | | |
| Date | | 6/8/2023 | 7/26/2023 | 4/30/2024 | 4/26/2024 | 10/31/2023 |
| Status | | Recorded | Recorded | Recorded | Recorded | Recorded |
| Rights Transferred | | Leased Fee | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Analysis Price | | $9,450,000 | $7,500,000 | $7,050,000 | $23,587,547 | $4,500,000 |
| Price/SF | | $157.12 | $196.22 | $365.68 | $183.26 | $86.81 |
| **TRANSACTIONAL ADJUSTMENTS** | | | | | | |
| Property Rights | | 0% | 0% | 0% | 0% | 0% |
| Financing | | 0% | 0% | 0% | 0% | 0% |
| Conditions of Sale | | 0% | 0% | 0% | 0% | 0% |
| Expenditures After the Sale | | 0% | 0% | 0% | 0% | 0% |
| Market Conditions¹ | | 0% | 0% | 0% | 0% | 0% |
| Subtotal Transactional Adj Price | | $157.12 | $196.22 | $365.68 | $183.26 | $86.81 |
| **PROPERTY ADJUSTMENTS** | | | | | | |
| Location | Average/Good | Average/Good | Average/Good | Good/Excellent | Average/Good | Fair/Average |
| *Adjustment* | | 0% | 0% | -10% | 0% | 10% |
| Size | 43,200 | 60,146 | 38,223 | 19,279 | 128,712 | 51,836 |
| *Adjustment* | | 0% | 0% | -5% | 5% | 0% |
| Exposure | Average | Average | Average | Good | Average | Average |
| *Adjustment* | | 0% | 0% | -10% | 0% | 0% |
| Access | Average/Good | Average | Average/Good | Good | Average/Good | Average |
| *Adjustment* | | 5% | 0% | -5% | 0% | 5% |
| Shape | Generally Rectan | Irregular | Rectangular | Rectangular | Generally Rectangu | Generally Rectangu |
| *Adjustment* | | 0% | 0% | 0% | 0% | 0% |
| Site Utility Rating | Average | Average | Average | Average | Average | Average |
| *Adjustment* | | 0% | 0% | 0% | 0% | 0% |
| Subtotal Property Adjustment | | 5% | 0% | -30% | 5% | 15% |
| **TOTAL ADJUSTED PRICE** | | **$165** | **$196** | **$256** | **$192** | **$100** |

| STATISTICS | UNADJUSTED | ADJUSTED |
|---|---|---|
| LOW | $86.81 | $99.83 |
| HIGH | $365.68 | $255.98 |
| MEDIAN | $183.26 | $192.42 |
| AVERAGE | $197.82 | $181.88 |

¹ Market Conditions Adjustment: 0%

Date of Value (for adjustment calculations): 9/18/24

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## LAND SALES ANALYSIS

Our five selected comparable land sales are all improved properties that sold for land value, with eventual redevelopment either assumed or already planned.

**Land Sale 1** is the June 2023 sale of multiple parcels from different owners into an assemblage for redevelopment in Shoreline, WA. The property is adjusted upward only for access.

**Land Sale 2** is the July 2023 sale of a redevelopment site a short distance west of the subject. There are no property adjustments.

**Land Sale 3** is the April 2024 sale of a former bank branch in Kirkland's downtown core. The property is adjusted upward for superior location, smaller site size, and superior exposure and access.

**Land Sale 4** is the April 2024 sale of a former bowling alley in Kirkland for redevelopment with a 369-unit mixed use development. The property is adjusted upward for larger site size.

**Land Sale 5** is the October 2023 sale of a retail site in Kenmore for redevelopment. The property is adjusted upward for location and access.

## CALCULATION OF LAND VALUE

Sales 1, 2, and 4 are the strongest comparisons, with low or no net and gross adjustments. They show a value range from $165 to $196/SF. We conclude in the middle of this range at a value of **$180/SF of site area**. No deduction for demolition costs is made, as such costs will be offset by interim rental income. The following table summarizes the analysis of the comparables, reports the reconciled price per square foot value conclusion, and presents the concluded value of the subject site.

| | | | CALCULATION OF LAND VALUE | | | | | |
|---|---|---|---|---|---|---|---|---|
| | ANALYSIS | | ADJUSTMENT | | | NET | GROSS | OVERALL |
| COMP | PRICE | TRANSACTIONAL[1] | ADJUSTED | PROPERTY[2] | FINAL | ADJ % | ADJ % | COMPARISON |
| 1 | $157.12 | 0% | $157.12 | 5% | **$165** | 5% | 5% | PRIMARY |
| 2 | $196.22 | 0% | $196.22 | 0% | **$196** | 0% | 0% | PRIMARY |
| 3 | $365.68 | 0% | $365.68 | -30% | **$256** | -30% | 30% | SECONDARY |
| 4 | $183.26 | 0% | $183.26 | 5% | **$192** | 5% | 5% | PRIMARY |
| 5 | $86.81 | 0% | $86.81 | 15% | **$100** | 15% | 15% | SECONDARY |
| **LOW** | **$99.83** | | | | **AVERAGE** | | | **$182** |
| **HIGH** | **$255.98** | | | | **MEDIAN** | | | **$192** |
| **COMPONENT** | | | **SUBJECT SF** | | **$/SF CONCLUSION** | | | **VALUE** |
| **TOTAL PROPERTY** | | | **43,200** | x | $180.00 | = | | **$7,780,000** |

[1]Cumulative [2]Additive                                                   Rounded to nearest $10,000

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## RECONCILIATION OF VALUE CONCLUSIONS

The Analysis of Value Conclusions is the final step in the appraisal process and involves the weighing of the individual valuation techniques in relationship to their substantiation by market data, and the reliability and applicability of each valuation technique to the subject property. The following table summarizes the opinions of the As-Is Market Value of the subject property's leased fee interest. At the request of the client, we have also completed an Insurable Replacement Cost Estimate. As can be seen, the land value exceeds the valuations of the property as-improved. This land value is our concluded market value. No deduction for demolition costs is required, as such costs would be funded by interim rental income.

Our opinion of value reflects current conditions and the likely actions of market participants as of the date of value. It is based on the available information gathered and provided to us, as presented in this report, and does not predict future performance. Changing market or property conditions can and likely will have an effect on the subject's value.

| ANALYSIS OF VALUE CONCLUSIONS | |
|---|---|
| **VALUATION INDICES** | **AS-IS MARKET VALUE** |
| **INTEREST APPRAISED** | **LEASED FEE** |
| **DATE OF VALUE** | **SEPTEMBER 18, 2024** |
| Land Valuation | $7,780,000 |
| Sales Comparison Approach | $4,520,000 |
| Income Approach | $4,610,000 |
| **FINAL VALUE CONCLUSION** | **$7,780,000** |
| $/SF | $463/SF |
| Exposure Time | Six Months or Less |
| Marketing Period | Six Months or Less |
| **OTHER CONCLUSIONS** | **SEPTEMBER 18, 2024** |
| Insurable Replacement Cost | $3,120,000 |

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions of the signers are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- The signers of this report have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

- Joseph Liss has performed no services, as an appraiser or in any other capacity regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Reid Erickson, MAI has performed no services, as an appraiser or in any other capacity regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

- The signers are not biased with respect to the property that is the subject of this report or to the parties involved with this assignment.

- The engagement in this assignment was not contingent upon developing or reporting predetermined results.

- The compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- The reported analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice* and the *Code of Professional Ethics and Standards of Professional Appraisal* Practice of the Appraisal Institute.

- Joseph Liss inspected the property that is the subject of this report. Reid Erickson, MAI did not inspect the property that is the subject of this report.

- No one provided significant real property appraisal assistance to appraisers signing this certification.

The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

As of the date of this report Reid Erickson, MAI completed the continuing education program for Designated Members of the Appraisal Institute.

As of the date of this report Joseph Liss has completed the Standards and Ethics Education Requirement for (Candidates or Practicing Affiliates) of the Appraisal Institute.

_____          _____
Joseph Liss                                                September 30, 2024
Valuation Specialist                                          Date
Certified General Real Estate Appraiser
State of Washington License #22003802
+1 323 334 7958
joseph.liss@colliers.com

25-00240-WLH11   Doc 19   Filed 02/19/25   Entered 02/19/25 16:03:51   Pg 85 of 189

September 30, 2024
Date

Reid Erickson, MAI
Executive Managing Director
Certified General Real Estate Appraiser
State of Washington License #1100150
+1 206 965 1106
reid.erickson@colliers.com

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

This appraisal is subject to the following assumptions and limiting conditions:

- The appraisers may or may not have been provided with a survey of the subject property. If further verification is required, a survey by a registered surveyor is advised.

- We assume no responsibility for matters legal in character, nor do we render any opinion as to title, which is assumed to be marketable. All existing liens, encumbrances, and assessments have been disregarded, unless otherwise noted, and the property is appraised as though free and clear, under responsible ownership, and competent management.

- The exhibits in this report are included to assist the reader in visualizing the property. We have made no survey of the property and assume no responsibility in connection with such matters.

- Unless otherwise noted herein, it is assumed that there are no encroachments, zoning, or restrictive violations existing in the subject property.

- The appraisers assume no responsibility for determining if the property requires environmental approval by the appropriate governing agencies, nor if it is in violation thereof, unless otherwise noted herein.

- Information presented in this report has been obtained from reliable sources, and it is assumed that the information is accurate.

- This report shall be used for its intended purpose only, and by the party to whom it is addressed. Possession of this report does not include the right of publication.

- The appraisers may not be required to give testimony or to appear in court by reason of this appraisal, with reference to the property in question, unless prior arrangements have been made therefore.

- The statements of value and all conclusions shall apply as of the dates shown herein.

- There is no present or contemplated future interest in the property by the appraisers which is not specifically disclosed in this report.

- Without the written consent or approval of the authors neither all, nor any part of, the contents of this report shall be conveyed to the public through advertising, public relations, news, sales, or other media. This applies particularly to value conclusions and to the identity of the appraisers and the firm with which the appraisers are connected.

- This report must be used in its entirety. Reliance on any portion of the report independent of others, may lead the reader to erroneous conclusions regarding the property values. Unless approval is provided by the authors no portion of the report stands alone.

- The valuation stated herein assumes professional management and operation of the buildings throughout the lifetime of the improvements, with an adequate maintenance and repair program.

- The liability of Colliers International Valuation & Advisory Services, its principals, agents, and employees is limited to the client. Further, there is no accountability, obligation, or liability to any third party. If this report is placed in the hands of anyone other than the client, the client shall make such party aware of all limiting conditions and assumptions of the assignment and related discussions. The appraisers are in no way responsible for any costs incurred to discover or correct any deficiency in the property.

- The appraisers are not qualified to detect the presence of toxic or hazardous substances or materials which may influence or may be associated with the property or any adjacent properties, has made no investigation or analysis as to the presence of such materials, and expressly disclaims any duty to note the degree of fault. Colliers International Valuation & Advisory Services and its principals, agents, employees, shall not be liable for any costs, expenses, assessments, or penalties, or diminution in value, property damage, or personal

25-00249-WLH11   Doc 19   Filed 02/18/25   Entered 02/19/25 15:03:51   Pg 87 of 189

injury (including death) resulting from or otherwise attributable to toxic or hazardous substances or materials, including without limitation hazardous waste, asbestos material, formaldehyde, or any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, solids or gasses, waste materials or other irritants, contaminants or pollutants.

- The appraisers assume no responsibility for determining if the subject property complies with the *Americans with Disabilities Act* (*ADA*). Colliers International Valuation & Advisory Services, its principals, agents, and employees, shall not be liable for any costs, expenses, assessments, penalties or diminution in value resulting from non-compliance. This appraisal assumes that the subject meets an acceptable level of compliance with *ADA* standards; if the subject is not in compliance, the eventual renovation costs and/or penalties would negatively impact the present value of the subject. If the magnitude and time of the cost were known today, they would be reduced from the reported value conclusion.

- An on-site inspection of the subject property was conducted. No evidence of asbestos materials on-site was noted. A Phase 1 Environmental Assessment was not provided for this analysis. This analysis assumes that no asbestos or other hazardous materials are stored or found in or on the subject property. If evidence of hazardous materials of any kind occurs, the reader should seek qualified professional assistance. If hazardous materials are discovered and if future market conditions indicate an impact on value and increased perceived risk, a revision of the concluded values may be necessary.

- A detailed soils study was not provided for this analysis. The subject's soils and sub-soil conditions are assumed to be suitable based upon a visual inspection, which did not indicate evidence of excessive settling or unstable soils. No certification is made regarding the stability or suitability of the soil or sub-soil conditions.

- This analysis assumes that the financial information provided for this appraisal, including rent rolls and historical income and expense statements; accurately reflect the current and historical operations of the subject property.

Engagement Letter

Rent Roll

P&L Statements

Subject Data

Valuation Glossary

Qualifications of Appraisers

Qualifications of Colliers International Valuation & Advisory Services

## INSURABLE REPLACEMENT COST

At the client's request, we have included an estimate of the insurable replacement cost estimate of the subject improvements, which represents the replacement cost new of the subject improvements, exclusive of land value and profit. Insurance coverage is usually specific to a given project. We have not been provided with the specific policy requirements, which limit the reliability of the conclusion. Insurable replacement cost is a matter of underwriting as opposed to valuation. Users of this report should not construe the conclusion of insurable value to be an indication of market value. The insurable estimate is made using base costs and multiplier adjustments for market conditions and location from *Marshall Valuation Service,* which is assumed to accurately reflect replacement cost of the subject. We assume no liability as to the subject's insurable replacement cost and recommend that an estimate from a reputable insurance company be obtained if further assurance is required.

The following chart summarizes the insurable replacement cost estimate:

| INSURABLE REPLACEMENT COST | | |
|---|---|---|
| **MARSHALL VALUATION SERVICE DIRECT COST** | | |
| Number of Buildings | 1 | |
| Gross Building Area | 17,386 SF | **1** |
| MVS Building Type | | Office |
| Number of Stories | | 2 |
| Height per Story | | 10' |
| MVS Section/Page/Class | | 15/p.17/D |
| MVS Publication Date | | Nov-23 |
| Quality Rating | | Average |
| Component SF (Gross) | | 17,386 |
| **Base Cost (Per SF)** | | $149.00 |
| **HEIGHT & SIZE REFINEMENTS** | | |
| Number of Stories Multiplier | | 1.000 |
| Height Per Story Multiplier | | 0.953 |
| Area/Perimeter Multiplier | | 0.998 |
| **Subtotal** | | **$141.71** |
| **COST MULTIPLIERS** | | |
| Current Cost Multiplier | | 1.01 |
| Local Multiplier | | 1.21 |
| **DIRECT COSTS PER SF** | | **$173.19** |
| Indirect Cost (% of Direct) | 15% | 15% |
| INDIRECT COST PER SF | | $25.98 |
| **DIRECT & INDIRECT TOTAL PER SF** | | **$199.17** |
| **CALCULATION OF REPLACEMENT COST NEW** | | |
| Component SF (Gross) | | 17,386 |
| Base Improvement Cost | | $3,462,693 |
| Demolitions | 0% | $0 |
| Exclusions | 10% | ($346,269) |
| **TOTAL REPLACEMENT COST NEW** | | **$3,116,424** |

| INSURABLE REPLACEMENT COST CONCLUSION | |
|---|---|
| Base Improvement Cost | $3,462,693 |
| Demolition @ 0% | $0 |
| Exclusions @ 10% | ($346,269) |
| **INSURABLE REPLACEMENT COST** | $3,120,000 |
| | Rounded to nearest $10,000 |

© 2024 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES



September 04, 2024

Rob A. Detling
Colliers International Valuation & Advisory Services
4350 La Jolla Village Dr, 500
San Diego, CA92122

Dear Rob A. Detling:

Axos Bank ("Bank") hereby requests that you prepare an appraisal report as outlined in Attachment 1 (entitled "Appraisal Request Information"), which contains information to assist you in preparing your report. The purpose of the appraisal is to provide an estimate of the market value of the property in accordance with the requirements of Attachment 2 and the information contained in Attachment 1. Please advise the undersigned immediately if at any time during the assignment you are not able to prepare the report with this estimate of time or cost. Compliance with the terms of this letter and any attachment(s) is necessary to ensure acceptance of the appraisal and prompt payment of your invoice.

**Number of Hard Copies:** One electronic Copy

**Fee:** $3,600.00

**Due Date:** September 25, 2024

**Loan Number:** 90099031245 - Please reference loan number in letter of transmittal.

**I. General Requirements**

1. The **purpose of the report** is to estimate the market value of the subject property in accordance with the latest definition of market value offered in USPAP. An "as is" market value must be reported. The interest appraised must also be included (i.e. Fee Simple, Leased Fee, Leasehold, etc.). When applicable, an allocation to FF & E, business and going concern value is required.
2. An estimate of **Replacement Cost New** is required regardless of whether a Cost Approach is included in the appraisal.
3. An **executed copy of the engagement letter** needs to be returned within 24 hours of acceptance of the assignment. A copy of this engagement letter must be included in the addenda of the report.
4. A **narrative report** is required unless otherwise specified.
5. **Competency -** The report must contain a statement as to the competency of the appraiser. A general certified appraiser who is experienced with the property type and the subject market must inspect the interior of the property. A certified residential appraiser can satisfy this requirement for small multifamily properties, generally consisting of two to four units, with approval of Axos Bank prior to acceptance of the assignment.
6. **Delivery -** The appraiser must notify the Client, in writing, at least one week before the Due Date of any reasonable delays; however, the appraiser is encouraged to inform us of any problems encountered as soon as they occur. The signed appraisal must be delivered no later than the specified due date in order to avoid late fees or penalties. You agree to be available to discuss any concerns we have regarding the appraisal report and to make those corrections we deem necessary to bring the report into compliance with Axos Bank's appraisal policy at no additional charge. In our sole discretion, we reserve the right to withhold payment to you until all required corrections have been made to the appraisal report. Requested corrections should be made within three (3) business days of notification.
7. **Communication -** Neither the appraiser nor the appraisal firm may verbally divulge the opinions or conclusions of the appraisal or give a copy of the report to anyone other than the undersigned, Appraiser, or Axos Bank's designee as specified in writing.

1

## II. Valuation Requirements

1. **Cost Approach -** (if developed) Comparable land sales, location map, and adjustment grid are required. The source of cost and depreciation estimates must be disclosed. An explanation for omission of the cost approach is required and should be included in the Scope of Work.

2. **Sales Comparison Approach (required) -** Photographs and comparable sale property location map must be included. All adjustments for market conditions should be supported by market data. The comparable sales should "bracket" the estimated value of the subject on both an unadjusted and adjusted basis. **Axos Bank will not accept appraisals with outdated information.** Use the most recent competitive listings and the most recent sales data available. We understand that depending on the property type and market area, there may be limited data available for recent sales. In these instances, it is imperative that you also research competitive listings and analyze how these affect your determination of value.

3. **Income Approach (required) -** Rental photographs and competitive rental location map are required. The estimates of vacancy, expenses and capitalization rates should be supported by market data. The estimate of effective gross income should be consistent with operating history and significant discrepancies must be reconciled. The competitive rental indications should "bracket" the conclusion of market rent for the subject on both an unadjusted and adjusted basis. **For the fee simple analysis, all rents, including Section 8 rents for apartments, must be marked to market levels.**

## III. Miscellaneous Requirements

1. **Inspection Requirements**: the appraiser must clearly state the scope of the inspection that was undertaken. Any material limitations should also be disclosed in the report, and, if the appraiser feels that such limitation could affect the reliability of the appraisal, the appraiser should contact the undersigned. For apartment buildings with 20 or less units, 50% of all units must be inspected, including one unit of each unit mix, and all vacant units. For apartment buildings with more than 20 units, 25% of all units must be inspected, including one unit of each unit mix, and all vacant units. If the subject property is commercial in nature, all suites/units should be inspected. You must provide the unit number inspected. The appraiser must notify the Client of the inspection date once it has been scheduled.

2. **Subject Photographs**: Street scene(s), and interior and exterior of subject property are required.

3. **Building Sketch**: Required in some format, whether completed by the appraiser or via a blueprint. The appraiser must explicitly state the source of the size estimates (gross, rentable, etc.) that are provided. If the source of the size estimates is not clearly disclosed in the report, the appraisal may be returned for correction.

4. **Zoning**: The subject's zoning must be disclosed and an explicit statement discussing the subject's conformance, or the lack thereof, must also be included.

5. **Prior Sales**: In accordance with USPAP, the appraiser is required to analyze and report any sales of the subject property that have occurred within three years prior to the effective date of the appraisal. Any recent offer, current offer or pending agreement of sale must also be reported, and the appraiser must reconcile the appraised value to any such previous sale, offer or pending transaction.

6. **Real Estate Taxes**: Actual taxes and delinquent taxes must be reported. For valuation purposes, the analysis should address whether the real estate taxes would change (up or down) if the property was sold and the property should be valued accordingly (especially if the current market value significantly differs from the current assessed value).

7. **Historical Data**: All historical data (schedule of renovation costs, rent roll, operating statement, etc.) should be included in the addenda of the report. It will never be acceptable to rely upon the representations of the buyer, seller, owner or any agent involved in the process without a written document to support the representation (e.g., a lease "out for signature" is not a valid lease that can be relied upon by the appraiser).

8. **Exposure & Marketing Time**: Must be reported and the basis of the estimate must be disclosed.

9. **Highest & Best Use**: A highest and best use analysis must be done with the four recognized criteria for analysis: legally permissible, physically possible, financially feasible, and maximally productive.

2

v.1.3087.0

## IV. Axos Bank's Commercial Lending Philosophy

We request a candid, objective, and thorough assessment of the subject property and Axos Bank will not meddle in this process. This is our most important message to you and we expect our appraisers to reach reasonable and well-supported conclusions. The "litmus" test is whether the estimated value would cause the sale of the subject within a normal marketing time, but never to exceed one year. **Please be aware that we also independently search for current, comparable data during the review process (e.g. Costar, www.loopnet.com, RealQuest, etc.).** Our appraisers are also encouraged to communicate with us - early in the process - significant valuation issues, so that we can determine whether - and how - to proceed. Of course, if a deal is terminated before completion of the appraisal, the appraiser will be reimbursed for time spent at a reasonable hourly rate, plus any out-of-pocket expenses.

## V. Indemnification

Appraiser agrees to defend, indemnify and hold harmless Axos Bank and its officers, directors, shareholders, employers, and its successors and assigns (for purposes of indemnification collectively referred to as the "Axos Bank Parties") from any and all claims, demands, damages, losses, actions, liabilities, causes of action or judgments (including attorney's fees), which any one of the Axos Bank Parties may be required to pay or which may be asserted against any one of the Axos Bank Parties, by any person, entity, firm or corporation, related to the appraisal.

## VI. Miscellaneous

1. Please **ADDRESS** copies of your report to:

   Axos Bank
   PO Box 919008
   San Diego, CA 92191-9872
2. Please **UPLOAD** copies of your report and invoice to the RIMS website under the appropriate project number.


Sincerely,

*Rachel Hoss*

Rachel Hoss

Appraisal Department

Axos Bank



Acceptance of the electronic award of this engagement in the RIMS system constitutes acceptance by you of this engagement under the terms of this engagement letter.


Agreed and Accepted By:

BY: _____ DATE: 09/04/24 _____

Reid Erickson is report signatory.

3

<div align="center">**ATTACHMENT 1**</div>

**APPRAISAL REQUEST INFORMATION:**

**Borrower:** Stanley Xu

**Property Location:** 14400 NE Bel Red Rd, Bellevue, Washington 98005, United StatesBellevue, WA 98007

**Property Type:** OfficeOffice Building-Low-Rise

**Report Type:** Appraisal Report

You may arrange for an interior inspection and obtain all pertinent information by contacting the following:

**Property Contact:(Contact within 48 Hours)**

Stanley Xu, Property Owner
Phone: 425-336-1124
stanley.xu@longwellcompany.com

**Comments:**

**Subject is improved with a two-story office building and is 78% leased to multiple tenants (three vacant spaces). Rent roll, operating history, and leases will be provided upon award.;**

**Project Purpose:** Renewal/Subsequent Transaction

| Premise | Qualifier | Interest | Comment |
|---|---|---|---|
| Market Value | As-Is | Leased Fee | |
| Insurable Value | Insurable Cost | NA | |
| Market Value | Upon Stabilization | Leased Fee | |

| | |
|---|---|
| Intended Use: | Use - Loan Underwriting<br>Description: The intended use of this appraisal is for loan underwriting and-or credit decisions by Bank and-or participants |
| Intended User: | User - Bank<br>Description: The intended users of this report is Bank and-or affiliates |
| Approaches to Value: | Approach - ALL<br>Description: All applicable approaches |
| Inspection: | Inspect - All<br>Description: An interior and exterior inspection of the subject property, as well as an inspection of all comparable properties utilized |
| Additional Scope: | None |

<div align="center">4</div>

# ATTACHMENT 2

1. Conform absolutely to the most recent edition of the Uniform Standards of Professional Appraisal Practice (USPAP) adopted and published by Appraisal Standards Board of The Appraisal Foundation as well as the standards required under the federal appraisal regulations and guidelines that implement Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) (collectively, "Federal Requirements").
2. Disclose any steps taken that were necessary or appropriate to comply with the Competency Provision of the USPAP.
3. Be written and presented in a narrative format or on forms that satisfy Federal requirements and the instructions contained herein; and, be sufficiently descriptive to enable the reader to ascertain the estimated market value and the rationale for the estimate; and, provide detail and depth of analysis that reflect the complexity of the real estate appraised.
4. Analyze and report data on current revenues, expenses and vacancies for the property if it is and will continue to be income producing.
5. Analyze and report on current market conditions and trends that will affect projected income or the absorption period to the extent they affect the value of the subject property.
6. Analyze and report appropriate discounts for any proposed construction, or any completed properties that are partially leased or sold, or leased at other than market rents as of the date of the appraisal, or any tract development with unsold units. This should include, for rental properties, the effect of leasing commissions, rent losses and tenant improvement arrangements.
7. Contain sufficient supporting documentation with all pertinent information so that your logic, reasoning, judgment, and analysis in arriving at a conclusion indicate to the reader the reasonableness of the market value reported.
8. Include the legal description of the property being appraised, in addition to the description required by the USPAP.
9. Identify the following on the Summary of Salient Facts page or within the form of the appraisal report:
    1. Thomas Brothers map reference (if available);
    2. Flood insurance designation; panel number and date;
    3. Census tract number;
    4. Tax Assessor's parcel number;
    5. Zoning designation;
    6. Effective age and remaining economic life of the Property;
    7. Property interest appraised; and
    8. Summary information such as: Land area, building area, project description, gross/rentable/usable areas, gross/net income, value estimates by each approach to value, final value conclusion, building occupancy, and date of valuation.
10. Identify and separately value any personal property, fixtures, and business interests or intangible items that are not real property, and discuss the impact of their inclusion or exclusion on the estimate of market value. If the property is in a flood zone that requires flood insurance then the value of personal property must be provided for each individual structure.
11. Utilize all reasonable valuation methods including, without limitation, the sales comparison, income capitalization, and cost approaches to value, along with a reconciliation of the approaches used. The exclusion of any of the three valuation methods described above must be supported by a reasonable and supportable explanation for the exclusion of any particular valuation approach.
12. When utilizing the income capitalization approach, the discussion should include, where applicable, a comparison between the projected rental income and the current rent roll and historical income, along with an explanation and reconciliation, in detail, of any differences. In addition, the discussion should include an itemization and explanation of all estimated expenses and vacancies. Actual expenses should be compared with projected expenses, along with a reconciliation of any significant differences. A minimum of two (2) years of historical operating results should also be included, unless a reasonable explanation is provided when less than 2 years history is not included.
13. Justify all rates and assumptions used, including the selection of any discount rate and capitalization rate.

5

v.1.3087.0

14. Report present occupancy and uses and explain any differences from the conclusions reached in the appraisal report.

15. If important data (such as rent rolls or income and expense statements) is not available to you, the appraisal report should state the nature of the missing data and the reasons it was not available. Appraisers must notify the bank immediately if any information (rent roll, historical income and expenses, leases, etc.) required to provide credible results is not provided upon engagement of the assignment.

16. For any proposed construction, analyze and report on facility compliance with architectural standards adopted by the Department of Justice for ADA accessibility guidelines.

17. If environmental problems are evident, immediately notify the undersigned. If requested by the Bank, please complete the Bank's form of environmental check-list (to be provided by the Bank).

18. Address any and all special limiting conditions, extraordinary assumptions and any hypothetical conditions in a separate section before any listing of standard assumptions. Typical special limiting conditions may include a current title report, evidence of final government approvals for proposed buildings, recordation of a final subdivision map or execution of a pending lease. Inclusion of any extraordinary assumptions and/or hypothetical conditions requires prior approval from the Bank. If allowed, these extraordinary assumptions and/or hypothetical conditions should be clear cut, reasonably achievable and readily verifiable by the Bank.

19. Summarize any and all critical risks in a separate section of the appraisal report. This section will summarize any market, physical, or economic issues raised in the appraisal report that might negatively affect value. The following are some typical issues which should be included in this section: known environmental problems and structural or soils problems, addition of significant competitive supply to the market, decreasing population or employment trends which would affect demand for the subject property, limited market data upon which the value conclusion is based, pending lease expiration or bankruptcy of a major tenant in the building, and unrealistic asking rental rates or sale prices.

20. Consider any deferred maintenance or required capital improvements at the property, and reflect the "cost-to-cure" to derive the "as is" value. This includes any fire and health & safety issues.

21. For commercial properties, include a brief discussion of typical tenant improvements and leasing commissions for the subject property type. Provide a full rent roll or lease abstract either in the body of the appraisal or in the addendum.

22. For leasehold properties, provide a summary of key terms and conditions of the ground lease must be included in the report, and key pages of the ground lease included in the addendum. Additionally, an analysis must be included of land values, an analysis of ground lease rents and terms relative to the market, and an analysis of the capitalization rate relative to the leasehold interest.

6

**Rent Roll**

Property = Amity Court

As Of = 08/28/2024

Month = 08/2024

| Unit | Unit SqFt | Tenant Name | Actual Rent | Tenant Deposit | CAM | Misc | Move In | Lease Expiration |
|------|-----------|-------------|-------------|----------------|-----|------|---------|------------------|
| **Current/Notice/Vacant Tenants** | | | | | | | | |
| 100 | 228.00 | Olga Shade, LLC | 315.00 | 550.00 | 239.04 | 0.00 | 12/01/2023 | 10/31/2024 |
| 102 | 1,044.00 | Conant Lens | 1,832.00 | 1,659.00 | 1,094.46 | 0.00 | 08/01/2019 | 07/31/2026 |
| 103 | 781.00 | Cruise Center | 956.72 | 1,144.00 | 803.52 | 0.00 | 06/01/2019 | 05/31/2025 |
| 104 | 600.00 | Wenrui Art Studio | 745.00 | 1,395.25 | 629.00 | 0.00 | 09/01/2023 | 08/31/2025 |
| 105 | 519.00 | Kinese Studio | 825.00 | 1,214.81 | 544.09 | 0.00 | 10/01/2019 | 09/30/2025 |
| 106 | 854.00 | Mona Foundation | 1,740.30 | 2,045.60 | 895.28 | 0.00 | 06/01/2019 | 05/31/2025 |
| 110 | 610.00 | Sysmax Tech  Inc | 915.00 | 3,108.00 | 639.00 | 0.00 | 04/24/2024 | 05/31/2025 |
| 201 | 1,399.00 | VACANT | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 202 | 545.00 | NSA Motors, LLC | 681.00 | 1,867.00 | 571.34 | 625.00 | 12/15/2023 | 12/31/2024 |
| 203 | 684.00 | Levite Constructio | 855.00 | 1,572.00 | 717.00 | 0.00 | 04/10/2024 | 03/31/2026 |
| 204 | 995.00 | Longwell Office II | 1,492.50 | 0.00 | 1,043.20 | 0.00 | 01/01/2023 | 12/31/2024 |
| 205 | 1,102.00 | US Tiny Bear Cor | 1,378.00 | 2,533.00 | 1,155.00 | 0.00 | 06/10/2024 | 06/30/2025 |
| 206 | 878.00 | InExt Staging | 1,374.63 | 2,085.55 | 920.44 | 0.00 | 01/01/2022 | 01/31/2025 |
| 207 | 1,265.00 | VACANT | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 208 | 644.00 | LuComm Technol | 1,046.21 | 0.00 | 675.13 | 0.00 | 03/01/2020 | 02/28/2025 |
| 101A | 223.00 | AMG Financial | 395.00 | 500.00 | 234.00 | 0.00 | 05/01/2018 | 04/30/2026 |
| 101B | 345.00 | Silver Pacific Hom | 604.00 | 877.00 | 361.68 | 0.00 | 02/18/2022 | 02/28/2026 |
| 101C | 573.00 | OLGA Shade, LLC | 716.00 | 1,317.00 | 601.00 | 0.00 | 03/01/2024 | 02/28/2026 |
| 108A | 318.00 | S-On Chinese Sch | 576.00 | 800.00 | 333.40 | 0.00 | 11/15/2023 | 10/31/2024 |
| 108B | 702.00 | Sudden Beauty, L | 614.00 | 1,350.00 | 736.00 | 0.00 | 03/16/2024 | 03/31/2025 |
| 109A | 486.00 | CYT Makeup and | 730.00 | 1,239.00 | 509.00 | 0.00 | 07/01/2024 | 07/31/2025 |
| 109B | 1,036.00 | VACANT | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 204A | 320.20 | Anna Lozhkina Ph | 480.30 | 956.00 | 335.68 | 0.00 | 03/01/2023 | 02/28/2025 |
| 204B | 645.00 | Signature Eyelash | 1,136.19 | 3,600.00 | 676.18 | 0.00 | 05/01/2024 | 10/31/2024 |
| **Total** | | **Amity Court** | **19,407.85** | **29,813.21** | **13,713.44** | **625.00** | | |

**Page 1 of 2**

25-00240-WLH11     Doc 10     Filed 02/19/25     Entered 02/19/25 16:03:51      Pg 97 of 189

# Rent Roll

Property = Amity Court

As Of = 08/28/2024

Month = 08/2024

| Unit | Unit SqFt | Tenant Name | Actual Rent | Tenant Deposit | CAM | Misc | Move In | Lease Expiration |
|------|-----------|-------------|-------------|----------------|-----|------|---------|------------------|

| Summary Groups | Square Footage | Actual Rent | Security Deposit | CAM | Misc | Unit Occupancy | % Sqft Occupied |
|----------------|----------------|-------------|------------------|-----|------|----------------|-----------------|
| Current/Notice/Vacant Tenants | 16,796.20 | 19,407.85 | 29,813.21 | 13,713.44 | 625.00 | 24 | |
| Future Tenants/Applicants | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 | 0.00% |
| Occupied Units | 13,096.20 | 0.00 | 0.00 | 0.00 | 0.00 | 21 | 77.97% |
| Total Vacant Units | 3,700.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3 | 22.03% |
| **Totals:** | **16,796.20** | **19,407.85** | **29,813.21** | **13,713.44** | **625.00** | **24** | **100%** |

25-00240-WLH11    Doc 10    Filed 02/19/25    Entered 02/19/25 16:03:51    Pg 98 of 189

# Income Statement

Owner =  Amity Court LLC (all properties)

Period = Jan 2023-Dec 2023

Book = Accrual

**INCOME**

**COMMERCIAL RENT INCOME**

| | |
|---|---:|
| Rent-Commercial | 423,148.15 |
| **TOTAL COMMERCIAL RENT INCOME** | **423,148.15** |

**OTHER INCOME**

| | |
|---|---:|
| Parking | 312.50 |
| Miscellaneous Income | 150.00 |
| Late Fee | 1,145.46 |
| CleanUp (Misc) | 2,649.51 |
| **TOTAl OTHER INCOME** | **4,257.47** |
| **TOTAl  INCOME** | **427,405.62** |

**EXPENSES**

**PROPERTY EXPENSES**

| | |
|---|---:|
| Repair | 21,202.86 |
| Janitorial | 21,216.71 |
| HVAC | 12,640.68 |
| Gardening | 1,424.29 |
| Advertising | 300.00 |
| Building Inspection | 540.00 |
| Professional Services | 550.00 |
| Property Insurance | 7,116.00 |
| Property Tax | 57,922.61 |
| License & Permit | 199.00 |
| Software Fees | 660.60 |
| Office Supplies | 91.00 |
| Screening Fee | 24.95 |
| Electricity | 36,936.75 |
| Water and Sewer | 6,019.34 |
| Trash Disposal | 3,908.27 |
| Bank Fees | 206.00 |
| Legal Fees | 6,784.00 |
| Accounting Fees | 5,515.00 |
| Mortgage Interest | 448,468.20 |
| Management Fees | 21,591.71 |
| **TOTAL PROPERTY EXPENSES** | **653,317.97** |
| **TOTAL EXPENSES** | **653,317.97** |
| | |
| **NET INCOME** | **-225,912.35** |



# Valuation Glossary 2024

Unless specified otherwise, these definitions were extracted or paraphrased from the following sources or publications:

- The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, Chicago, Illinois, 2022 (Dictionary).
- Uniform Standards of Professional Appraisal Practice, 2020-2023 Edition (USPAP).
- The Appraisal of Real Estate, Fifteenth Edition, Appraisal Institute, Chicago, Illinois, 2020 (15th Edition).

**Absolute Net Lease**
A lease in which the tenant pays all expenses including structural maintenance, building reserves, and management; often a long-term lease to a credit tenant. *(Dictionary)*

**Ad Valorem Tax**
A real estate tax based on the assessed value of the property, which is not necessarily equivalent to its market value. *(15th Edition)*

**Arm's-length Transaction**
A transaction between unrelated parties who are each acting in his or her own best interest. *(Dictionary)*

**As-Is Market Value**
The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. *(Dictionary)*

**Assessed Value**
The value of a property according to the tax rolls in ad valorem taxation; may be higher or lower than market value, or based on an assessment ratio that is a percentage of market value. *(Dictionary)*

**Average Daily Room Rate (ADR)**
In the lodging industry, the net rooms revenue derived from the sale of guest rooms divided by the number of paid occupied rooms. *(Dictionary)*

**Band of Investment**
A technique in which the capitalization rates attributable to components of an investment are weighted and combined to derive a weighted-average rate attributable to the total investment. *(Dictionary)*

**Cash-Equivalent Price**
The sale price of a property that is equivalent to what a cash buyer would pay. *(Dictionary)*

**Common Area**
The total area within a property that is not designed for sale or rental but is available for common use by all owners, tenants, or their invitees, e.g., parking and its appurtenances, malls, sidewalks, landscaped areas, recreation areas, public toilets, truck and service facilities. *(Dictionary)*

**Contract Rent**
The actual rental income specified in a lease. *(15th Edition)*

**Cost Approach**
A set of procedures through which a value indication is derived for the fee simple estate by estimating the cost new as of the effective date of the appraisal to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive; deducting depreciation from the total cost; and adding the estimated land value. The contributory value of any site improvements that have not already been considered in the total cost can be added on a depreciated-cost basis. Adjustments may then be made to the indicated value of the fee simple estate in the subject property to reflect the value of the property rights being appraised. *(Dictionary)*

**Curable Functional Obsolescence**
An element of depreciation; a curable defect caused by a flaw involving the structure, materials, or design, which can be practically and economically corrected. *(Dictionary)*

**Debt Coverage Ratio (DCR)**
The ratio of net operating income to annual debt service, which measures the relative ability of a property to meet its debt service out of net operating income; also called *debt service coverage ratio (DSCR).* (Dictionary)

**Deferred Maintenance**
Items of wear and tear on a property that should be fixed now to protect the value or income-producing ability of a property. *(Dictionary)*

**Depreciation**
In appraisal, a loss in the value of improvements from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the value of the improvement on the same date. *(Dictionary)*

**Direct Costs**
Expenditures for the labor and materials used in the construction of improvements; also called *hard costs.* (Dictionary)

**Discounted Cash Flow (DCF) Analysis**
The procedure in which a discount rate is applied to a set of projected income streams and a reversion. The analyst specifies the quantity, variability, timing, and duration of the income streams and the quantity and timing of the reversion, and discounts each to its present value at a specified yield rate. *(Dictionary)*



**Discount Rate**

A rate of return on capital used to convert future payments or receipts into present value. *(Dictionary)*

**Disposition Value**

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider their best interests.
7. An adequate marketing effort will be made during the exposure time.
8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms. *(Dictionary)*

**Easement**

The right to use another's land for a stated purpose. Access or right-of-way easements may be acquired by private parties or public utilities. Governments may be the beneficiaries of easements placed on privately owned land that is dedicated to conservation, open space, or preservation. *(15th Edition)*

**Economic Life**

The period over which improvements to real estate contribute to property value. *(Dictionary)*

**Effective Age**

The age of property that is based on the amount of observed deterioration and obsolescence it has sustained, which may be different from its chronological age. *(Dictionary)*

**Effective Date**

The date on which the appraisal or review opinion applies (SVP) *(Dictionary)*

**Effective Gross Income (EGI)**

The anticipated income from all operations of the real estate after an allowance is made for vacancy and collection losses and an addition is made for any other income. *(Dictionary)*

**Effective Gross Income Multiplier (EGIM)**

The ratio between the sale price (or value) of a property and its effective gross income. *(Dictionary)*

**Effective Rent**

The total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions - e.g. free rent, excessive tenant improvements, moving allowances, lease buyouts, cash allowances, and other lease incentives. *(15th Edition)*

**Eminent Domain**

The right of government to take private property for public use upon the payment of just compensation. The Fifth Amendment of the U.S. Constitution, also known as the *takings clause*, guarantees payment of just compensation upon appropriation of private property. *(Dictionary)*

**Entrepreneurial Incentive**

The amount an entrepreneur expects or wants to receive as compensation for providing coordination and expertise and assuming the risks associated with the development of a project. Entrepreneurial incentive is the expectation of future reward as opposed to the profit actually earned on the project. *(Dictionary)*

**Entrepreneurial Profit**

A market-derived figure that represents the amount an entrepreneur received for his or her contribution to a past project to compensate for his or her time, effort, knowledge, and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with development. An entrepreneur is motivated by the prospect of future value enhancement (i.e., the entrepreneurial incentive). An entrepreneur who successfully creates value through new development, expansion, renovation, or an innovative change of use is rewarded by entrepreneurial profit. Entrepreneurs may also fail and suffer losses. *(Dictionary)*

**Excess Land**

Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. *(Dictionary)*

**Excess Rent**

The amount by which contract rent exceeds market rent at the time of the appraisal; created by a lease favorable to the lessor and may reflect superior management, a lease execution in an earlier, stronger rental market, or an agreement of the parties. Due to the higher risk inherent in the receipt of excess rent, it may be calculated separately and capitalized or discounted at a higher rate in the income capitalization approach. *(15th Edition)*

**Expense Stop**

A clause in a lease that limits the landlord's expense obligation, which results in the lessee paying any operating expenses above a stated level or amount. *(Dictionary)*

Accelerating success.



**Exposure Time**

An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. *(USPAP)*

**Extraordinary Assumption**

An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis. An extraordinary assumption may be used in an assignment only if:

- It is required to properly develop credible opinions and conclusions;
- The appraiser has a reasonable basis for the extraordinary assumption;
- Use of the extraordinary assumption results in a credible analysis; and
- The appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions. *(USPAP)*

**External Obsolescence**

A type of depreciation; a diminution in value caused by negative external influences and generally incurable on the part of the owner, landlord, or tenant. The external influence may be either temporary or permanent. There are two forms of external obsolescence: economic and locational. *(Dictionary)*

**Fair Market Value**

In nontechnical usage, a term that is equivalent to the contemporary usage of *market value*.
As used in condemnation, litigation, income tax, and property tax situations, a term that is similar in concept to market value but may be defined explicitly by the relevant agency or interpreted differently by court precedent. *(Dictionary)*

**Feasibility Analysis**

A study of the cost-benefit relationship of an economic endeavor. *(USPAP)*

**Fee Simple Estate**

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat. *(Dictionary)*

**Floor Area Ratio (FAR)**

The relationship between the above-ground floor area of a building, as described by the zoning or building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area. *(Dictionary)*

**Functional Obsolescence**

The impairment of functional capacity of improvements according to market tastes and standards. *(Dictionary)*

**Functional Utility**

The ability of a property or building to be useful and to perform the function for which it is intended according to current market tastes and standards; the efficiency of a building's use in terms of architectural style, design and layout, traffic patterns, and the size and type of rooms. *(Dictionary)*

**Furniture, Fixtures, and Equipment (FF&E)**

Business trade fixtures and personal property, exclusive of inventory. (Dictionary)

**Going-concern**

An established and operating business having an indefinite future life. *(Dictionary)*

**Going-concern Value**

An outdated label for the market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the *market value of the going concern or market value of the total assets of the business*. *(Dictionary)*

**Gross Building Area (GBA)**

Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved. *(Dictionary)*

**Gross Leasable Area (GLA)**

Total floor area designed for the occupancy and exclusive use of tenants, including basements and mezzanines; measured from the center of joint partitioning to the outside wall surfaces. *(Dictionary)*

**Gross Living Area (GLA)**

Total area of finished, above-grade residential space area; calculated by measuring the outside perimeter of the structure and includes only finished, habitable, above-grade living space. (Finished basements and attic areas are not generally included in total gross living area. Local practices, however, may differ.) *(Dictionary)*

**Highest & Best Use**

The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market



participant would have in mind for the asset when formulating the price that it would be willing to bid (IVS). *(Dictionary)*

**Hypothetical Condition**
A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. *(USPAP)*

**Income Capitalization Approach**
In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to this approach. Techniques and procedures from this approach are used to analyze comparable sales data and to measure obsolescence in the cost approach. *(15th Edition)*

**Incurable Functional Obsolescence**
An element of depreciation; a defect caused by a deficiency or superadequacy involving the structure, materials, or design that cannot be practically or economically corrected as of the effective date of the appraisal. *(Dictionary)*

**Indirect Costs**
Expenditures or allowances for items other than labor and materials that are necessary for construction, but are not typically part of the construction contract. Indirect costs may include administrative costs, professional fees, financing costs and the interest paid on construction loans, taxes and the builder's or developer's all-risk insurance during construction, and marketing, sales, and lease-up costs incurred to achieve occupancy or sale. Also called *soft costs*. *(Dictionary)*

**Interim Use**
The use contemplated by the market participants that the subject real estate can be put to while waiting for certain subsequent factors to occur. *(Dictionary)*

**Investment Value**
The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. *(Dictionary)*

**Leased Fee Interest**
The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversion right when the lease expires. *(Dictionary)*

**Leasehold Estate**
The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease. *(Dictionary)*

**Legal Nonconforming Use**
A use that was lawfully established and maintained, but no longer conforms to the use regulations of its current zoning; sometimes known as a legally nonconforming use. *(Dictionary)*

**Liquidation Value**
The most probable price that a specified interest in property should bring under the following conditions:
1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms. *(Dictionary)*

**Market Area**
The geographic region from which a majority of demand comes and in which the majority of competition is located. Depending on the market, a market area may be further subdivided into components such as primary, secondary, and tertiary market areas, or the competitive market area may be distinguished from the general market area. *(Dictionary)*

**Market Rent**
The most probable rent that a property should bring in a competitive and open market under all conditions requisite to a fair lease transaction, the lessee and lessor each acting prudently and knowledgeably, and assuming the rent is not affected by undue stimulus. *(Dictionary)*

**Market Study**
An analysis of the market conditions of supply, demand, and pricing for a specific property type in a specific area. *(Dictionary)*

**Market Value (Most Common Non-FRT)**
The most probable price, as of a specific date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue distress. *(Dictionary)*

Accelerating success.



**Market Value (Interagency Guidelines)**

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (*12 CFR, Part 34, Subpart C - Appraisals, 34.42(h)*).

**Marketability Analysis**

The study of how a specific property is expected to perform in a specific market. A marketability analysis expands on a market analysis by addressing a specific property. *(Dictionary)*

**Neighborhood Analysis**

The objective analysis of observable or quantifiable data indicating discernible patterns of urban growth, structure, and change that may detract from or enhance property values; focuses on four sets of considerations that influence value: social, economic, governmental, and environmental factors. *(Dictionary)*

**Net Net Net Lease**

An alternative term for a type of net lease. In some markets, a net net net lease is defined as a lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management. Also called *NNN lease, triple net lease,* or *fully net lease. (Dictionary)*

**Net Operating Income (NOI)**

The actual or anticipated net income that remains after all operating expenses are deducted from effective gross income but before mortgage debt service and book depreciation are deducted. Note: This definition mirrors the convention used in corporate finance and business valuation for EBITDA (earnings before interest, taxes, depreciation, and amortization). *(15th Edition)*

**Obsolescence**

One cause of depreciation; an impairment of desirability and usefulness caused by new inventions, changes in design, improved processes for production, or external factors that make a property less desirable and valuable for a continued use; may be either functional or external. *(Dictionary)*

**Off-site Costs**

Costs incurred in the development of a project excluding on-site costs such as grading and construction of the building and other improvements; also called *common costs* or *off-site improvement costs. (Dictionary)*

**On-site Costs**

Costs incurred for the actual construction of buildings and improvements on a particular site. *(Dictionary)*

**Overage Rent**

The percentage rent paid over and above the guaranteed minimum rent or base rent; calculated as a percentage of sales in excess of a specified breakeven sales volume. *(15th Edition)*

**Overall Capitalization Rate (OAR)**

The relationship between a single year's net operating income expectancy and the total property price or value. *(Dictionary)*

**Parking Ratio**

The ratio of parking area or parking spaces to an economic or physical unit of comparison. Minimum required parking ratios for various land uses are often stated in zoning ordinances. *(Dictionary)*

**Potential Gross Income (PGI)**

The total income attributable to property at full occupancy before vacancy and operating expenses are deducted. *(Dictionary)*

**Potential Gross Income Multiplier (PGIM)**

The ratio between the sale price (or value) of a property and its annual potential gross income. *(Dictionary)*

**Present Value (PV)**

The value of a future payment or series of future payments discounted to the current date or to time period zero. *(Dictionary)*

**Prospective Opinion of Value**

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not achieved sellout or a stabilized level of long-term occupancy. *(Dictionary)*

**Qualitative Adjustment**

An indication that one property is superior, inferior, or similar to another property. Note that the common usage of the term is a misnomer in that an adjustment to the sale price of a comparable property is not made. Rather, the indication of a property's superiority or inferiority to another is used in relative comparison analysis, bracketing, and other forms of qualitative analysis. *(Dictionary)*



**Quantitative Adjustment**
In the application of the sales comparison and income capitalization approaches, a numerical (dollar or percentage) adjustment to the sale price, rent, or expense amount of a comparable property to account for the effect on value of a difference between each comparable property and the subject property. *(Dictionary)*

**Rentable Area**
The amount of space on which the rent is based; calculated according to local practice. *(Dictionary)*

**Replacement Cost**
The estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout. *(Dictionary)*

**Replacement Cost for Insurance Purposes**
The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design and layout for insurance coverage purposes guaranteeing that damaged property is replaced with a new property (i.e., depreciation is not deducted). *(Dictionary)*

**Reproduction Cost**
The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same or similar materials, construction standards, design, layout, and quality of workmanship and embodying all the deficiencies, superadequacies, and obsolescence of the subject building. *(Dictionary)*

**Retrospective Value Opinion**
A value opinion effective as of a specified historical date. The term *retrospective* does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." *(Dictionary)*

**Sales Comparison Approach**
The process of deriving a value indication for the subject property by comparing sales of similar properties to the property being appraised, identifying appropriate units of comparison, and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered vacant when an adequate supply of comparable sales is available. *(Dictionary)*

**Scope of Work**
The type and extent of research and analysis in an appraisal or appraisal review assignment. Scope of work includes, but is not limited to:
The extent to which the property is identified;
The extent to which tangible property is inspected;
The type and extent of data researched; and
The type and extent of analysis applied to arrive at opinions or conclusions. *(USPAP)*

**Shopping Center Types**
Neighborhood Shopping Center: The smallest type of shopping center, generally with a gross leasable area of between 30,000 and 100,000 square feet. Typical anchors include supermarkets. Neighborhood shopping centers offer convenience goods and personal services and usually depend on a market population support of 3,000 to 40,000 people.

Community Shopping Center: A shopping center of 100,000 to 400,000 square feet that usually contains one junior department store, a variety store, discount or department store. A community shopping center generally has between 20 and 70 retail tenants and a market population support of 40,000 to 150,000 people.

Regional Shopping Center: A shopping center of 300,000 to 900,000 square feet that is built around one or two full-line department stores of approximately 200,000 square feet each plus small tenant spaces. This type of center is typically supported by a minimum population of 150,000 people.

Super-Regional Center: A large center of 600,000 to 2.0 million square feet anchored by three or more full-line department stores. This type of center is typically supported by a population area of 300,000 people. *(15th Edition)*

**Sum of the Retail Values**
The sum of the separate and distinct market value opinions for each of the units in a condominium; subdivision development, or portfolio of properties, as of the date of valuation. The aggregate of retail values does not represent the value of all the units as sold together in a single transaction; it is simply the total of the individual market value conclusions. An appraisal has an effective date, but summing the sales prices of multiple units over an extended period of time will not be the value on that one day unless the prices are discounted to make the value equivalent to what another developer or investor would pay for the bulk purchase of the units. Also called the *aggregate of the retail values* or *aggregate retail selling price*. *(Dictionary)*

**Superadequacy**
An excess in the capacity or quality of a structure or structural component; determined by market standards. *(Dictionary)*

Accelerating success.



**Surplus Land**

Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. *(Dictionary)*

**Tenant Improvements (TIs)**

1. Fixed improvements to the land or structures installed for use by a lessee.
2. The original installation of finished tenant space in a construction project; subject to periodic change for succeeding tenants. *(Dictionary)*

**Usable Area**

The area that is actually used by the tenants measured from the inside of the exterior walls to the inside of walls separating the space from hallways and common areas. *(Dictionary)*

**Useful Life**

The period of time over which a structure or a component of a property may reasonably be expected to perform the function for which it was designed. *(Dictionary)*

**Vacancy and Collection Loss**

A deduction from potential gross income *(PGI)* made to reflect income deductions due to vacancies, tenant turnover, and nonpayment of rent; also called *vacancy and credit loss* or *vacancy and contingency loss. (Dictionary)*

**Yield Capitalization**

A method used to convert future benefits into present value by (1) discounting each future benefit at an appropriate yield rate, or (2) developing an overall rate that explicitly reflects the investment's income pattern, holding period, value change, and yield rate. *(Dictionary)*





**Joseph Liss**

Valuation Specialist
Valuation & Advisory Services

joseph.liss@colliers.com
Mobile: +1 323 334 7958
colliers.com

601 Union Street
Suite 5300
Seattle, WA 98101
United States

**Education or Qualifications**

BA in Fundamentals: Issues and Texts from The University of Chicago, 2004

**State Certifications**

Washington

**Area of Expertise**

Joseph Liss is a Valuation Specialist in the Seattle office of Colliers Valuation & Advisory Services. He has appraised a wide variety of office and industrial properties for clients including small businesses, global investment banks, and municipal agencies.

**Property Types Experience**

Office and Industrial (single-tenant and multi-tenant), including proposed construction projects.

Retail (strip centers, restaurants)

Land (Commercial, Industrial, and Residential)

Corridor valuation and right-of-way appraisals

Contaminated properties

**Professional Background**

Joseph received his appraisal training at Kidder Mathews Valuation Advisory Services. He joined Colliers in 2022.

**Select Client List**

- Bank of America
- Wells Fargo
- East West Bank
- Columbia Bank
- Commencement Bank
- The City of Olympia
- Pierce County

*Accelerating success.*



**State of Washington**
**DEPARTMENT OF LICENSING**
**BUSINESS AND PROFESSIONS DIVISION**
**APPRAISER PROGRAM**
**PO Box 9021**
**Olympia, WA 98507-9021**

**JOSEPH  LISS**
**9318 VETERANS DR SW , APT 7**
**LAKEWOOD WA 98498-7305**



# STATE OF WASHINGTON

## DEPARTMENT OF LICENSING - BUSINESS AND PROFESSIONS DIVISION
## THIS CERTIFIES THE PERSON OR BUSINESS NAMED BELOW IS AUTHORIZED AS  A

WASHINGTON STATE DEPARTMENT OF
**LICENSING**

**CERTIFIED GENERAL REAL ESTATE APPRAISER**

**JOSEPH  LISS**

| 22003802 | 03/02/2022 | 01/02/2026 | |
|----------|------------|------------|---|
| License Number | Issue Date | Expiration Date | Marcus J Glasper, Director |

(R/4/23)





**Reid C. Erickson, MAI**

Executive Managing Director
Northwest Region
Valuation & Advisory Services

reid.erickson@colliers.com
Direct: +1 206 965 1106
Mobile: +1 206 817 6309
Fax: +1 206 965 1206
colliers.com

601 Union Street
Suite 5300
Seattle, WA 98101
United States

### Area of Expertise

Executive Managing Director for the Pacific Northwest with the appraisal firm of Colliers International Valuation & Advisory Services with offices nationally.

### Property Types

Eastern Washington Real Estate

Retail

Industrial

Professional and Medical Office

Special Purpose Properties (incl. auto dealerships, self-storage)

Alaska Real Estate

### Professional Background

Managing Director and Team Leader, Colliers International Valuation & Advisory Services, Seattle, 1992-present

### University of Washington Extension – Certificate Program of Commercial Real Estate

Analysis of Development Processes

Real Estate Investment Analysis

The Public Process

Property Management and Leasing

The Decision Making Process of Commercial Real Estate

### Education or Qualifications

Bachelor of Arts, Business Administration, University of Washington, Seattle, Washington, 1987

### State Certifications

Alaska

Idaho

Oregon

Washington

### Affiliations or Memberships

Member of Appraisal Institute, designated August 2010

*Accelerating success.*



**State of Washington**
**DEPARTMENT OF LICENSING**
**BUSINESS AND PROFESSIONS DIVISION**
**APPRAISER PROGRAM**
**PO Box 9021**
**Olympia, WA 98507-9021**

**REID C ERICKSON**
**4737 193RD PL SE**
**ISSAQUAH WA 98027-9312**

⸖

⸖



# STATE OF WASHINGTON

WASHINGTON STATE DEPARTMENT OF
**LICENSING**

**DEPARTMENT OF LICENSING - BUSINESS AND PROFESSIONS DIVISION**
**THIS CERTIFIES THE PERSON OR BUSINESS NAMED BELOW IS AUTHORIZED AS A**

**CERTIFIED GENERAL REAL ESTATE APPRAISER**

**REID C ERICKSON**

| 1100150 | 08/05/1994 | 10/11/2025 | *Marcus J Glasper* |
|---------|------------|------------|---------------------|
| License Number | Issue Date | Expiration Date | Marcus J Glasper, Director |

(R/4/23)



# Valuation & Advisory Services

Accelerating success.

# Valuation & Advisory Services

Real estate valuations play a pivotal role in today's business climate. An accurate and well supported opinion of property value can mean the difference between reaching a critical goal—securing a loan, closing a sale, reporting to investors, choosing the best asset—or failing to achieve it altogether.

Colliers Valuation & Advisory Services' reports are designed to deliver insight into a property's fundamentals, its competition and the overall market dynamics affecting value. A solid valuation report can be a strategic asset for investors, lenders and owners, provided that it addresses both a property's unique characteristics and the most current market conditions.

Commitment to high-end client service, coupled with Colliers' unparalleled market intelligence and resources, differentiates us as the firm of choice in the real estate industry.

## Professional

Our professionals share a commitment to deliver the highest level of service and consistent results. We go the extra mile for our clients, whether this means meeting a tight deadline or working with a complex and challenging property.

## Technology

Our unmatched report creation technology speeds appraisals through the pipeline. This secure, centralized production system generates a wide range of reports and high volume portfolio orders without delays.

## Information

Today's business climate places valuation in a more pivotal position than ever before. All our appraisals are evaluated and approved by an experienced review team to ensure our clients receive concise and timely appraisals. With clear, prompt reporting and a comprehensive, big picture approach, Colliers' valuation and advisory reports give our clients the information they need to make better business decisions.



# What We Do



Real estate advisors in
501 offices in 65 countries.



Founding member
of the World Green
Building Council



Recognized and ranked
17 consecutive years,
more than any other
real estate firm



Ranked in the top 3
most recognized
global commercial real
estate brands by The
Lipsey Company



Ranked in the world's
top female-friendly
companies.



## 400+
licensed appraisers and staff



## 30,000+
assignments completed annually



## 63
Valuation & Advisory Services
market locations across the country



## Valuation & Advisory Services National Leadership

**Jeremy Walling, MAI, MRICS**
President | US
Valuation & Advisory Services
Jeremy.Walling@colliers.com
+1 312 371 4920

**Jeff Shouse, MAI, CRE**
Executive Vice President
Western US
Jeff.Shouse@colliers.com
+1 916 724 5531

**Bruce Nell, MAI, AI-GRS, MRICS**
Executive Managing Director
Advisory Services
Bruce.Nell@colliers.com
+1 614 437 4687

**PJ Cusmano, MAI, MRICS**
Executive Vice President
Eastern US
PJ.Cusmano@colliers.com
+1 813 229 1599

**Jerry Gisclair, MAI, MRICS**
Executive Vice President
US Client Relations & Service
Jerry.Gisclair@colliers.com
+1 813 871 8531

**Anjanette "AJ" Hutson, MAI, AI-GRS**
Executive Managing Director
Quality Assurance
AJ.Hutson@colliers.com
+1 704 973 7202

## Our Experts

To learn more about our Regional and Market Valuation Experts, please click on or scan the QR code.

## Why work with Colliers?

### We act as an extension of your team.

Our approach is collaborative, nimble and informed by uncommon knowledge. By aligning with your core business needs, we develop and execute customized real estate solutions to support your growth strategy.

### We are both results and process-driven.

From the first handshake to the last, we manage the valuation process to minimize disruption, mitigate risk and mediate competing perspectives so that you can focus on what you do best. You can count on us to stay focused on your priorities.

### We are defined by our people.

We attract an exemplary roster of top valuation experts across the United States – specialists who save you time and money by cutting through the noise to deliver the most favorable outcome.

*This document has been prepared by Colliers for advertising and general information only. Colliers makes no guarantees, representations or warranties of any kind, expressed or implied, regarding the information including, but not limited to, warranties of content, accuracy and reliability. Any interested party should undertake their own inquiries as to the accuracy of the information. Colliers excludes unequivocally all inferred or implied terms, conditions and warranties arising out of this document and excludes all liability for loss and damages arising there from. This publication is the copyrighted property of Colliers and/or its licensor(s). © 2023. All rights reserved. This communication is not intended to cause or induce breach of an existing engagement agreement.*

Colliers



# EXHIBIT B

## SECURED PROMISSORY NOTE

**$5,000,000.00**                                                   **September 22, 2021**

1.    Promise to Pay

For value received, Amity Court LLC, a Washington limited liability company ("**Borrower**"), promises to pay to the order of AXOS BANK™, a federally chartered savings association ("**Lender**"), at 4350 La Jolla Village Drive, Suite 100, San Diego, California, 92122, or at such other place as may be designated in writing by Lender, the principal sum of Five Million and 00/100 Dollars ($5,000,000.00), with interest on the unpaid principal balance as set forth below.  All sums owing hereunder are payable in lawful money of the United States of America, in immediately available funds, without offset, deduction or counterclaim of any kind.

2.    Secured by Security Instrument

This Note is secured by, among other things, that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (as the same may hereinafter be amended, modified, restated, renewed or extended from time to time, the "**Security Instrument**") of even date herewith, encumbering the Property (hereinafter defined).

3.    Definitions

For the purposes of this Note, the following terms shall have the following meanings:

"**Affiliate**" shall mean, as to any Person, any other Person (i) which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such Person; or (ii) which, directly or indirectly, beneficially owns or holds ten percent (10%) or more of any class of stock or any other ownership interest in such Person; or (iii) ten percent (10%) or more of the direct or indirect ownership of which is beneficially owned or held by such Person; or (iv) which is a member of the family of such Person or which is a trust or estate, the beneficial owners of which are members of the family of such Person; or (v) which directly or indirectly is a general partner, controlling shareholder, managing member, officer, director, trustee or employee of such Person.

"**Business Day**" shall mean any day other than a Saturday, Sunday, legal holiday or other day on which commercial banks in New York, New York are authorized or required by law to close.  All references in this Note to a "day" or a "date" shall be to a calendar day unless specifically referenced as a Business Day.

"**Closing Date**" shall mean the earlier of the date Lender releases any part of the Loan proceeds to Borrower or the date in which the Security Instrument is recorded in the official records of the county in which the Property is located.

"**Default Rate**" shall be the lesser of (i) eighteen percent (18%) and (ii) the maximum amount permitted by law applicable to Lender.

"**Event of Default**" shall have the meaning set forth in the Security Instrument.

"**First Interest Payment Date**" shall mean **November 1, 2021**.

"**Guarantor**" shall mean: **X & C Holdings LLC**, a Delaware limited liability company, **Stanley Xu** and **Nanling Chen**.

"**Index**" shall mean the one month U.S. Dollar denominated London Inter-Bank Offered Rate ("LIBOR USD") as published in a reference publication of general circulation (the "Reference Publication") two (2) Business Days prior to, for the first payment due hereunder, the Closing Date, and for each subsequent payment,

25-00240-WLH11    Doc 10    Filed 02/19/25    Entered 02/19/25 16:03:51    Pg 116 of 189    Exhibit  - 2

the applicable Rate Change Date, or if not published on such date, then most recently prior thereto. The initial Reference Publication shall be *The Wall Street Journal*. Lender, in Lender's sole discretion, shall have the right to select a substitute Reference Publication at any time and from time to time by written notice to Borrower delivered to Borrower not less than thirty (30) days prior to the Rate Change Date to which such substitution shall first apply. If LIBOR USD, or another Index as then in effect, is no longer available, Lender shall choose a replacement index (a "Replacement Index") in its sole and absolute discretion, which selection shall be final, conclusive and binding on Borrower in all respects, and which shall for all purposes be the Index hereunder; provided, however, that the Interest Rate shall not at any time be less than 5.00% per annum. Without limiting Lender in any way, Borrower acknowledges and agrees that either Ameribor or Secured Overnight Financing Rate may be a Replacement Index hereunder. Lender shall notify Borrower of any Replacement Index not less than thirty (30) days prior to the Rate Change Date to which such Replacement Index shall first apply. **Borrower's Initials** _VX_ _NC_.

"**Interest Rate**" shall mean a per annum interest rate that is the sum (rounded as necessary, to the nearest 1/1000 of 1%) of the Index and the Margin; provided, however, the Interest Rate shall never be less than 5.00%, at any time and for the life of the Loan (it being understood that this rate, without limiting any provision requiring a higher Interest Rate, shall constitute a minimum Interest Rate).

"**Loan**" shall mean the aggregate of all principal and interest payments that accrue or are due and payable hereunder, together with any other amounts for which Borrower is liable under the Loan Documents.

"**Loan Documents**" shall mean this Note, the Security Instrument and any document executed in connection herewith or therewith. For the avoidance of doubt, notwithstanding any other clause of this Note, any "Guaranty", "Environmental Indemnity Agreement" or "ADA Indemnity Agreement" (including any rider(s) or successor documents thereto) shall not be secured by the Security Instrument.

"**Margin**" shall mean Four and seventy-five hundredths percent (4.75%).

"**Maturity Date**" shall mean October 1, 2024, as the same may be extended in accordance with Section 4.5.

"**Patriot Act**" shall mean United State Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as amended from time to time, together with all rules and regulations promulgated from time to time thereunder.

"**Payment Date**" shall mean the first day of each calendar month.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Property**" shall mean that certain real property and improvements thereon owned by Borrower, together with all rights pertaining to such real property and improvements, located at the property commonly known as 14400 Northeast Bellevue-Redmond Road, Bellevue, Washington, 98007.

"**Rate Change Date**" shall mean the first day of the month immediately following the month in which Closing Date occurs and the same date each one (1) month thereafter until the Maturity Date (as defined herein).

4.      Payment of Principal, Interest and Loan Fee

4.1     Payments.

        (a)     Interest Only Period. During the term of the Loan, Borrower shall pay consecutive monthly installments of interest only at the Interest Rate, as set forth in Section 5 hereof. Such

interest only payments shall commence on the First Interest Payment Date and shall be made thereafter on each Payment Date up until **but excluding** the Maturity Date.

(b) <u>Payments in Arrears</u>. On the Maturity Date, all unpaid principal and accrued but unpaid interest shall be due and owing in full. All interest shall be paid in arrears, except that on the Closing Date, Borrower shall pre-pay all interest that will accrue from the date of funding through the end of that month. Whenever any payment to be made under this Note or any other Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, unless such next succeeding Business Day would fall in the next calendar month, in which case such payment be payable on the next preceding Business Day.

4.2    <u>Interest Accrual</u>. Interest on the outstanding principal balance of this Note shall accrue at an annual rate equal to the Interest Rate calculated on an Actual/360 Basis. "**Actual/360 Basis**" shall mean on the basis of a 360-day year, charged based on the number of actual days elapsed for any whole or partial month in which interest is being calculated.

4.3    <u>Loan Fee</u>. On or prior to the Closing Date, Borrower shall pay to Lender **$53,000.00** as the "**Loan Fee**". The Loan Fee shall be deemed fully earned by Lender upon execution of this Note. In addition to the Loan Fee, Borrower shall also pay to Lender on or prior to the Closing Date, a $30.00 wire fee.[1]

4.4    <u>Application of Payments</u>. In the absence of a specific determination by Lender to the contrary, all payments paid by Borrower to Lender in connection with the obligations of Borrower under this Note and under the other Loan Documents shall be applied in the following order of priority: (a) to amounts, other than principal and interest, due to Lender pursuant to this Note or the other Loan Documents; (b) to accrued but unpaid interest on this Note; and (c) to the unpaid principal balance of this Note.

4.5    <u>Extension of Maturity Date</u>. Borrower may elect to extend the Maturity Date one (1) time for a period of one (1) year (the "**Extension Option**"). Borrower may exercise the Extension Option by providing written notice to Lender at least sixty (60) days prior to the Maturity Date and upon satisfaction of the following conditions, as determined by Lender, in its sole discretion:

(a) Borrower pays to Lender an extension fee in the amount of 0.50% of the outstanding principal balance of the Loan on the date Borrower elects to extend the then Maturity Date;

(b) No default or an Event of Default shall have occurred and be continuing during the period commencing on the date that Borrower delivers a notice of its exercise of the Extension Option through and including the date immediately preceding the commencement of the extension term;

(c) Borrower pays to Lender all of Lender's out-of-pocket costs and expenses incurred in connection with such extension, including the cost of title endorsements (evidencing title free of mechanics liens and any other endorsements required by Lender in its sole discretion) required by Lender, recording, documentation, and attorney's fees.

(d) Borrower shall have fully funded the reserve account to be maintained by Lender pursuant to the Reserve Pledge and Security Agreement, and, to the extent required by Lender, Borrower shall have funded any additional interest reserve in an amount sufficient, in Lender's sole and absolute discretion, to make all payments under this Loan through the applicable extension.

---

[1] NTD - .50% exit fee is waived if closing occurs on or prior to September 30, 2021.

(e) Borrower, each Guarantor, and Lender execute any and all modifications, extension agreements, reaffirmation agreements or any other documents or instruments required by Lender, in form and substance mutually agreeable by all parties;

(f) The representations and warranties contained in this Agreement and in all the Loan Documents are true and correct as of the date the Loan would otherwise mature;

(g) Following such extension, the Loan shall continue to be secured by the Deed of Trust and the other Loan Documents, subject to those exceptions to title approved by Lender at the time of Loan closing, as evidenced by title insurance endorsements satisfactory to Lender (as applicable), at Borrower's sole cost and expense;

(h) No change shall have occurred in the financial condition of Borrower, Guarantor or the Property which would have, in Lender's sole and absolute discretion and judgment, a material adverse effect on the Loan, Borrower's ability to perform its obligations under the Loan Documents, or Guarantor's ability to perform its obligations under the Environmental Indemnity or the Guaranty, as verified by Lender to its satisfaction; and

(i) The Loan conforms with all underwriting guidelines then applicable to term commercial loans by Lender.

5.   <u>Interest Rate Change</u>.

Prior to the first Rate Change Date, Borrower will pay interest at the Interest Rate based on the Index two (2) Business Days prior to the Closing Date.  On the Rate Change Date, and on each Rate Change Date thereafter, Lender will determine the new interest rate and the changed amount of the monthly payments based on the Interest Rate (i.e., based on the Index then in effect).  The new interest rate shall become effective on each Rate Change Date.  Borrower shall pay the amount of any new monthly interest payment beginning on the first Payment Date **following** any Rate Change Date.  Lender will provide Borrower with notice of any changes in the amount of the monthly payment due under this Note.  However, if Lender has not provided Borrower with prior notice of the monthly payment due on any Payment Date, then Borrower will pay on that Payment Date an amount equal to the monthly payment for which Borrower last received notice.  If Lender at any time determines that Borrower has paid one or more monthly payments in an incorrect amount because of the preceding sentence, or because Lender has miscalculated the adjustable rate or has otherwise miscalculated the amount of any monthly payment, then Lender will give notice to Borrower of such determination.  If such determination discloses that Borrower has paid less than the full amount due, Borrower, within thirty (30) calendar days after receipt of the notice from Lender, will pay to Lender the full amount of the deficiency.  If such determination discloses that Borrower has paid more than the full amount due, then the amount of the overpayment will be credited to the next payment(s) of principal and interest due under this Note (or, if an Event of Default has occurred and is continuing, such overpayment will be credited against any amount owing by Borrower to Lender).

6.   <u>Late Charge; Default Rate; NSF Charges</u>

6.1   <u>Late Charge</u>.  If any payment required hereunder is not paid on or before the tenth (10th) calendar day of the month in which it is due, or the payment is returned to Lender as a result of insufficient funds in Borrower's bank account, Borrower shall pay a late or collection charge equal to five percent (5%) of the amount of such unpaid payment.  Borrower acknowledges that Lender will incur additional expenses as a result of any late payments hereunder, which expenses would be impracticable to quantify, and that Borrower's payments under this paragraph are a reasonable estimate of such expenses and do not constitute a penalty.  The foregoing to the contrary notwithstanding, no late or collection charge shall be payable by Borrower as a result of any delay in the payment of any sum due and payable on the Maturity Date.

6.2    Default Rate.  Commencing upon an Event of Default and continuing until such Event of Default shall have been cured by Borrower, all sums owing on this Note shall bear interest until paid in full at a rate per annum equal to the Default Rate.

6.3    Non-Sufficient Funds Charge.  Any checks received that are returned to Lender marked for "non-sufficient funds" shall require payment by Borrower of a NSF fee of $25 or such other amount then charged by Lender in accordance with applicable law.

7.    Prepayments

7.1    Prepayment Premium.  Prepayment of the Loan other than: (i) as provided in Section 4.1 hereof with respect to the interest pre-paid on the Closing Date; (ii) as a result of application of insurance proceeds or a condemnation award received by Lender pursuant to the Security Instrument; or (iii) a prepayment made after October 1, 2022, as long as Lender has not granted forbearance or otherwise altered the payment schedule during the term of the Loan by written agreement with the Borrower prior to such date (in a writing signed by an officer of Lender holding a title of Executive Vice President or higher), shall result in Borrower owing to Lender a prepayment premium (the "**Prepayment Premium**"). The Prepayment Premium shall be equal to the original principal amount of the Loan multiplied by the Make Whole Interest Rate. The "**Make Whole Interest Rate**" equals the Interest Rate in effect at the time of prepayment multiplied by the quotient of (x) the remaining number of months until the first (1st) anniversary of the Closing Date and (y) twelve (12). The Prepayment Premium is due and payable to Lender on the date that any prepayment of the Loan is made.

7.2    PREPAYMENT WAIVER.  BORROWER HEREBY EXPRESSLY WAIVES THE RIGHT TO PREPAY THE INDEBTEDNESS EVIDENCED HEREBY IN WHOLE OR PART WITHOUT PENALTY, AND EXPRESSLY AGREES TO PAY THE AMOUNTS REQUIRED HEREIN, INCLUDING THE PREPAYMENT PREMIUM, IN THE EVENT OF AN ACCELERATION UPON THE OCCURRENCE OF A DEFAULT OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, UPON OCCURRENCE OF A TRANSFER OF THE PROPERTY SECURING THIS NOTE AND THE OTHER SECURITY INSTRUMENTS EVIDENCING THE LOAN, WHETHER VOLUNTARILY OR INVOLUNTARILY OR OTHERWISE. WHETHER PREPAYMENT IS VOLUNTARY OR INVOLUNTARY, IN NO EVENT SHALL THE AMOUNT OF THE PREPAYMENT PREMIUM RESULT IN A REDUCTION OF THE OUTSTANDING PRINCIPAL BALANCE, ACCRUED AND UNPAID INTEREST OR OTHER AMOUNTS DUE AS OF THE DATE OF PREPAYMENT. BORROWER AGREES THAT THE PREPAYMENT CONSIDERATION REQUIRED HEREIN IS REASONABLE. BORROWER HAS GIVEN INDIVIDUAL WEIGHT TO THE CONSIDERATION IN THIS TRANSACTION FOR THIS WAIVER AND AGREEMENT.  ANY SUCH PREPAYMENT SHALL NOT RESULT IN A REAMORTIZATION, DEFERRAL, POSTPONEMENT, SUSPENSION OR WAIVER OF ANY AND ALL OTHER PAYMENTS DUE UNDER THIS NOTE.  BORROWER HAS INITIALED THIS PROVISION OF THE NOTE EXPRESSLY WAIVING THE RIGHT TO PREPAY THE NOTE EXCEPT AS EXPRESSLY PERMITTED HEREIN.

**Borrower Initials:**   _IX_    _NC_

8.    Taxes and Insurance

8.1    Borrower shall pay to Lender on each Payment Date an amount determined by Lender that will result in the deposit with Lender of sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates, and (ii) an amount determined by Lender that will result in the deposit with Lender of sufficient funds to pay all insurance premiums at least thirty (30) days prior to the expiration of the applicable insurance policies.  "**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, now or hereafter levied or assessed or imposed against all or part of the Property.  Such amounts will be transferred by Lender to an account maintained by Lender (the "**Tax and Insurance Account**").  Lender will (a) apply funds in the Tax and Insurance Account to payments of Taxes and insurance premiums required to be made by Borrower, provided that Borrower has promptly supplied Lender with notices of all Taxes and insurance premiums due, or (b) reimburse Borrower for such amounts within thirty (30) days

after Lender's receipt of evidence of payment. In making any payment relating to Taxes and insurance premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to insurance premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If Lender determines in its reasonable judgment that the funds in the Tax and Insurance Account will be insufficient to pay (or in excess of) the Taxes or insurance premiums next coming due, Lender may increase (or decrease) the monthly contribution required to be made by Borrower to the Tax and Insurance Account. Notwithstanding the foregoing, nothing contained herein shall cause Lender to be deemed a trustee of said funds or to be obligated to pay any amounts in excess of the amount of funds deposited with Lender pursuant to this Section. Lender shall not be obligated to pay or allow any interest on any sums held by Lender pending disbursement or application hereunder, and Lender may impound or reserve for future payment of Taxes and insurance premiums such portion of such payments as Lender may in its absolute discretion deem proper, applying the balance on the principal of or interest on the obligations secured hereby.

8.2     Should Borrower fail to deposit with Lender (exclusive of that portion of said payments which has been applied by Lender on principal of or interest on the indebtedness secured hereby) sums sufficient to fully pay such Taxes or insurance premiums, at least thirty (30) days before delinquency thereof, Lender may, at Lender's election, but without any obligation so to do, advance any amounts required to make up the deficiency, which advances, if any, shall be secured by the Security Instrument and shall be repayable to Lender, or at the option of Lender the Lender may, without making any advance whatever, apply any sums held by it upon any obligation of Borrower secured by the Security Instrument.

8.3     As security for payment of the Loan and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all Borrower's right, title and interest in and to the Tax and Insurance Account. Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all funds in the Tax and Insurance Account. Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in the Tax and Insurance Account, or permit any lien to attach thereto, or any levy to be made thereon, or any financing statements, except those naming Lender as the secured party, to be filed with respect thereto. This Note is, among other things, intended by the parties to be a security agreement for purposes of the UCC. Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in the Tax and Insurance Account in any order and in any manner as Lender shall elect in Lender's discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the lien of the Security Instrument or exercise its other rights under the Loan Documents. The Tax and Insurance Account shall not constitute trust funds and may be commingled with other monies held by Lender. Upon repayment in full of this Note, all remaining funds in the Tax and Insurance Account, if any, shall be promptly disbursed to Borrower.

9.      <u>Maximum Rate Permitted By Law</u>

Neither this Note nor any of the other Loan Documents may be construed to require the payment or permit the collection of, in each case, any interest or any late payment charge to be charged to Borrower in excess of the maximum rate permitted by law applicable to Lender as a federally chartered savings association. If any such excess interest or late payment charge is provided for under this Note or any of the other Loan Documents or if this Note or any of the other Loan Documents shall be adjudicated to provide for such excess, neither Borrower nor Borrower's successors or assigns shall be obligated to pay such excess, and the right to demand the payment of any such excess shall be and hereby is waived, and this provision shall control any other provision of this Note or any of the other Loan Documents. If Lender shall collect amounts that are deemed to constitute interest and that would increase the effective interest rate to a rate in excess of the maximum rate permitted by law to be charged to Borrower, all such amounts deemed to constitute interest in excess of the maximum legal rate shall, upon such determination, at the option of Lender, be returned to Borrower or credited against the outstanding principal balance of this Note.

10. <u>Acceleration</u>

If (a) Borrower shall fail to pay when due any sums payable under this Note; (b) any other Event of Default shall occur (taking into account the provisions of Section 14 hereof); or (c) any other event or condition shall occur which, under the terms of the Security Instrument or any other Loan Document, gives rise to a right of acceleration of sums owing under this Note, then Lender, at its sole option, shall have the right to declare all sums owing under this Note immediately due and payable; provided, however, if the Security Instrument or any other Loan Document provides for the automatic acceleration of payment of sums owing under this Note, all sums owing under this Note shall be automatically due and payable in accordance with the terms of the Security Instrument or such other Loan Document.

11. <u>Recourse</u>

Borrower shall have full recourse liability to Lender under all of the Loan Documents for the payment of the Loan and for the performance of all other obligations of Borrower under the Loan Documents.

12. <u>Disbursement of Loan Proceeds; Limitation of Liability</u>

Borrower hereby authorizes Lender to disburse the proceeds of the Loan, after deducting any and all fees owed by Borrower to Lender in connection with the Loan to Borrower. With respect to such disbursement, Borrower understands and agrees that Lender does not accept responsibility for errors, acts or omissions of others, including, without limitation, the escrow company, other financial institutions, communications carriers or clearinghouses through which the transfer of Loan proceeds may be made or through which Lender receives or transmits information, and no such entity shall be deemed Lender's agent. As a consequence, Lender shall not be liable to Borrower for any actual (whether direct or indirect), consequential or punitive damages, whether or not (a) any claim for such damages is based on tort or contract; or (b) either Lender or Borrower knew or should have known of the likelihood of such damages in any situation.

13. <u>Notices.</u>

All notices and other communications that are required or permitted to be given to a party under this Note shall be in writing and shall be sent to such party, either by personal delivery, by overnight delivery service, or by certified first-class mail, return receipt requested. All notices and other communications shall include reference to Lender's loan number. Any party may change its address for notice hereunder to any other location within the continental United States by giving thirty (30) days' notice to the other parties in the manner set forth above. All such notices and communications shall be effective upon receipt, or in the case of notice via certified first-class mail, return receipt requested, upon the earlier of (i) receipt or (ii) five days of mailing.

The initial addresses of the parties shall be:

<u>LENDER:</u>
Axos Bank
9205 West Russell Rd., Suite 400
Las Vegas, NV 89148
Attn: Loan Servicing

<u>WITH A COPY TO:</u>
Axos Bank
4350 La Jolla Village Drive, Suite 100
San Diego, CA 92122
Attn: Legal Department

BORROWER:
Amity Court LLC
1215 120th Ave NE, Suite 204
Bellevue, WA 98005
Attn: Stanley Xu and Nanling Chen

14.    Non-Trustor Borrower

If any Borrower is not also a grantor under the Security Instrument, such Borrower hereby makes all representations and warranties in favor of Lender contained in Article 5 of the Security Instrument, all covenants contained in Sections 6.4, 6.5, 6.6, 6.7, 6.23, 6.24 of the Security Instrument, and all indemnities in favor of Lender contained in Section 6.18 of the Security Instrument, jointly and severally with the grantor. In addition, if any Borrower is not also a grantor under the Security Instrument, any reference to the Grantor in the description of the Events of Default thereunder shall also be deemed to reference any such Borrower.

15.    [Intentionally Omitted]

16.    Assignment

This Note may be freely transferred and assigned by Lender, its successors, endorsees and assigns. Borrower's ability to assign, delegate, or otherwise, directly or indirectly, transfer its rights or obligations with respect to, in each case, its indebtedness, duties under the Loan Documents, or to be released from liability under this Note as a result of such an assignment, delegation, or other transfer shall be governed, in each case, by Section 6.14 of the Security Instrument regarding the "Transfer" of the grantor's interest therein (it being understood that "Transfer" has the meaning ascribed to it in Section 6.14.1 of the Security Instrument). The Borrower shall not "Transfer" its interest under any of the Loan Documents in violation of the Loan Documents including provisions of Section 6.14 of the Security Instrument, such provisions being construed for the purposes of this Section of the Note as if the Borrower hereunder were the grantor under the Security Instrument. Any "Transfer" by the Borrower of its interest under any of the Loan Documents contrary to this provision shall be null and void *ab initio*. For clarity in construing these provisions, the grantor under the Security Instrument is referred to as "Borrower" in the text of the Security Instrument.

17.    Brokers and Financial Advisors

Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan. Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated herein. The provisions of this Section shall survive the expiration and termination of this Note and the repayment of this Note and satisfaction of all of its monetary and nonmonetary obligations set forth under the Loan Documents.

18.    Compliance With Laws

Borrower hereby represents, warrants and covenants that:

18.1    Neither Borrower nor Guarantor nor any of their respective Affiliates is or will be a Person (a) that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order 13224 issued on September 24, 2001 ("**EO13224**"), (b) whose name appears on the United States Treasury Department's Office of Foreign Assets Control ("**OFAC**") most current list of "Specifically Designated National and Blocked Persons," (c) who commits, threatens to commit or supports "terrorism," as defined in EO13224, or (d) who is otherwise affiliated with any entity or Person listed above (any and all parties or Persons described in subparts (a) through (d) above are herein referred to as a "**Prohibited Person**"). Neither Borrower nor

Guarantor nor any of their respective Affiliates will knowingly (i) conduct any business, nor engage in any transaction or dealing, with any Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services to or for the benefit of a Prohibited Person, or (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in EO13224. Borrower shall deliver (from time to time) to Lender any such certification or other evidence as may be requested by Lender in its sole and absolute discretion, confirming each such representation.

18.2    Neither Borrower nor Guarantor, nor to the knowledge of Borrower, any agent or other Person acting on behalf of the Borrower or Guarantor, has (a) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (b) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (c) failed to disclose fully any contribution made by Borrower or Guarantor (or made by any Person acting on its behalf of which Borrower or Guarantor is aware) which is in violation of law, or (d) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, et seq.), as amended ("**FCPA**"). Each of Borrower and Guarantor shall cause any agent or other Person acting on its behalf to comply with the FCPA, including maintaining and complying with all policies and procedures to ensure compliance with this act.

19.    <u>General Provisions</u>

19.1    <u>Joint and Several Liability</u>. If this Note is executed by more than one Person or entity as Borrower, the obligations of each such Person or entity shall be joint and several. No Person or entity shall be a mere accommodation maker, but each shall be primarily and directly liable hereunder.

19.2    <u>Waiver of Presentment</u>. Except as otherwise provided in any other Loan Document, Borrower hereby waives presentment, demand, notice of dishonor, notice of default or delinquency, notice of acceleration, notice of nonpayment, notice of costs, expenses or losses and interest thereon, and notice of interest on interest and late charges.

19.3    <u>Delay in Enforcement</u>. No previous waiver or failure or delay by Lender in acting with respect to the terms of this Note or the Security Instrument shall constitute a waiver of any breach, default or failure of condition under this Note, the Security Instrument or the obligations evidenced or secured thereby. A waiver of any term of this Note, the Security Instrument or of any of the obligations evidenced or secured thereby must be made in writing signed by Lender, shall be limited to the express terms of such waiver, and shall not constitute a waiver of any subsequent obligation of Borrower. The acceptance at any time by Lender of any past due amount shall not be deemed to be a waiver of the right to require prompt payment when due of any other amounts then or thereafter due and payable.

19.4    <u>Time of the Essence</u>. Time is of the essence with respect to all Borrower's obligations hereunder involving: (i) the payment of money and (ii) providing notice to Lender.

19.5    <u>Governing Law</u>. This Note and the other Loan Documents shall be governed by and construed under the internal laws of the State of Washington, except to the extent preempted by federal laws.

19.6    <u>Consent to Jurisdiction</u>. Borrower irrevocably submits to the jurisdiction of: (a) any state or federal court sitting in the State of Washington over any suit, action, or proceeding, brought by Borrower against Lender, arising out of or relating to this Note or the Loan evidenced hereby; (b) any state or federal court sitting in the state where the Property is located or the state in which Borrower's principal place of business is located over any suit, action or proceeding, brought by Lender against Borrower, arising out of or relating to this Note or the Loan evidenced hereby; and (c) any state court sitting in the county of the state where the Property is located over any suit, action, or proceeding, brought by Lender to exercise its STATUTORY POWER OF SALE under the Security Instrument or any action brought by Lender to enforce its rights with respect to the Property. Borrower irrevocably waives, to the fullest extent permitted by law, any objection that Borrower may now or hereafter have to the laying of venue of any such suit, action, or proceeding

brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.

19.7  Heirs, Successors and Assigns.

(a) All of the terms, covenants, conditions and indemnities of Borrower contained in this Note and the other Loan Documents shall be binding upon the heirs, successors and assigns of Borrower and shall inure to the benefit of the successors, indorsees and assigns of Lender. The foregoing sentence shall not be construed to permit Borrower to assign the Loan or otherwise directly or indirectly transfer its interest therein contrary to Section 14 hereof.

(b) Lender may assign its right, title, and interest in any or all of the Secured Obligations (as defined in the Security Instrument) arising under this Note to any Person and any such assignee shall succeed to all of Lender's rights with respect thereto. Upon such assignment, Lender shall be released from all responsibility for the Collateral (as defined in the Security Instrument) to the extent same is assigned to any transferee. Lender may from time to time sell or otherwise grant participations in any of the Secured Obligations (as defined in the Security Instrument) and the holder of any such participation shall, subject to the terms of any agreement between Lender and such holder, be entitled to the same benefits as Lender with respect to any security for the Secured Obligations (as defined in the Security Instrument) in which such holder is a participant.

19.8  Severability.  If any term of this Note, or the application thereof to any Person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Note, or the application of such term to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term of this Note shall be valid and enforceable to the fullest extent permitted by law.

19.9  Further Assurances.  Borrower shall, upon demand by Lender, execute, acknowledge (if appropriate) and deliver any and all documents and instruments and do or cause to be done all further acts reasonably necessary or appropriate to effectuate the provisions hereof.

19.10  Attorneys' Fees.  In the event it is necessary for Lender to retain the services of an attorney or any other party to enforce or to commence any legal action to enforce the terms of this Note, the Security Instrument, or any of the other Loan Documents, or any portion hereof or thereof, Borrower agrees to pay to Lender, in addition to damages or other relief, any and all costs and expenses incurred in connection therewith.

19.11  Disclaimers.  The relationship of Borrower and Lender under this Note and the other Loan Documents is, and shall at all times remain, solely that of borrower and lender; and Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any third party with respect to the Property. Notwithstanding any other provisions of this Note and the other Loan Documents: (i) Lender is not, and shall not be construed to be, a partner, joint venturer, member, alter ego, manager, controlling Person or other business associate or participant of any kind of Borrower, and Lender does not intend to ever assume such status; (ii) Intentionally Omitted; and (iii) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower.

19.12  Separate and Community Property.  Any married Person who executes this Note or any other Loan Document as a Borrower agrees that any money judgment which Lender obtains pursuant to the terms of this Note or any other Loan Document may be collected by execution upon any separate property or community property, in each case, of that Person.

19.13  Integration; Interpretation.  The Loan Documents contain or expressly incorporate by reference the entire agreement of the parties with respect to the matters contemplated therein and supersede all prior negotiations or agreements, written or oral. The Loan Documents shall not be modified except by written instrument executed by all parties. Any reference in any of the Loan Documents to the Property shall

include all or any part of the Property. Any reference to the Loan Documents includes any amendments, renewals or extensions now or hereafter approved by Lender in writing.

19.14   Commercial Purpose. Borrower represents that the indebtedness evidenced by the Note is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.

20.      WAIVER OF RIGHT TO JURY TRIAL.

BORROWER HEREBY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY ANY APPLICABLE LAWS, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS NOTE OR ANY OTHER LOAN, DOCUMENT (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS NOTE OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE. BORROWER HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. BORROWER HEREBY AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS AND HAS BEEN AFFORDED THE OPPORTUNITY TO HAVE ITS LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN.

21.      PATRIOT ACT. Lender hereby notifies Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act. Borrower will provide such information promptly upon the request of Lender.

22.      **Statutory Notice. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Borrower has duly executed this Note to be effective the day and year first above written.

**BORROWER:**

Amity Court LLC, a Washington limited liability company

By: X & C Holdings LLC, a Delaware limited liability company
Its Managing Member, Manager, and Governor

By: _____
Nanling Chen, Managing Member and Manager for X & C Holdings LLC

By: _____
Stanley Xu, Managing Member and Manager for X & C Holdings LLC

# EXHIBIT C

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

AXOS BANK™
4350 La Jolla Village Drive, Suite 100
San Diego, CA 92122
Mailstop: 4365-03

Tax Parcel(s)/APN: 272505-9147

(Space Above For Recorder's Use)

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

Amity Court LLC (Grantor),
a Washington limited liability company

to

FIRST AMERICAN TITLE INSURANCE COMPANY

(Grantee/Trustee)

in favor of

AXOS BANK™

(Grantee/Beneficiary)

**DATED:**  September 22, 2021

**Abbreviated Legal Description:** Ptn. SW 1/4 NE 1/4, Sect. 27, Twp. 25N, Rng. 5 E

**The full legal description is set forth on Exhibit A.**

 Tax Parcel(s) APN  272505-9147-00

310704763.4

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
## SECURITY AGREEMENT AND FIXTURE FILING

This DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Deed of Trust**"), dated as of September 22, 2021 is entered into by Amity Court LLC, a Washington limited liability company ("**Grantor**"), as Grantor, having its principal place of business at 1215 120th Ave NE, Suite 204, Bellevue, WA 98005, in favor of First American Title Insurance Company ("**Trustee**"), as Trustee, having its address at 920 Fifth Avenue, Suite 1200, Seattle, WA 98104, for the benefit of AXOS BANK™, a federally chartered savings association ("**Lender**"), as beneficiary, having its principal place of business at 4350 La Jolla Village Drive, Suite 100, San Diego, California, 92122.

RECITALS:

A.      Lender is making a loan (the "**Loan**") to Grantor ("**Borrower**"), which is evidenced by a Secured Promissory Note (all extensions, modifications or renewals thereof (including, without limitation, any extension, modification, or renewal of the Note at a different rate of interest or on different terms), collectively, the "**Note**") in the principal amount of **Five Million and 00/100 Dollars** (**$5,000,000.00**), executed by Borrower in favor of Lender, dated the same date as this Deed of Trust, payable to the order of Lender.

B.      The loan documents include this Deed of Trust, the Note and the other documents described in the Note as Loan Documents (the "**Loan Documents**").

ARTICLE 1

DEED OF TRUST

1.1.    <u>Grant</u>. For the purposes of and upon the terms and conditions of this Deed of Trust, Grantor irrevocably grants, bargains, sells, mortgages, conveys and assigns to Trustee, in trust for the benefit of Lender, with power of sale and right of entry and possession, all estate, right, title and interest which Grantor now has or may hereafter acquire in, to, under or derived from any or all of the following:

(a)      All right, title and interest which Grantor now has or may later acquire in any real property and all appurtenances, easements, covenants, rights of way, tenements, hereditaments and appurtenances, strips and gores of land, streets, ways, alleys, passages, thereunto belonging or in any way appertaining thereto now or hereafter, and all of the estate, right, title, interest, claim, demand, reversion or remainder whatsoever of Grantor therein or thereto, at law or in equity, now or hereafter in possession or expectancy, including, without limitation, all mineral, oil, and gas rights and royalties and profits therefrom, all water and water rights and shares of stock pertaining to water, water courses and water rights and powers, and all sewers and sewer rights, pipes, conduits, wires and other facilities furnishing utility or services to the real property, air rights and development rights and credits, pumps, pipes, flumes and ditches and ditch rights, water stock, ditch and/or reservoir stock or interests, rights to oil, gas, minerals, coal and other substances of any kind or character (the "**Land**") located in the **County of King, State of Washington** and more particularly described on <u>Exhibit A</u> attached hereto;

(b)      All right, title and interest which Grantor now has or may later acquire in and to all buildings, structures and improvements now or hereafter erected, used or placed on the Land, including, without limitation, all plant equipment, apparatus, machinery, appliances and fixtures of every

2

Security Instrument
310704763.4

kind and nature whatsoever now or hereafter located on or forming part of said buildings, structures and improvements (collectively, the "**Improvements**");

(c)      All right, title and interest which Grantor now has or may later acquire in and to the land lying in the bed of any street, road, highway or avenue now or hereafter in front of or adjoining the Property (hereinafter defined);

(d)      All additions and accretions to the property described above;

(e)      All licenses, authorizations, certificates, variances, consents, approvals and other permits now or hereafter pertaining to the Land and all estate, right, title and interest of Grantor in, to, under or derived from all trade names or business names relating to the Land or the present or future development, construction, operation or use of the Land;

(f)      Any and all awards heretofore or hereafter made by any governmental authorities (federal, state, local or otherwise) to Grantor and all subsequent owners of the Property (hereinafter defined) which may be made with respect to the Property as a result of the exercise of the right of eminent domain, the alteration of the grade of any street or any other injury to or decrease of value of the Property, which said award or awards are hereby assigned to Lender;

(g)      Any and all unearned premiums accrued, accruing or to accrue, and the proceeds of insurance now or hereafter in effect with respect to all or any portion of the Property;

(h)      Any and all claims or demands which Grantor now has or may hereafter acquire against anyone with respect to any damage to all or any portion of the Property;

(i)      Any and all claims under and proceeds of any insurance policies by reason of or related to a loss of any kind sustained to the Property, now or hereafter, whether or not such policies name Lender as an insured and whether or not such policies are required by Lender, and whether or not such claims thereunder are characterized as personal claims;

(j)      All goods, equipment, machinery, furniture, furnishings, trade fixtures, appliances, inventory, building materials, apparatus, utensils, vehicles, wiring, pipes, conduits, elevators, escalators, heating and air conditioning equipment, chattels and articles of personal property, including, without limitation, any interest therein now or at any time hereafter affixed to, attached to or used in any way in connection with or to be incorporated at any time into the Property or placed on any part thereof wheresoever located, whether or not attached to or incorporated in the Property, together with any and all accessions, accessories, attachments and replacements thereof, appertaining and adapted to the complete and compatible use, enjoyment, occupancy, operation or improvement of the Property;

(k)      All instruments, investment property, deposit accounts, accounts, contract rights, general intangibles, and other intangible property and rights now or hereafter relating to the foregoing property, or the operation thereof or used in connection therewith, including, without limitation, all options, letters of intent, and rights of first refusal of any nature whatsoever, covering all or any portion of such property, together with any modifications thereof, and deposits or other payments made in connection therewith, existing and future development rights, permits and approvals, air rights, density bonus rights and transferable development rights; all of Grantor's right, title and interest in and to any awards, remunerations, settlements or compensation heretofore made or hereafter made by any and all courts, boards, agencies, commissions, offices or authorities, of any nature whatsoever for any

3

Security Instrument
310704763.4

governmental unit (federal, state, local or otherwise) to the present or any subsequent owner of the foregoing property, including those for any vacation of, or change of grade in, any streets affecting the foregoing property and any and all licenses and privileges obtained by Grantor from non-governmental sources;

(l)     All leases of the Property, Personalty (as defined below), Fixtures (as defined below), or any part thereof, now or hereafter entered into and all right, title and interest of Grantor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder (whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms); all other rights and easements of Grantor now or hereafter existing pertaining to the use and enjoyment of the Property; and all right, title and interest of Grantor in and to all declarations of covenants, conditions and restrictions as may affect or otherwise relate to the Property;

(m)     All permits, plans, licenses, specifications, subdivision rights, security interests, contracts, contract rights, public utility deposits, prepaid sewer and water hook-up charges, or other rights as may affect or otherwise relate to the Property; and

(n)     All rents, income, issues and profits (subject, however, to the rights given in this Deed of Trust to Lender to collect and apply same), including, without limitation, the accounts, revenues and proceeds of any business operation conducted by or on behalf of Grantor on or through the use of the Property, prepaid municipal and utility fees, bonds, revenues, income and other benefits to which Grantor may now or hereafter be entitled to, or which are derived from, the Property or any portion thereof or interest therein.

The foregoing listing is intended only to be descriptive of the property encumbered hereby, and not exclusive or all inclusive.  It is the intent of Grantor to encumber hereby all property located or to be located upon the above-described real property.  Said real property (or the leasehold estate if this Deed of Trust encumbers a leasehold estate), buildings, improvements, appurtenances, Fixtures, Personalty, additions, accretions, and other property are herein referred to as the "**Property**."  As used herein, the term "**Fixtures**" shall include all articles of personal property hereinabove described, now or hereafter attached to, placed upon for a definite term, or otherwise used in connection with the Property, and shall include trade fixtures and goods which are or are to become fixtures.  As used herein, the term "**Personalty**" shall include all furniture, furnishings, equipment, machinery, goods, contract rights, general intangibles, money, deposit accounts, instruments, accounts, leases, chattel paper and other personal property described in this Deed of Trust (other than Fixtures) of any kind or character now existing or hereafter arising or acquired, now or hereafter located upon, within or about the Property, or which otherwise pertains to the use, ownership, management, operation, construction, leasing and sale of the Property, and all products and proceeds thereof, and all of Grantor's right, title, and interest in and to all such property.

ARTICLE 2

OBLIGATIONS SECURED

2.1.    Obligations Secured.  Grantor makes the foregoing grant and assignment for the purpose of securing the following obligations (the "**Secured Obligations**"):

(a)     Full and punctual payment to Lender of all sums at any time owing under the Note by Borrower;

4

Security Instrument
310704763.4

(b)      Payment and performance of all covenants and obligations of Grantor under this Deed of Trust including, without limitation, indemnification obligations and advances made to protect the Property;

(c)      Payment and performance of all additional covenants and obligations of Grantor and Borrower, in each case, under the Loan Documents except for the Grantor's and/or Borrower's covenants and obligations under any Environmental Indemnity Agreement, executed in favor of Lender, as of the date hereof, including any riders and amendments thereto or replacements thereof (collectively, the "**Environmental Indemnity Agreement**"), and the ADA Indemnity Agreement executed in favor of Lender, as of the date hereof, including any riders and amendments thereto or replacements thereof (collectively, the "**ADA Indemnity Agreement**").  For the avoidance of doubt, the Secured Obligations, notwithstanding anything to the contrary contained herein, shall not include, obligations or covenants, in each case, pursuant to:  (i) any guarantee of the Loan, including, without limitation, any amendment thereto or replacement thereof (it being understood that the guarantor(s) under such guarantee/guarantees shall not be the Grantor); (ii) any environmental indemnity regarding the Property executed by, in each case, the Borrower, Grantor and/or any guarantor/additional indemnitor, including, without limitation, the Environmental Indemnity Agreement; and (iii) any similar guarantee or indemnity, including any rider(s) and amendments thereto or replacements thereof, by which a person guarantees or otherwise acts as a surety regarding the Grantor's obligations under the Loan Documents (it being understood that guarantee and guarantees, as used in this Section 2.1(c), shall not be construed to include this Deed of Trust, even if this Deed of Trust is executed by a Grantor that is not the Borrower).  For the avoidance of doubt and without limiting the generality of the foregoing provisions of this Section 2.1(c), this Deed of Trust does not secure and shall not be construed to secure, in each case, the Environmental Indemnity Agreement, the ADA Indemnity Agreement, and any guarantee of the Loan.

(d)      Payment and performance of all covenants and obligations, if any, that any rider, attached as an exhibit to this Deed of Trust, recites are secured hereby;

(e)      Payment and performance of all future advances and other obligations that the then record owner of all or part of the Property may agree to pay and/or perform (whether as principal, surety or guarantor) for the benefit of Lender when the obligation is evidenced by a writing that recites that it is secured by this Deed of Trust; however, any obligation secured by this Deed of Trust shall not be construed to be part of any guarantee or the Environmental Indemnity Agreement or the ADA Indemnity Agreement (as the terms guarantee/guarantees, Environmental Indemnity Agreement and the ADA Indemnity Agreement are used in Section 2.1(c) hereof, including, in each case, any rider(s) or successor documents thereto);

(f)      All interest and charges on all obligations secured hereby including, without limitation, prepayment charges, late charges and Loan-related fees; and

(g)      All modifications, extensions and renewals of any of the obligations secured hereby, however evidenced, including, without limitation:  (i) modifications of the required principal payment dates or interest payment dates or both, as the case may be, deferring or accelerating payment dates wholly or partly; and (ii) modifications, extensions or renewals at a different rate of interest whether or not any such modification, extension or renewal is evidenced by a new or additional promissory note or notes.

2.2.    <u>Obligations</u>.   The term "**obligations**" is used herein in its broadest and most comprehensive sense and shall be deemed to include, without limitation, all interest and charges,

5

prepayment charges, late charges, reimbursements for expenses, and Loan-related fees at any time accruing or assessed on any of the Secured Obligations.

2.3. Incorporation. All terms and conditions of the documents that evidence any of the Secured Obligations are incorporated herein by this reference. All persons who may have or acquire an interest in the Property shall be deemed to have notice of the terms of the Secured Obligations and to have notice that the rate of interest on one or more Secured Obligations may vary from time to time. As used in this Deed of Trust, "person" or "persons" shall refer to both a natural person and a legal person.

ARTICLE 3

ASSIGNMENT OF RENTS AND LEASES

3.1. Assignment. Grantor absolutely, irrevocably, and unconditionally grants, transfers and assigns to Lender all of Grantor's right, title and interest in, to and under: (a) all present and future leases of the Property or any portion thereof, all licenses and agreements relating to the management, leasing or operation of the Property or any portion thereof, and all other agreements of any kind relating to the use or occupancy of the Property or any portion thereof, whether such leases, licenses and agreements are now existing or entered into after the date hereof (collectively, the "**Leases**"); and (b) the rents, issues, deposits and profits of the Property, including, without limitation, all amounts payable and all rights and benefits accruing to Grantor under the Leases (the "**Payments**"). The term "**Leases**" shall also include all guarantees of and security for the tenants' performance thereunder, and all amendments, extensions, renewals or modifications thereto that are permitted hereunder. This is a present and absolute assignment, not an assignment for security purposes only, and Lender's right to the Leases and Payments is not contingent upon, and may be exercised without possession of, the Property. This assignment of Leases and Rent is intended to be specific, perfected, and choate upon recording as provided in RCW § 7.28.230.

3.2. Grant of License. Lender confers upon Grantor a revocable license (the "**License**") to collect and retain the Payments as they become due and payable, until the occurrence of an Event of Default (as hereinafter defined). Upon an Event of Default, the License shall be automatically revoked and Lender may collect and apply the Payments pursuant to the terms hereof without notice and without taking possession of the Property. All Payments thereafter collected by Grantor shall be held by Grantor as trustee under a constructive trust for the benefit of Lender. Grantor hereby irrevocably authorizes and directs the tenants under the Leases to rely upon and comply with any notice or demand by Lender for the payment to Lender of any rental or other sums which may at any time become due under the Leases, or for the performance of any of the tenants' undertakings under the Leases, and the tenants shall have no right or duty to inquire as to whether any Event of Default has actually occurred or is then existing. Grantor hereby relieves the tenants from any liability to Grantor by reason of relying upon and complying with any such notice or demand by Lender. Lender may apply, in its sole discretion, any Payments so collected by Lender against any Secured Obligation or any other obligation of Grantor or any other person or entity, under any document or instrument related to or executed in connection with the Loan Documents, whether existing on the date hereof or hereafter arising. Collection of any Payments by Lender shall not cure or waive any Event of Default or notice of an Event of Default or invalidate any acts done pursuant to such notice.

3.3. Effect of Assignment. The foregoing irrevocable assignment shall not cause Lender to be: (a) a mortgagee in possession; (b) responsible or liable for the control, care, management or repair of the Property or for performing any of the terms, agreements, undertakings, obligations, representations, warranties, covenants and conditions of the Leases; (c) responsible or liable for any

6

Security Instrument
310704763.4

waste committed on the Property by the tenants under any of the Leases or by any other parties for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee, invitee or other person; or (d) responsible for or impose upon Lender any duty to produce rents or profits.  Lender shall not directly or indirectly be liable to Grantor or any other person as a consequence of:  (e) the exercise or failure to exercise any of the rights, remedies or powers granted to Lender hereunder; or (f) the failure or refusal of Lender to perform or discharge any obligation, duty or liability of Grantor arising under the Leases.

3.4. <u>Covenants</u>.

(a) <u>All Leases</u>.  Grantor shall, at Grantor's sole cost and expense:

(i) perform all obligations of the landlord under the Leases and use reasonable efforts to enforce performance by the tenants of all obligations of the tenants under the Leases;

(ii) use reasonable efforts to keep the Property leased at all times to tenants that Grantor in good faith believes are creditworthy, at rents not less than the fair market rental value (including, but not limited to, free or discounted rents to the extent the market so requires);

(iii) promptly upon Lender's request, deliver to Lender a copy of each requested Lease and all amendments thereto and waivers thereof, as well as any landlord or tenant estoppel certificates requested by Lender;

(iv) promptly upon Lender's request, execute and record any additional assignments of landlord's interest under any Lease to Lender and specific subordinations of any Lease to this Deed of Trust, in form and substance satisfactory to Lender; and

(v) promptly upon Lender's request, but in any event by June 30th of each year, provide Lender a current rent roll, certified by Grantor as being true and correct, containing the names of all tenants with respect to the Property, the terms of their respective Leases, the spaces occupied and the rentals or fees payable thereunder and the amount of each tenant's security deposit.

Unless consented to in writing by Lender or otherwise permitted under any other provision of the Loan Documents, Grantor shall not:

(vi) grant any tenant under any Lease any option, right of first refusal or other right to purchase all or any portion of the Property under any circumstances;

(vii) grant any tenant under any Lease any right to prepay rent more than one (1) month in advance;

7

Security Instrument
310704763.4

(viii)   except upon Lender's request, execute any assignment of landlord's interest in any Lease;

(ix)   except as set forth in Section 3.4(a)(vii), collect rent or other sums due under any Lease in advance, other than to collect rent one (1) month in advance of the time when it becomes due;

(x)   modify any Lease in a manner inconsistent with the Loan Documents;

(xi)   convey or transfer or suffer or permit a conveyance or transfer of the Property so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees under Leases;

(xii)   consent to any assignment of or subletting under any Major Lease unless required in accordance with its terms;

(xiii)   cancel or terminate any Lease or accept a surrender thereof (except in the exercise of Grantor's commercially reasonable judgment in connection with a tenant default under a Lease that is not a Major Lease) or

(xiv)   execute any lease for a term of greater than five (5) years, which deviates materially from the standard form Lease approved by Lender in writing.

Any such attempted action in violation of the provisions of this Section 3.4(a) shall be null and void.

(b)   <u>Major Leases</u>.  Grantor shall, at Grantor's sole cost and expense, give Lender prompt written notice of any material default by landlord or tenant under any Major Lease (as defined below).  Unless consented to in writing by Lender or otherwise permitted under any other provision of the Loan Documents, Grantor, in each case, shall not:

(i)   enter into any Major Lease without first obtaining Lender's prior written consent, which consent shall not be unreasonably withheld unless an Event of Default has occurred];

(ii)   reduce any rent or other sums due from the tenant under any Major Lease;

(iii)   terminate or materially modify or amend any Major Lease; or

(iv)   release or discharge the tenant or any guarantor under any Major Lease from any material obligation thereunder.

Any such attempted action in violation of the provisions of this Section 3.4(b) shall be null and void.

Without in any way limiting the requirement of Lender's consent hereunder, any sums received by Grantor in consideration of any termination or material modification or amendment of any

8

Major Lease or any release or discharge of any tenant under any Major Lease from any material obligation thereunder shall be applied to reduce the outstanding Secured Obligations (without payment of a prepayment charge) and any such sums received by Grantor shall be held in trust by Grantor for such purpose; provided, however, so long as no Event of Default exists at the time, any sums received by Grantor in consideration of any termination (or the release or discharge of any tenant), modification or amendment of any Major Lease that:  (A) total less than $50,000 shall be payable to Grantor; and (B) total $50,000 or more shall be placed into an impound account and shall be released to Grantor from time to time upon delivery of an executed replacement tenant lease and satisfactory evidence as to the completion of re-tenanting work.  Following the completion of such re-tenanting work, and provided no Default exists at such time, Lender shall release any excess funds received by Grantor with respect to the termination of any Major Lease to Grantor.  "**Major Lease**," as used herein, shall mean, in each case, (w) demise at least one (1) full floor of the Property, (x) a Lease of more than twenty percent (20%) of the total rentable area of all buildings forming a part of the Property (assuming the exercise of all expansion rights and all preferential rights to lease additional space contained in any such Lease), as  determined by Lender, (y) cell tower Leases, and (z) Leases of oil, gas and mineral rights.  Grantor's obligations with respect to Major Leases shall be governed by the provisions of Section 3.4(a) hereof applicable to all Leases as well as by the provisions of this Section 3.4(b).  Lender's failure to deny any written request by Grantor for consent as required by this Section 3.4(b) within twenty (20) Business Days after Lender's receipt of such request (and all documents and information reasonably related thereto) shall be deemed to constitute Lender's consent to such request.  "**Business Day**" shall mean any day other than a Saturday, Sunday, legal holiday or other day on which commercial banks in New York, New York are authorized or required by law to close.  All references in this Deed of Trust to a "day" or a "date" shall be to a calendar day unless specifically referenced as a Business Day.

3.5.    <u>Estoppel Certificates</u>.  Within thirty (30) days after request by Lender, Grantor shall deliver to Lender and to any party designated by Lender, estoppel certificates relating to the Leases executed by Grantor and by each of the tenants, in form and substance acceptable to Lender; provided, however, if any tenant fails or refuses to so execute and deliver any such estoppel certificate upon request, Grantor shall use reasonable efforts to cause such tenant to execute and deliver such estoppel certificate but such tenant's continued failure or refusal to do so, despite Grantor's reasonable efforts, shall not constitute a default by Grantor under this Section 3.5.

3.6.    <u>Right of Subordination</u>.  Lender may at any time and from time to time by specific written instrument intended for the purpose unilaterally subordinate the lien of this Deed of Trust to any Lease, without joinder or consent of, or notice to, Grantor, any tenant or any other person.  Notice is hereby given to each tenant under a Lease of such right to subordinate.  No subordination referred to in this Section 3.6 shall constitute a subordination to any lien or other encumbrance, whenever arising, or improve the right of any junior lienholder.  Nothing herein shall be construed as subordinating this Deed of Trust to any Lease.

ARTICLE 4

SECURITY AGREEMENT AND FIXTURE FILING

4.1.    <u>Security Interest</u>.  This Deed of Trust shall also constitute and serve as a security agreement and financing statement for Personalty, Fixtures, and any of the Property in which a security interest can be perfected under and within the meaning of RCW 62A-9A of the Washington Uniform Commercial Code (the "**Collateral**"), and shall grant to Lender, until the obligations secured hereby shall be satisfied, a first priority security interest, including but not limited to a fixture filing, pursuant to RCW 62A-9A of the Washington Uniform Commercial Code with respect to the Personalty and Fixtures.

9

To this end, Grantor shall and hereby does grant to Lender, a first priority security interest in, under and to the Collateral.

      4.2.   <u>Financing Statements</u>.  Grantor authorizes Lender to file such financing statements and cause such financing statements and other assurances as Lender may from time to time require to be recorded and filed at such times and places as may be required or permitted by law to create, perfect and preserve such security interest.

      4.3.   <u>Remedies on Default</u>.  Upon an event of default, Lender may, at its option: (i) exercise any remedy permitted by law or in equity, including without limitation, all the rights and remedies of a secured party under the Washington Uniform Commercial Code in any jurisdiction where enforcement is sought, whether in Washington or elsewhere; (ii) notify any parties obligated on any of the Personalty or Fixtures to make payment to Lender and enforce collection thereof; (iii) apply any sums received or collected from or on account of any Personalty or Fixtures, including the proceeds of any sales thereof, to the payment of any indebtedness of Grantor to Lender in any order, including the costs and expenses incurred in preserving and enforcing the rights of Lender and attorneys' fees, in such order and manner as Lender in Lender's sole discretion determines.  All of Lender's rights and remedies shall be cumulative and not exclusive.

      4.4.   <u>Fixture Filing</u>.  This Deed of Trust shall constitute a fixture filing under the Washington Uniform Commercial Code.

      4.5.   <u>Additional Covenants of Grantor</u>.  Grantor, at its sole cost and expense, (a) shall give Lender at least thirty (30) days' prior written notice of any change in Grantor's principal place of business and the acquisition or use of a trade name or style by Grantor; (b) shall promptly notify Lender in writing of any claim, lien, security interest, right, encumbrance or any other occurrence that may be adverse to Lender's security interest in the Collateral; (c) shall defend the Collateral from all claims, liens, security interests, rights, encumbrances and other matters that are adverse to Lender's security interest in the Collateral; (d) shall promptly pay all costs and expenses relating to the purchase, ownership, or use of the Collateral, including all liens, taxes, assessments and charges of any board, commission, department, agency, court, or other body of any governmental unit (e.g., without limitation, (i) the federal government and the departments thereof and (ii) applicable state governments and any cities, counties, or other political subdivisions or special districts organized thereunder) having jurisdiction over, in each case, the matter, thing, or person in question (collectively, "**Governmental Authorities**") levied, assessed or imposed on all or part of the Collateral; (e) shall not sell, transfer, pledge (including, without limitation, any assignment for the benefit of creditors other than Lender), hypothecate, lease or otherwise dispose of or abandon all or part of the Collateral without Lender's prior written consent, except for the sale of inventory in the ordinary course of Grantor's business or the disposition of any Collateral that is replaced with new Collateral of substantially comparable value and utility; (f) shall not remove any material part of the Collateral that consists of tangible personal property from its location on the Property without Lender's prior written consent; (g) shall, upon Lender's request, give notice, in form and substance acceptable to Lender, to any or all account debtors designated by Lender of Grantor's grant of a security interest in any Collateral that consists of accounts, contract rights, instruments, documents, or general intangibles (collectively, the "**Accounts**" and individually, an "**Account**"); (h) following the occurrence of any Event of Default, shall not compromise, settle, adjust, or grant any discount, credit, or allowance to any Account debtor without Lender's prior written consent; (i) shall undertake any and all other acts necessary or appropriate to maintain, preserve and protect the Collateral and Lender's security interest therein, including any actions requested by Lender; (j) shall not without Lender's prior written consent, given at Lender's sole discretion and signed by an officer of Lender holding the title of Executive Vice President or higher, make or acquiesce in Grantor making any changes to organizational documents of, in each case, Grantor or any affiliate

10

Security Instrument
310704763.4

thereof or interest holder therein (e.g., without limitation, articles of organization, articles of incorporation, operating agreement, bylaws, certificate of formation, partnership agreement) that, in each case, violate or are inconsistent with Grantor's obligations under the Loan Documents or materially alter Grantor's performance of its duties under the Loan Documents (each an "**Unauthorized Amendment**"), and Grantor hereby agrees that Unauthorized Amendments shall not adversely affect Lender's rights and remedies against Grantor under the Loan Documents and that Grantor shall be estopped from using any Unauthorized Amendment as a defense to or to otherwise impair, delay, or undermine Lender's remedies against Grantor under the Loan Documents; and (k) shall execute and deliver to Lender such other documents as Lender may request in order to evidence, effectuate, perfect, maintain, preserve or protect Lender's security interest in the Collateral, including, without limitation, financing statements, continuation financing statements, financing statement amendments, security agreements, and assignments.  If Grantor fails to execute and deliver to Lender any document requested by Lender pursuant to this Section 4.4 within ten (10) days after such request, then Grantor irrevocably appoints Lender, with full power of substitution, as Grantor's attorney-in-fact, coupled with an interest, with full power, in its own name or in the name of Grantor, to execute such document on behalf of Grantor.  Grantor has set forth above its full and correct name, and Grantor does not presently use any other names or tradenames, except for those tradenames specifically disclosed in writing by Grantor to Lender prior to the recordation of this Deed of Trust.  Nothing contained in this Article 4 may be construed to obligate Lender to act on behalf of Grantor as attorney-in-fact.

4.6.    FOR PURPOSES OF THE UCC THE FOLLOWING INFORMATION IS FURNISHED:

| | |
|---|---|
| Name, address of Debtor(s): | Amity Court LLC<br>1215 120th Ave NE, Suite 204<br>Bellevue, WA 98005 |
| Name and address<br>of Secured Party | Axos Bank<br>4350 La Jolla Village Dr., Ste. 100<br>San Diego, CA 92122 |
| Description of the type<br>(or items) of property (constituting the<br>Collateral): | See Section 4.1. |
| Description of real property<br>to which the Collateral<br>is attached or upon which<br>it is or will be located: | See Exhibit A hereto. |

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES

5.1.    Grantor's Representations and Warranties.  Grantor represents and warrants to Lender that the following statements are true and correct as of the date set forth in the preamble, each and every date during the existence of the Loan, or any portion thereof, as the context admits or requires:

11

Security Instrument
310704763.4

(a)    <u>Legal Status</u>.  Grantor is a limited liability company duly organized and existing under the laws of the State of Washington, and is qualified or licensed to do business in all jurisdictions in which such license or qualification is required.

(b)    <u>No Conflicts</u>.  The execution, delivery and performance of the Loan Documents by Grantor and the transactions contemplated hereby will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien or encumbrance (other than pursuant to the Loan Documents) upon any of the property of Grantor pursuant to the terms of, any agreement or instrument to which Grantor is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any governmental authority having jurisdiction over Grantor or any of its properties.  Any consent, approval, authorization, order, registration or qualification of or with any governmental authority required for the execution, delivery and performance by Grantor of the Loan Documents has been obtained and is in full force and effect.

(c)    <u>Permits</u>.  Grantor, or an affiliate thereof if permitted to do so under applicable law, possess all permits, franchises, licenses, entitlements, trade names and fictitious names, necessary for Grantor to undertake the business activities related to its possession of the Property.

(d)    <u>Authorization and Validity</u>.  The execution and delivery of this Deed of Trust have been duly authorized and this Deed of Trust constitutes a valid and binding obligation of Grantor, in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights, or by the application of rules of equity.

(i)    The person executing this Deed of Trust has all necessary power and authority to execute and deliver this Deed of Trust for, on behalf of, and in the name of such Grantor.

(ii)    If Grantor is a trust or Grantor has caused any trust documents to be delivered to Lender in connection with its organizational structure, Grantor's trust documents or such other trust documents have not been amended or altered (except for such amendments as have been provided to Lender) and are in full force and effect as of the date hereof.

(iii)    Grantor has had an adequate opportunity to consult with legal counsel of Grantor's choosing prior to executing and delivering this Deed of Trust.

(e)    <u>Non-Circumvention</u>.  The execution, delivery and performance by Grantor of this Deed of Trust do not violate any provision of any law or regulation, or result in any breach or default under any contract, obligation, indenture or other instrument to which Grantor is a party or by which Grantor is bound.

(f)    <u>Litigation</u>.  There are no pending or threatened actions, claims, investigations, suits or proceedings before any Governmental Authorities, court or administrative agency that may adversely affect the financial condition or operations of Grantor other than those previously disclosed in writing by Grantor to Lender.

(g)    <u>Financial Statements</u>.  The financial statements of Grantor, of each general partner (if Grantor is a partnership) and/or of each member (if Grantor is a limited liability company) previously delivered by Grantor to Lender:  (i) are materially complete and correct; (ii) present fairly the financial condition of such party; and (iii) have been prepared in accordance with the same accounting

Security Instrument
310704763.4

standard used by Grantor to prepare the financial statements delivered to and approved by Lender in connection with the making of the Loan, or other accounting standards approved by Lender.  Since the date of such financial statements, there has been no material adverse change in such financial condition, nor have any assets or properties reflected on such financial statements been sold, transferred, assigned, mortgaged, pledged or encumbered except as previously disclosed in writing by Grantor to Lender, prior to Lender's issuing a final commitment letter, and approved in writing by Lender.

(h)  <u>Income Taxes</u>.  There are no pending assessments or adjustments of Grantor's income tax payable with respect to any year.

(i)  <u>Title</u>.  Grantor lawfully holds and possesses fee simple title to the Property, without limitation on the right to encumber same.  This Deed of Trust is a first lien on the Property prior and superior to all other liens and encumbrances on the Property except:  (i) liens for real estate taxes and assessments not yet due and payable; (ii) senior exceptions previously approved by Lender and shown in the title insurance policy insuring the lien of this Deed of Trust; and (iii) other matters, if any, previously disclosed to Lender by Grantor and approved by Lender in a writing specifically referring to this representation and warranty.

(j)  <u>Intentionally Omitted</u>.

(k)  <u>Liens</u>.  There are no mechanics' or similar liens or claims that have been filed for work, labor or material (and no rights are outstanding that under law could give rise to any such liens) affecting the Property that are or may be prior to or equal to the lien of this Deed of Trust.

(l)  <u>Encroachments</u>.  To the best of Grantor's knowledge, except as shown in the survey, if any, previously delivered to Lender, none of the buildings or other improvements that were included for the purpose of determining the appraised value of the Property lies outside of the boundaries or building restriction lines of the Property, and no buildings or other improvements located on adjoining properties encroach upon the Property.

(m)  <u>Tax Returns</u>.  Grantor has provided true, correct and complete copies of the tax returns for Grantor, or of the person whose tax return contains the tax liabilities of Grantor if Grantor is a disregarded entity (collectively, the "**Tax Return**"), which Tax Return is the most recent tax return prepared for Grantor.  The Tax Return gives a true, correct and complete statement of financial condition for Grantor as of the date hereof.

(n)  <u>Taxes Paid</u>.  Grantor has filed all federal, state, county and municipal tax returns required to have been filed by Grantor, and has paid all taxes which have become due pursuant to such returns or to any notice of assessment received by Grantor, and Grantor has no knowledge of any basis for additional assessment with respect to such taxes.  To the best of Grantor's knowledge, there are not presently pending any special assessments against the Property or any part thereof.

(o)  <u>Leases</u>.  All existing Leases are in full force and effect and are enforceable in accordance with their respective terms.  No material breach or default by any party, or event that would constitute a material breach or default by any party after notice or the passage of time, or both, exists under any existing Lease.  None of the landlord's interests under any of the Leases, including, but not limited to, rents, additional rents, charges, issues or profits, has been transferred or assigned.  No rent or other payment under any existing Lease has been paid by any tenant for more than one (1) month in advance.

13

Security Instrument
310704763.4

(p)  <u>Collateral</u>.  Grantor has good title to the existing Collateral.  Grantor has not previously assigned or encumbered Grantor's interest in any of the Collateral, and no financing statement that remains in force covering any of the Collateral has been delivered to any other person or entity.  Grantor's principal place of business is located at the address shown in Section 4.6.

(q)  <u>Condition and Use of Property</u>.  Except as shown in the property condition survey or other engineering reports, if any, previously delivered to or obtained by Lender, the Property is in good condition and repair and is free from any damage, waste or defect that would materially and adversely affect the value of the Property as security for the Loan or the intended use of the Property. The Property is and shall remain for the term of Loan exclusively used for the same commercial purpose as existing as of the date this Deed of Trust is entered into.

(r)  <u>Wetlands</u>.  No part of the Property consists of or is classified as wetlands, tidelands or swamp and overflow lands.

(s)  <u>Compliance with Laws; ERISA</u>.

(i)  The Property is used exclusively for commercial office use and other appurtenant and related uses.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements shall be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  No legal proceedings are pending or, to the knowledge of Grantor, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property.  All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property (collectively, the "**Licenses**"), have been obtained and are in full force and effect. The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

(ii)  Grantor shall not engage in any transaction that would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement and the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

(iii)  Grantor (i) is not and shall not be an "employee benefit plan," as defined in Section 3(3) of ERISA, or a "plan," as defined in Section 4975 of the Code, (ii) none of the assets of Grantor constitutes or will constitute "plan assets" of one or more "benefit plan investors" (as those terms are defined in the Plan Asset Regulation), (iii) Grantor is not and shall not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with Grantor are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.  As of the date hereof, neither Grantor, nor any ERISA affiliate maintains, sponsors or contributes to any Plan or any Welfare Plan that provides any benefits to any former employee (or the spouse or dependent of any such former employee) of the Grantor or any of its ERISA Affiliates after such employee's retirement or termination of employment (other than COBRA continuation coverage required to be provided pursuant to Sections 601 through 607 of ERISA or Section 4980B of the Code).

14

Security Instrument
310704763.4

(t)     <u>Change in Business or Operation of Property</u>.  Borrower shall not cease to operate the Property as a commercial office property.

(u)     <u>Property Taxes and Other Liabilities</u>.  All taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, and ground rents, if any, that previously became due and owing in respect of the Property have been paid.

(v)     <u>Condemnation</u>.  There is no proceeding pending or threatened for the total or partial condemnation of the Property.

(w)     <u>Homestead</u>.  There is no homestead, dower, or other exemption available to Borrower that would materially interfere with the right to sell the Property at a trustee's sale or the right to foreclose this Deed of Trust.

(x)     <u>Property</u>.  Grantor owns (or will own, prior to the date set forth in the preamble) fee simple title to the Property.  This Deed of Trust creates the lien and security it purports to create and is a valid and binding obligation of Grantor enforceable against Grantor and the Property in accordance with its terms.

(y)     <u>No Default</u>.  The execution, delivery and performance of the obligations imposed on Grantor under this Deed of Trust will not cause Grantor to be in default under the provisions of any agreement, judgment or order to which Grantor is a party or by which Grantor is bound.

(z)     <u>Items Due and Payable</u>.  No default or Event of Default exists under any Loan Documents, and all of the following items regarding the Property which have become due and payable have been paid, or, with the approval of Lender, an escrow fund sufficient to pay them has been established:  taxes; government assessments; insurance premiums; water, sewer and municipal charges; leasehold payments; ground rents; and any other charges affecting the Property.

(aa)    <u>Compliance with Applicable Laws and Regulations</u>.  All Improvements to the Property and the use of the Property comply with all applicable statutes, rules and regulations, including, without limitation, all applicable statutes, rules and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, environmental protection, zoning and land use.  Improvements on the Property comply with applicable health, fire, and building codes and the Americans with Disabilities Act 42 U.S.C.A. Section 12101 et seq., as amended from time to time (the "**ADA**"), or, if exempt from the ADA, the Improvements are accessible to and useable by persons with disabilities and shall at all times during the term of the Loan be in compliance with applicable law and regulations.  There is no evidence of any illegal activities relating to controlled substances on the Property.  All required permits, licenses and certificates for the lawful use and operation of the Property, including, but limited to, certificates of occupancy, municipal licenses, or the equivalent, have been obtained and are current and in full force and effect.

(bb)    <u>Insurance Policies</u>.  Grantor has furnished to Lender all insurance policies and certificates required pursuant to the Loan Documents.

(cc)    <u>No Insolvency Proceeding or Judgment</u>.  Grantor is not currently (a) the subject of or a party to any completed or pending bankruptcy, reorganization or insolvency proceeding; or (b) the subject of any judgment unsatisfied of record or docketed in any court of the state in which the Property is located or in any court located in the United States.

Security Instrument
310704763.4

(dd)　　<u>No Subordinate Financing</u>.  Except as otherwise expressly approved by Lender in writing signed by an officer of Lender holding the title Executive Vice President or more senior, no part of the Property is, or will become, subject to a subordinate mortgage, deed of trust, security instrument (other than this Deed of Trust), or other type of subordinate lien.

(ee)　　<u>No Labor or Material Supplier Claims</u>.  All parties furnishing labor and materials have been paid in full and, except for such liens or claims insured against by the policy of title insurance to be issued in connection with the Loan, there are no mechanics', laborers' or material supplier's liens or claims outstanding for work, labor or materials affecting the Property, whether prior to, equal with or subordinate to the lien of this Deed of Trust.

(ff)　　<u>No Other Interests</u>.  No person has (a) any possessory interest in the Property or right to occupy the same except under and pursuant to the provisions of existing leases by and between tenant and Grantor, the material terms of all such leases having been previously disclosed to Lender, or (b) an option to purchase the Property or an interest therein (including, without limitation, any right of first offer or refusal).

(gg)　　<u>Property Characteristics</u>.  No part of the Property is included or assessed under or as part of another tax lot or parcel, no part of any other property is included or assessed under or as part of the tax lot or parcels for the Property, other than as expressly disclosed to Lender in writing and accepted by Lender during its underwriting process prior to Lender issuing its final commitment letter.

(hh)　　<u>Operating Statements</u>.  Grantor has provided Lender a true, correct and complete copy of its most recent operating statement (the "**Operating Statement**") prepared for the Property. The Operating Statement gives a true, correct and complete statement of financial conditions for the Property as of the date hereof.

(ii)　　<u>Service Contracts</u>.  Grantor has provided Lender with a true, correct and complete list of all service contracts and service agreements relating to the Property and/or the ownership, maintenance and operation of the Improvements located on the Property (the "**Service Contracts**"). Each of the Service Contracts is in full force and effect in accordance with its terms; neither party is in default under any of the Service Contracts; true, correct and complete copies of each of the Service Contracts have been provided to Lender in connection with its underwriting of the Loan; and each of the Service Contracts is terminable on not more than thirty (30) days' notice without the payment of any fee, penalty, cost or expense.

(jj)　　<u>Furniture, Fixtures and Equipment</u>.  Except for furniture and trade fixtures, equipment, and other personal property owned by any tenant of the Property, all furniture, fixtures and equipment used in connection with the ownership, management, operation and maintenance of the Property are free and clear of any right, title or interest of any other person or entity.

(kk)　　<u>Financial Statements</u>.  The financial statements of Grantor reflect a positive net worth as of the date thereof.

(ll)　　<u>Insolvency</u>.  Grantor is not presently insolvent, and the Loan will not render Grantor insolvent.  The term "insolvent" means, either and in each case, that (i) the sum total of all of an a person's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all such entity's non-exempt assets, i.e., all of the assets of the entity that

16

Security Instrument
310704763.4

are available to satisfy claims of creditors or (ii) a person will not be able to pay all creditors as obligations are become due.

(mm)  <u>Fraudulent Transfer</u>.  Grantor has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Grantor has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Grantor's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Grantor's total probable liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  Grantor's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Grantor does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Grantor).

(nn)  <u>Working Capital</u>.  After the Loan is made, Grantor will have sufficient working capital, including cash flow from the Property or other assets, not only to adequately maintain the Property, but also to pay all of Grantor's outstanding debts as they come due.

(oo)  <u>No Material Change</u>.  There has been no material change in the occupancy of the Property or the business, financial condition or results of operations of Grantor, the Property or, to the best of Grantor's knowledge, any tenant of the Property, from the date of the application to Lender to make the Loan, other than in connection with the regular commencement and/or, expiration of short-term leases and rental agreements ordinarily occurring as part of the business conducted on the Property and as disclosed by Grantor to Lender in Lender's underwriting process for the Loan.

(pp)  <u>Investigation and Inquiry</u>.  Grantor makes the representations and warranties contained this Section 5.1 following Grantor's reasonable inquiry and investigation into the matters and facts to which Grantor is attesting, and Grantor's inquiry and investigation has confirmed the accuracy of Grantor's statements made in this Section 5.1.

<u>Federal Reserve Regulations; Investment Company Act</u>.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document.  Grantor is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (ii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

ARTICLE 6

RIGHTS AND DUTIES OF THE PARTIES

6.1.  <u>Maintenance and Preservation of the Property</u>.  Grantor shall:  (a) keep the Property in good condition and repair; (b) complete or restore promptly and in workmanlike manner the Property or any part thereof which may be damaged or destroyed (unless, if and to the extent permitted under Section 6.11 hereof, Lender elects to require that insurance proceeds be used to reduce the Secured

17

Obligations and after such repayment the ratio of Secured Obligations to the value of the Property, as reasonably determined by Lender is the same as or lower than it was immediately before the loss or taking occurred); (c) comply and cause the Property to comply with (i) all laws, ordinances, regulations and standards, (ii) all covenants, conditions, restrictions and equitable servitudes, whether public or private, of every kind and character and (iii) all requirements of insurance companies and any bureau or agency which establishes standards of insurability, which laws, covenants or requirements affect the Property and pertain to acts committed or conditions existing thereon, including, without limitation, any work of alteration, improvement or demolition as such laws, covenants or requirements mandate; (d) operate and manage the Property at all times in a professional manner and do all other acts that from the character or use of the Property may be reasonably necessary to maintain and preserve its value; (e) promptly after execution, deliver to Lender a copy of any management agreement concerning the Property and all amendments thereto and waivers thereof; and (f) execute and acknowledge all further documents, instruments and other papers as Lender or Trustee deems necessary or appropriate to preserve, continue, perfect and enjoy the benefits of this Deed of Trust and perform Grantor's obligations, including, without limitation, statements of the amount secured hereby then owing and statements of no offset. Grantor shall not: (g) remove or demolish all or any material part of the Property; (h) alter either (i) the exterior of the Property in a manner that materially and adversely affects the value of the Property or (ii) the roof or other structural elements of the Property in a manner that requires a building permit; (i) initiate or acquiesce in any change in any zoning or other land classification that affects the Property; (j) materially alter the type of occupancy or use of all or any part of the Property; (k) commit or permit waste of the Property, (l) modify or consent to a modification of any easement, covenant, restriction or other matters of records without Lender's prior written consent, or (m), whether by Grantor's action or inaction, cause, permit, or otherwise allow any activity that may, in Lender's sole and absolute discretion, adversely impact Lender's title insurance policy insuring the lien of this Deed of Trust, without the prior written consent of Lender..

      6.2.   Compliance with Laws. Grantor shall comply with all federal, state and local laws, rules and regulations applicable to the Property, including, without limitation, all zoning and building requirements and all requirements of the ADA. Grantor shall possess and maintain in full force and effect at all times (a) all certificates of occupancy and other licenses, permits and authorizations required by applicable law for the existing use of the Property and (b) all permits, franchises and licenses and all rights to all trademarks, trade names, patents and fictitious names, if any, required by applicable law for Grantor to conduct the business(es) in which Grantor is now engaged.

      6.3.   Litigation. Grantor shall promptly notify Lender in writing of any litigation pending or threatened against either Grantor claiming damages in excess of $50,000 and of all pending or threatened litigation against either Grantor if the aggregate damage claims against Grantor exceed $100,000.00.

      6.4.   Business Structure Change, Alienation of Assets. Grantor shall not: (a) merge or consolidate with any other entity, except when authorized to do so with the prior written consent of Lender as expressly authorized pursuant to Section 6.14 hereof; (b) make any substantial change in the nature of Grantor's business or structure; (c) acquire all or substantially all of the assets of any other entity or permit Grantor to acquire all or substantially all of the assets of any other entity; or (d) sell, lease, assign, transfer or otherwise dispose of a material part of Grantor's assets except in the ordinary course of Grantor's business.

      6.5.   Accounting Records. Grantor shall maintain adequate books and records in accordance with the same accounting standard used by Grantor to prepare the financial statements delivered to and approved by Lender in connection with the making of the Loan or other accounting standards approved by Lender. Grantor shall permit any representative of Lender, at any reasonable

<div align="center">18</div>

Security Instrument
310704763.4

time and from time to time, to inspect, audit and examine such books and records and make copies of same.

6.6.    Financial Statements and Accounts.

6.6.1.    Statements Required.  During the term of the Loan or while any liabilities of Grantor to Lender under any of the Loan Documents remain outstanding and unless Lender otherwise consents in writing, Grantor shall provide to Lender or cause to be provided to Lender, each in a form acceptable to Lender, the following:

(a)    Leasing Schedule.  Not later than thirty (30) days after written request by Lender, a schedule, signed and dated by Grantor, showing the following lease information regarding each tenant:  the name of the tenant, a description of the premises, monthly or other periodic rental amount, dates of commencement and expiration of the lease, and payment status;

(b)    Balance Sheet and Annual Financial Statements.  With respect to Grantor, not later than ninety (90) days after the close of the respective fiscal years of Grantor, any guarantor, and any indemnitor, balance sheet and financial statements, including, as applicable and without limitation:  (i) balance sheet for the Property, signed and dated by Grantor; (ii) a schedule, signed and dated by Grantor, showing all revenues and expenses during such fiscal year, relating to the Property; (iii) financial statements showing all assets and liabilities of Grantor that shall be certified by a principal, managing member or general partner of Grantor as being true, correct and complete, or upon the request of Lender, audited by an independent certified public accountant; and (iv) financial statements showing all assets and liabilities of each indemnitor and guarantor under any indemnity or guarantee, which shall be certified by such guarantor or indemnitor or the principal, managing member or general partner of such indemnitor or guarantor, as being true, correct and complete, or upon the request of Lender, audited by an independent certified public accountant;

(c)    Tax Returns.  Not later than April 30th of each year, copies of all tax returns (with all schedules) or extensions filed by Grantor (or on Grantor's behalf, if Grantor is a disregarded entity), unless an extension has been obtained, but no event later than the earlier of (i) September 1st of each year or (ii) within twenty (20) days after filing;

(d)    Other Information.  From time to time, such other information with regard to Grantor or the Property as Lender may reasonably request in writing.

6.6.2.    Form; Warranty.  Grantor agrees that all financial statements to be delivered to Lender, pursuant to Section 6.6.1 hereof, regardless of whether they pertain to Grantor shall:  (a) be complete and correct; (b) present fairly the financial condition of the party; (c) disclose all liabilities that are required to be reflected or reserved against; and (d) be prepared in accordance with the same accounting standard used by Grantor to prepare the financial statements delivered to and approved by Lender in connection with the making of the Loan or other accounting standards acceptable to Lender. By delivering any such financial statement, Grantor shall be deemed to warrant and represent that, as of the date of delivery of any such financial statement, there has been no material adverse change in financial condition, nor have any assets or properties been sold, transferred, assigned, mortgaged, pledged or encumbered since the date of such financial statement except as disclosed by Grantor in a writing delivered to Lender.

19

Security Instrument
310704763.4

Grantor agrees that all leasing schedules and other information to be delivered to Lender pursuant to Section 6.6.1 hereof and this Section 6.6.2, in each case, shall not contain any misrepresentation or omission of a material fact.

6.6.3.  <u>Accounts and Primary Banking Relationships</u>.  Grantor shall establish its primary deposit and operating accounts with Lender.

6.7.    <u>Costs, Expenses and Fees</u>.  Grantor agrees to pay to Lender immediately and upon demand all costs and expenses incurred by Trustee and Lender in the enforcement of the terms and conditions of this Deed of Trust (including, without limitation, statutory trustee's fees, court costs and attorneys' fees, whether incurred in litigation or not) with interest from the date of expenditure until said sums have been paid at the rate of interest applicable to the principal balance of the Note as specified therein. Grantor shall pay to Lender the full amount of all costs and expenses, including, without limitation, attorneys' fees (i.e., outside counsel), incurred by Lender in connection with: (a) appraisals and inspections of the Property or Collateral required by Lender as a result of (i) a Transfer (as hereinafter defined) or proposed Transfer, or (ii) an Event of Default; (b) any acts performed or proposed to be performed by Lender at Grantor's request or wholly or partially for the benefit of Grantor (including, without limitation, the preparation or review of amendments, consents, authorizations, assumptions, waivers, releases, reconveyances, estoppel certificates or statements of amounts owing under any Secured Obligation); (c) when permissible pursuant to applicable law and without limitation to Lender's rights under sub-clauses (a), (b), and (d) of this Section 6.7, any out-of-pocket expenses or costs incurred by Lender in taking any action prudent or reasonably necessary, in each case, in Lender's judgment to protect or preserve the priority of, in each case, Lender's liens securing the Secured Obligations; and (d) when permissible pursuant to applicable law and without limitation to Lender's rights under the preceding sub-clauses (a), (b), and (c) of this Section 6.7, any out-of-pocket costs and expenses incurred by Lender and its agents in responding to third-party legal process, subpoenas, or similar legal demands received by Lender and its agents as a result of or in relation to, in each case, the Secured Obligations, the Loan Documents, or Grantor's business with Lender, including, without limitation charges, expenses, attorney's fees and costs upon any appeal, and in any bankruptcy proceedings and in any arbitration proceeding (including, without limitation, any adversary proceeding, contested matter or motion) or otherwise incurred by Lender as a result thereof. Grantor shall pay all costs and expenses arising under this Section 6.7 immediately upon demand by Lender. Any administrative fees owed to Lender pursuant to the Loan Documents, including, without limitation, those owed pursuant to Section 6.14 hereof (but excluding 6.14.4(a)) shall be due and payable immediately upon Grantor requesting the action from Lender and shall be non-refundable, irrespective of the disposition of the request by Lender. Grantor shall have no expectation that Lender commence review of any matter or request prior to Grantor paying the required fee pursuant to the Loan Documents. In addition and without limitation to Lender's right to recover all its out-of-pocket expenses from Grantor on demand as provided in this Section 6.7, Lender shall have the right to require Grantor to provide a legal deposit (i.e., payment in advance) before engaging outside counsel to do any legal work and to refresh that deposit, at Lender's request, over the pendency of the matter. Grantor shall have no expectation that Lender commence any legal work with outside counsel prior to Grantor paying any legal deposit requested by Lender. For the avoidance of doubt, any reference in the Loan Documents to out-of-pocket costs or expenses incurred by Lender shall be construed, without limitation to other kinds of costs and expenses incurred by Lender, to include attorneys' fees (i.e., outside counsel). For the further avoidance of doubt, no other provision regarding Lender's right to payment of fees, costs, and expenses from Grantor contained in either (i) this Deed of Trust or (ii) any other Loan Document, in each case, may be construed to limit Lender's rights pursuant to this Section 6.7, including, without limitation, Lender's right to require an advance deposit for legal fees (it being understood that any other provision of the Loan Documents pertaining to Lender's right to payment of fees, costs, and expenses, from Grantor in each case, shall be construed consistent with this Section 6.7). Without limiting the

20

Security Instrument
310704763.4

generality of the immediately preceding sentence, no provision specifically requiring payment of a fee, cost, or expense to Lender by Grantor, by being so affirmatively and specifically stated in any Loan Document, may be construed to limit Lender's rights to payment pursuant to this Section 6.7 for any fee, cost, or expense, in each case, provided for by this Section 6.7, but not so specifically stated.  In the event that any party brings any suit or other proceeding with respect to the subject matter or enforcement of this Deed of Trust, including without limitation, in appellate proceedings or in any action or participation in, or in connection with, any case or proceeding under Chapter 7, 11 or 13 of the Bankruptcy Code, 11 United States Code Sections 101 et seq., or any successor statutes, the prevailing party (as determined by the court, agency or other authority before which such suit or proceeding is commenced) shall, in addition to such other relief as may be awarded, be entitled to recover reasonable attorneys' fees, expenses and costs of investigation.

6.8.    <u>No Other Liens, Encumbrances and Charges</u>.  Without obtaining Lender's prior written consent pursuant to Section 6.14 (which consent shall be granted or withheld in Lender's sole and absolute discretion and at Grantor's sole cost and expense), Grantor shall not incur against the Property any debt, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than the Loan and trade debt incurred in the ordinary course of Grantor's business (with any such trade debt to be paid within sixty (60) days of the date such debt was incurred and, in any event, prior to delinquency).  Grantor shall immediately discharge by bonding or otherwise any lien, charge or other encumbrance that attaches to the Property in violation of Section 6.14.  Subject to Grantor's right to contest such matters under this Deed of Trust or as expressly permitted in the Loan Documents, Grantor shall pay when due all obligations secured by or reducible to liens and encumbrances that shall now or hereafter encumber or appear to encumber all or any part of the Property or any interest therein, whether senior or subordinate hereto, including, without limitation, all claims for work or labor performed, or materials or supplies furnished, in connection with any work of demolition, alteration, repair, improvement or construction of or upon the Property, except such as Grantor may in good faith contest or as to which a bona fide dispute may arise (provided that provision is made to the satisfaction of Lender for eventual payment thereof in the event that Grantor is obligated to make such payment and that any recorded claim of lien, charge or other encumbrance against the Property is immediately discharged by bonding or otherwise).

6.9.    <u>Taxes and Other Liabilities</u>.  Grantor shall pay and discharge when due any and all indebtedness, obligations, assessments and taxes, both real and personal and including federal and state income taxes and state and local property taxes and assessments by or before the due date.  Grantor shall promptly provide to Lender copies of all tax and assessment notices pertaining to the Property.  Grantor hereby authorizes Lender to obtain, at Grantor's expense, a tax service contract which shall provide tax information on the Property to Lender for the term of the Loan and any extensions or renewals of the Loan.

6.10.    <u>Insurance Coverage</u>.  Grantor shall insure the Property against loss or damage by fire and such other hazards as Lender shall from time to time require, however, not to exceed full replacement cost; provided, however, (a) Lender, at Lender's election, may only require flood insurance if all or any portion of the Improvements located on the Property is or becomes located in a special flood hazard area; and (b) Lender, at Lender's election, may only require earthquake insurance if all or any portion of the Property is or becomes located in an earthquake fault zone.  Grantor shall also carry public liability insurance and such other insurance as Lender may require, including, without limitation, business interruption insurance or loss of rents insurance.  Such policies shall contain a standard mortgage clause naming Lender and its successors and assigns as a loss payee or additional insured, as appropriate, and requiring at least thirty (30) days' prior notice to the holder at termination or cancellation.  Grantor shall maintain all required insurance at Grantor's expense, in companies, and in substance and form satisfactory to Lender, including, without limitation, an agreed amount

21

Security Instrument
310704763.4

endorsement.  Neither Lender nor Trustee, by reason of accepting, rejecting, approving or obtaining insurance shall incur any liability for:  (c) the existence, nonexistence, form or legal sufficiency of any insurances; (d) the solvency of any insurer; or (e) the payment of claims.

If Grantor fails to maintain and deliver to Lender the original policies or certificates of insurance required by this Deed of Trust, upon ten (10) days' prior notice to Grantor, Lender may procure such insurance at Grantor's sole cost and expense.  Grantor agrees to deliver to Lender promptly upon receipt, but in any event no later than thirty (30) days' prior to the termination of any of such insurance policies, a renewal policy (or certificate of insurance evidencing the same) satisfying the requirements of this Deed of Trust.

6.11.    Insurance and Condemnation Proceeds.

(a)    Assignment of Claims.  Grantor absolutely and irrevocably assigns to Lender all of the following rights, claims and amounts (collectively, the "**Claims**"), all of which shall be paid to Lender:  (i) all awards of damages and all other compensation payable directly or indirectly by reason of a condemnation or proposed condemnation for public or private use affecting all or any part of, or any interest in, the Property; (ii) all other claims and awards for damages to or decrease in value of all or any part of, or any interest in, the Property; (iii) all proceeds of any insurance policies payable by reason of loss sustained to all or any part of the Property; and (iv) all interest which may accrue on any of the foregoing.  Grantor shall give Lender prompt written notice of the occurrence of any casualty affecting, or the institution of any proceedings for eminent domain or for the condemnation of, the Property or any portion thereof.  Lender may, in each case, commence, appear in, defend or prosecute any Claim, and may adjust, compromise, and settle all Claims, but shall not be responsible for any failure to commence, appear in, defend, prosecute or collect any such Claim regardless of the cause of the failure.  All awards, proceeds, and other sums described herein shall be payable to Lender.

(b)    Application of Proceeds; No Event of Default.  (1) So long as no Event of Default has occurred and is continuing at the time of Lender's receipt of the proceeds of the Claims (the "**Proceeds**") and no Event of Default occurs thereafter, Lender shall apply the Proceeds in the following order of priority:  First, to Lender's expenses in settling, prosecuting or defending the Claims; Second, to the repair or restoration of the Property; and Third, to Grantor if and only if the repair or restoration of the Property has been completed to the satisfaction of Lender, but otherwise, to the Secured Obligations, in any order, without suspending, extending or reducing any obligation of Grantor to make installment payments if the repair or restoration of the Property has not been completed.  (2) Notwithstanding the foregoing, Lender shall not have any obligation to make any Proceeds available for the repair or restoration of the Property unless and until all the following conditions have been satisfied in Lender's sole and absolute discretion:  (i) delivery to Lender of the Proceeds plus any additional amount that is needed to pay all costs of the repair or restoration (including, without limitation, taxes, financing charges, insurance and rent during the repair period); (ii) establishment of an arrangement for lien releases and disbursement of funds acceptable to Lender; and (iii) delivery to Lender in form and content acceptable to Lender of all of the following:  (aa) plans and specifications for the work; (bb) a contract for the work, signed by a contractor acceptable to Lender; (cc) a cost breakdown for the work; (dd) if required by Lender, a payment and performance bond for the work; (ee) evidence of the continuation of all Leases unless consented to in writing by Lender; (ff) evidence that, upon completion of the work, the size, capacity, value, and income coverage ratios for the Property will be at least as great as those which existed immediately before the damage or condemnation occurred; and (gg) evidence of the satisfaction of any additional conditions that Lender may reasonably establish to protect Lender's security.  Grantor acknowledges that the specific conditions described above are reasonable.

<div align="center">22</div>

Security Instrument
310704763.4

(c)    Application of Proceeds; Event of Default.  If an Event of Default has occurred and is continuing at the time of Lender's receipt of the Proceeds or if an Event of Default occurs at any time thereafter, Lender may, at Lender's absolute discretion and regardless of any impairment of security or lack of impairment of security, but subject to applicable law governing use of the Proceeds, if any, apply all or any of the Proceeds to Lender's expenses in settling, prosecuting or defending the Claims and then apply the balance to the Secured Obligations in any order without suspending, extending or reducing any obligation of Grantor to make installment payments, and may release all or any part of the Proceeds to Grantor upon any conditions Lender chooses.

6.12.    Defense and Notice of Losses, Claims and Actions.  Grantor shall protect, preserve and defend the Property and title to and right of possession of the Property, the security and priority of this Deed of Trust, and the rights and powers of Lender and Trustee hereunder, in each case, at Grantor's sole expense against all adverse claims, whether the claim:  (a) is against a possessory or non-possessory interest; (b) arose prior or subsequent to the date set forth in the preamble; or (c) is senior or junior to Grantor's or Lender's rights.  Grantor shall provide Lender and Trustee prompt notice in writing of the assertion of any claim, of the filing of any action or proceeding, of the occurrence of any damage to the Property and of any condemnation offer or action.

6.13.    Right of Inspection.  Lender and its independent contractors, agents and employees may enter the Property from time to time at any reasonable time for the purpose of inspecting the Property and ascertaining Grantor's compliance with the terms of this Deed of Trust.  Lender will use commercially reasonable efforts to assure that Lender's entry upon and inspection of the Property will not materially and unreasonably interfere with the business or operations of Grantor's tenants on the Property.

6.14.    Transfer of Property or Interests in Grantor.

6.14.1.  Prohibition.  Grantor acknowledges that Lender has relied upon the principal(s) of Grantor and such principal's or principals' experience in owning and operating properties similar to the Property in connection with the closing of the Loan.  Accordingly, except pursuant to the prior written consent of Lender, which Lender may withhold, delay, or condition in Lender's sole discretion (including, without limitation, pursuant to the terms of Section 6.14.4 hereof), Grantor shall not cause or permit any Transfer (as defined herein) of, in each case, itself (i.e., the Grantor), the Property, the Collateral (except for equipment and inventory in the ordinary course of its business, with respect to the Collateral only), or this Deed of Trust.  "**Transfer**" means any:  (a) sale or exchange; (b) mortgage, pledge, hypothecation, lien, or encumbrance; (c) assignment, including, without limitation, assignment by operation of law or for the benefit of creditors or the delegation of duties; (d) direct or indirect conveyance, transfer, or disposition, including, without limitation, any direct transfer, grant, or release of title or legal ownership and any indirect transfer through the use of a nominee, trustee, or receiver (other than a receiver appointed at Lender's request); (e) direct or indirect change of control of the Grantor through any means, including without limitation, serial transactions, contracts, or a change in the ultimate control or beneficial ownership of Grantor (including, without limitation, any transfer of or by, in each case, (i) a general or limited partnership interest; (ii) stock, shares, or other equity; (iii) issuance of new or treasury stock, shares, or other equity or changes in voting rights or the creation of a new class of stock, shares, or other equity interests, in each case, that, whether through one action or a series of actions, effects a direct or indirect change of control in an entity; (iv) a limited liability company or membership interest; (v) direct or indirect control of a trust; (vi) interest in a joint venture contract; (vii) an Unauthorized Amendment made or permitted in violation of clause (j) of Section 4.4 hereof; or (viii) any other interest analogous or otherwise similar to items (i)-(vii) of this list), as well as changing of a key control person, whether legal or natural, relied upon by Lender as provided in this Section 6.14, such as, without limitation, the naming a new general partner of a partnership or manager

23

or managing member of a limited liability company); and (f) any action, transfer, or event of similar effect to the preceding list of items (a)-(e), and the meaning of the meaning of Transfer shall include any of the foregoing circumstances listed in (a)-(f) whether occurring, in each case, voluntarily, involuntarily, by operation of law, through one action or event, or through a series of transactions, legal transfers, or other actions or events even if each individually would not constitute a change of (1) control in or (2) beneficial ownership of Grantor but as a series would constitute a Transfer. If a Transfer is made without the prior written consent of Lender (including, without limitation, any Transfer requiring Lender's prior written consent under Section 6.14.2 hereof), Lender shall have the absolute right at its option, without prior demand or notice, to declare all of the Secured Obligations immediately due and payable, except to the extent prohibited by applicable law, and to pursue its rights and remedies under Article 7 hereof. Lender's consent to one such Transfer shall apply only to the Transfer consented to in that instance and shall not be deemed to be a waiver of the right to require prior written consent to future or successive Transfers. Without limiting the generality of the foregoing provisions of this Section 6.14.1, the capitalized term "**Assignment**" refers to the subset of Transfers encompassing: (i) any assignment of Grantor's interest in this Deed of Trust, in each case, including, without limitation, an assignment by operation of law, and (ii) any delegation of duties by Grantor under this Deed of Trust. Unless Lender, in writing, subsequently ratifies an Assignment made contrary to this Section 6.14, any Assignment by Grantor, whether voluntarily or involuntarily, made contrary to this Section (including, without limitation, any Assignment requiring Lender's prior written consent under Section 6.14.2 hereof) shall be null and void *ab initio*. Lender's consent to or ratification of, in each case, one such Assignment shall apply only to the Assignment consented to or ratified in that instance and shall not be deemed to be a waiver of the right to require prior written consent to future or successive Assignments. With regard to any proposed Transfer or Assignment, or other assumption, substitution, or similar action provided for in this Section 6.14 or in Sections 7.1(m)-7.1(p) hereof, in each case, irrespective of whether Lender's consent is required for such action, Grantor shall (i) comply with the provisions of Section 7.1(o) hereof and (ii) provide to Lender or cause to be provided to Lender, in each case, at Lender's request, any information required by Section 6.14.4 hereof (it being understood that it is Lender's prerogative to review any proposed Transfer or Assignment, or other assumption, substitution, or similar action, unless exempt under the limited exception pursuant to Section 7.1(o) hereof applicable only to a Grantor that is a Public Company (as defined in Section 7.1(o)), to allow Lender to determine proper classification and disposition of the proposed action, as well as fees or reimbursements owed, if any, pursuant to, in each case this Section 6.14, Section 6.7 hereof, and Sections 7.1(m)-7.1(p) hereof.

6.14.2. Other Permitted Transfers. Notwithstanding and without limiting the generality of the foregoing Section 6.14.1, the following actions shall be permitted subject to the terms of (i) this Section 6.14.2 and (ii) the terms of Section 6.14.1 with respect to any action that requiring Lender's prior written consent that is taken without such consent (e.g., regarding (x) the definition of Transfer, (y) Assignments that are void, and (z) Lender's rights and remedies, including, without limitation, acceleration, payment of the prepayment fee). In the case of the actions described in clauses (a) and (c) of this Section 6.14.2, the actions described therein shall be permitted only with the prior written consent of Lender, which consent shall not be unreasonably withheld. In the case of actions described in clause (b) of this Section 6.14.2, Lender's consent shall not be necessary; however, Grantor shall comply with all applicable terms of this Deed of Trust, including, without limitation, the terms this Section 6.14, Section 6.7 hereof, and of Sections 7.1(m)-7.1(p) regarding Lender's rights to: (i) review the proposed action and determine its proper classification, (ii) request and receive any due diligence information as provided by Section 6.14.4 hereof, and (iii) receive an advance deposit for or reimbursement from Grantor, in each case, of any out-of-pocket expenses Lender may incur. In addition, any Transfer contemplated pursuant to clauses (a), (b) and (c) of this Section 6.14.2, shall be permitted, subject to the provisions of this Section 6.14, only so long as Grantor remains as a legal person or, if required, e.g., in the case of a joint venture or general partnership, is reconstituted,

24

Security Instrument
310704763.4

following such Transfer, properly authorized hereunder, and so long as those persons responsible for the management of the Property and Grantor remain unchanged following such gift or that any replacement management is approved by Lender pursuant to the terms hereof.

(a)  Without limiting the provisions of Sections 7.1(m)-7.1(p) hereof, the direct one-time transfer (i.e., of the interest itself, and not by a higher-level change in control) of up to forty-nine percent (49%) of: the (i) limited partnership interests in any Grantor that is a limited partnership; (ii) membership interests in any Grantor that is a limited liability company (other than the membership interests (x) of a member that is the manager or managing member of such Grantor or (y) that otherwise enables direct or indirect control of such Grantor, which, in each case, shall not be transferable without the prior written consent of Lender, which may be withheld, conditioned or delayed by Lender in its sole and absolute discretion); or (iii) voting stock in any Grantor that is a corporation (other than preferred, special, or similar stock that, despite holding less than 50% of the corporation's total stock allows for direct or indirect control of, in each case, the corporation or its board of directors or other governing body, which shall not be transferable without the prior written consent of Lender, which may be withheld, conditioned or delayed by Lender in its sole and absolute discretion).

(b)  Without limiting the provisions of Sections 7.1(m)-7.1(p) hereof, any involuntary transfer caused by the death or court-adjudicated incapacity of any natural person that is (i) a general partner, shareholder, joint venturer or member of Grantor; (ii) any manager or managing member of Grantor if Grantor is a limited liability company; and (iii) a beneficial owner of a or other natural person that controls a trust. For the avoidance of doubt, (x) this Section 6.14.2(b) applies only to involuntary transfers and not to planned estate gifts, which are provided for by Section 6.14.2(c) hereof and (y) this Section 6.14.2(b) applies to involuntary transfers caused by death or court-adjudicated incapacity of natural persons in the roles specified in this Section 6.14.2(b) and not where Grantor is a natural person (i.e., one individual), which is provided for in Section 7.1(p) hereof.

(c)  Without limiting the provisions of Sections 7.1(m)-7.1(p) hereof, gifts for estate planning purposes of any natural person's interests in Grantor or in any of Grantor's general partners, members or joint venturers to the spouse or any lineal descendant of such individual, or to a properly constituted trust for the benefit of any one or more of such individual, spouse or lineal descendant. Notwithstanding the foregoing provisions of this Section 6.14.2(c), nothing in this Section 6.14.2(c) authorizes title to the Property to be transferred without Lender's prior written consent that would be otherwise required, in each case, under Section 6.14.1 hereof or any other provision this Deed of Trust.

6.14.3.  Lender's Written Consent or Ratification:  As used in this Section 6.14, any reference to Lender's written consent, approval, or ratification of a Transfer, in each case, requires a writing made by Lender executed by an officer of Lender holding the title Executive Vice President or higher.

6.14.4.  Transfer Costs:  In connection with any Transfer requiring Lender's consent:

(a)  Grantor shall pay an assumption fee in the amount of one percent (1%) of the then unpaid principal balance of the Loan, which shall be due and payable at the closing of the Transfer transaction.

25

Security Instrument
310704763.4

(b)    Grantor shall pay to Lender both (i) an administrative fee of one thousand five hundred dollars ($1,500.00) for Lender processing the Transfer request (irrespective of the disposition thereof) and (ii) all Lender's out-of-pocket costs (including, without limitation, any out-of-pocket legal expenses paid to outside counsel and the cost of any appraisal); and

(c)    The cost of either (i) a "date down" endorsed to Lender's title insurance policy, including any additional endorsements required by Lender, or (ii) a new title insurance policy, satisfactory to Lender in its discretion, if a "date down" is not available.

In addition to the above-stated, Grantor shall comply with all Lender's policies and procedures in connection with providing its consent to a Transfer, including but not limited to (i) Grantor and its transferee entering an assumption agreement acceptable to Lender and providing, as determined by Lender in Lender's sole and absolute discretion, (x) a reaffirmation of guarantee by a then guarantor and/or (y) a substitute guarantor (acceptable to Lender in Lender's sole and absolute discretion) who shall sign a guarantee agreement acceptable to Lender (in Lender's sole and absolute discretion) and (ii) compliance with the provisions of Sections 7.1(o) hereof.  Without limiting the generality of the foregoing sentence of this paragraph of this Section 6.14.4, Grantor shall require, in each case, any prospective recipient of the Transfer, prospective new guarantor, prospective new member, partner, or shareholder of Grantor, or prospective new joint venturer to comply with any requests for due diligence information regarding such prospective new interest holder in, as applicable, Grantor or the Property.  Nothing in this Section 6.14 may be construed to require Lender to accept any Transfer, Assignment, assumption or similar action where the prospective person receiving or becoming an interest holder in Grantor or the Property or assuming a role of guarantor is a person with which Lender may not conduct business pursuant to law applicable to Lender (a "**Prohibited Person**"), and Lender shall not be deemed to have breached its obligations under any of the Loan Documents for refusing to consent to, approve, or honor any action that requires or may foreseeably require Lender in the future to conduct business with a Prohibited Person.

Nothing in this Section 6.14.4 limits Lender's discretion to withhold, delay, or condition, in each case, its consent pursuant to the provisions of Sections 6.14.1 and 6.14.2 hereof, including, without limitation, Lender's right to:  (i) require other conditions not provided for in this Section 6.14.4; (ii) make decisions regarding Lender's assessment of the creditworthiness of any prospective substitute guarantor or party assuming the obligations hereunder as a result of a proposed Transfer; (iii) require additional conditions related to its credit evaluation of any Transfer or party thereto; (iv) require execution of additional documentation; or (v) refer matters to outside counsel at Grantor's expense to assist with reviewing or consummating any proposed Transfer.

6.15.    <u>Acceptance of Trust; Powers and Duties of Trustee</u>.  Trustee accepts this trust when this Deed of Trust is recorded.  From time to time upon written request of Lender and presentation of this Deed of Trust, or a certified copy thereof, for endorsement, and without affecting the personal liability of any person for payment of any indebtedness or performance of any Secured Obligation, Trustee may, if authorized by Lender, without liability therefor and without notice:  (a) reconvey all or any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement on the Property;  (d) join in any declaration of covenants and restrictions; or (e) join in any extension agreement or any agreement subordinating the lien or charge of this Deed of Trust.  Nothing contained in the immediately preceding sentence shall be construed to limit, impair or otherwise affect the rights of Grantor in any respect.  Except as may otherwise be required by applicable law, Trustee or Lender may from time to time apply to any court of competent jurisdiction for aid and direction in the execution of the trusts hereunder and the enforcement of the rights and remedies available hereunder, and Trustee or Lender may obtain orders or decrees directing or confirming or approving

26

25-00240-WLH11    Doc 10    Filed 02/19/25    Entered 02/19/25 16:03:51    Pg 154 of 189    Exhibit - 40

acts in the execution of said trusts and the enforcement of said remedies. Trustee has no obligation to notify any party of any pending sale or any action or proceeding (including, without limitation, actions in which Grantor, Lender or Trustee shall be a party) unless held or commenced and maintained by Trustee under this Deed of Trust. Trustee shall not be obligated to perform any act required of it hereunder unless the performance of the act is requested in writing and Trustee is reasonably indemnified and held harmless against loss, cost, liability and expense.

6.16. <u>Compensation of Trustee</u>. Grantor shall pay to Trustee reasonable compensation and reimbursement for services and expenses in the administration of this trust, including, without limitation, reasonable attorneys' fees. Grantor shall pay all indebtedness arising under this Section 6.16 immediately upon demand by Trustee or Lender.

6.17. <u>Exculpation</u>. Lender shall not directly or indirectly, be liable to Grantor or any other person as a consequence of: (a) the exercise of the rights, remedies or powers granted to Lender in this Deed of Trust; (b) the failure or refusal of Lender to perform or discharge any obligation or liability of Grantor under any agreement related to the Property or under this Deed of Trust; or (c) any loss sustained by Grantor or any third party resulting from Lender's failure to lease the Property after an Event of Default or from any other act or omission of Lender in managing the Property after an Event of Default unless the loss is caused by the willful misconduct and bad faith of Lender. No liability contrary to the terms of this Section 6.17 may be asserted or enforced against Lender, and Grantor expressly waives all such liability, and to the fullest extent permitted by applicable law, releases Lender therefrom.

6.18. <u>Indemnity</u>. (1) Without in any way limiting any other indemnity contained in this Deed of Trust, Grantor agrees to defend, indemnify and hold harmless Trustee and the Lender Group (hereinafter defined) from and against any claim, loss, damage, cost, expense or liability directly or indirectly arising out of: (a) the making of the Loan, except for violations of banking laws or regulations by the Lender Group, but subject to the terms of clause (g) of this Section 6.18; (b) this Deed of Trust; (c) the execution of this Deed of Trust or the performance of any act required or permitted hereunder or by law; (d) any failure of Grantor to perform its obligations under this Deed of Trust or the other Loan Documents; (e) any alleged obligation or undertaking on the Lender Group's part to perform or discharge any of the representations, warranties, conditions, covenants or other obligations contained in any other document related to the Property; (f) any act or omission by Grantor or any contractor, agent, employee or representative of Grantor with respect to the Property; or (g) any prohibited transaction, in the sale of a prohibited loan, or in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion (it being understood that the indemnification owed under this Section 6.18 shall not be limited by clause (a) of this Section 6.18 hereof to the extent a prohibited transaction, sale of a prohibited loan, or transaction with a Prohibited Person may otherwise fall within clause (a) of this Section 6.18; and (h) an Event of Default under Article 7 hereof, including, without limitation, Lender's exercise of rights and remedies provided pursuant to Article 7 hereof. (2) Notwithstanding the foregoing provisions of this Section 6.18(1), this indemnity shall not include any claim, loss, damage, cost, expense or liability directly or indirectly arising out of the gross negligence or willful misconduct of any member of the Lender Group or Trustee, or any claim, loss, damage, cost, expense or liability incurred by the Lender Group or Trustee arising from any act or incident on the Property occurring after the full reconveyance and release of the lien of this Deed of Trust on the Property; however, this indemnity shall include, without limitation: (aa) all consequential and incidental damages (including, without limitation, any third party tort claims or governmental claims, fines or penalties against Trustee or the Lender Group) and (bb) all court costs and attorneys' fees (including, without limitation, expert witness fees) paid or incurred by Trustee or the Lender Group. "**Lender Group**," as used in this Deed of Trust, shall mean (i) Lender (including, without limitation, any participant in the Loan); (ii) any entity controlling, controlled by or under common control with Lender;

Security Instrument
310704763.4

(iii) the directors, officers, employees, and agents of Lender and such other entities of the Lender Group; and (iv) the successors, heirs and assigns of the entities and persons described in foregoing clauses (i) through (iii).  Grantor shall pay immediately upon Trustee's or Lender's demand any amounts owing under this indemnity.  Grantor agrees to use legal counsel acceptable to Trustee and the Lender Group in any action or proceeding arising under this indemnity.  IF THE GRANTOR IS ALSO THE BORROWER, THE PROVISIONS OF THIS SECTION 6.18 SHALL SURVIVE THE TERMINATION AND RELEASE OF THIS DEED OF TRUST, BUT SUCH PROVISIONS SHALL REMAIN SUBJECT TO ANY LIMITATIONS SET FORTH IN THE NOTE.

6.19.   Substitution of Trustee.  From time to time, by a writing signed and acknowledged by Lender and recorded in the official records of the county in which the Property is located, Lender may appoint another trustee to act in the place and stead of Trustee or any successor.  Such writing shall set forth any information required by applicable law.  The execution of such instrument of substitution shall discharge Trustee herein named and shall appoint the new trustee as the trustee hereunder with the same effect as if originally named trustee herein.  A writing recorded pursuant to the provisions of this Section 6.19 shall be conclusive proof of the proper substitution of such new trustee.

6.20.   Releases, Extensions, Modifications and Additional Security.  Without notice to or the consent, approval or agreement of any persons or entities having any interest at any time in the Property or in any manner obligated under the Secured Obligations (the "**Interested Parties**"), Lender may, from time to time:  (a) fully or partially release any person or entity from liability for the payment or performance of any Secured Obligation; (b) extend the maturity of any Secured Obligation; (c) make any agreement with Grantor increasing the amount or otherwise altering the terms of any Secured Obligation; (d) accept additional security for any Secured Obligation; or (e) release all or any portion of the Property, Collateral and other security for any Secured Obligation.  None of the foregoing actions releases or reduces the personal liability of any of the Interested Parties, or releases or impairs the priority of the lien of this Deed of Trust upon the Property.

6.21.   Reconveyance.  Upon Lender's written request, and upon surrender of this Deed of Trust or certified copy thereof and any note, instrument or instruments setting forth all obligations secured hereby to Trustee for cancellation, Trustee shall reconvey, without warranty, the Property or that portion thereof then held hereunder.  The recitals of any matters of fact or facts in any reconveyance executed hereunder shall be conclusive proof of the truthfulness thereof.  To the extent permitted by law, the reconveyance may describe the grantee as "the person or persons legally entitled thereto."  Neither Lender nor Trustee has any duty to determine the rights of persons claiming to be rightful grantees of any reconveyance.  When the Property has been fully released reconveyed, the last such reconveyance shall operate as a reassignment of all future rents, issues and profits of the Property to the person or persons legally entitled thereto.

6.22.   Subrogation.  If and in each case, (i) any or all of the proceeds of the Note have been used to pay, reduce, extinguish, extend or renew any indebtedness heretofore existing against the Property or (ii) if Lender pays or discharges any lien or encumbrance against or affecting the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property (collectively, "**Subrogated Interests**") heretofore held by, or in favor of, the holder of such indebtedness or other Subrogated Interest.  If any Subrogated Interest exists, without adversely affecting the priority of this Deed of Trust and the Secured Obligations, any such Subrogated Interest shall be construed in favor of Lender, whether or not it is of record, or has been released, or has been paid in whole or in part.  Nothing in this Section 6.22 may be construed to (x) limit the rights and remedies of Lender under, in each case, this Deed of Trust or any of the other Loan Documents or (y) make the Lender liable for any act or omission of any person previously entitled to enforce or collect amounts due in relation to any Subrogated Interest.

28

Security Instrument
310704763.4

6.23.  <u>Sale or Participation of Loan</u>.  Grantor agrees that Lender may at any time sell, assign, participate or securitize all or any portion of Lender's rights and obligations under this Deed of Trust, and that any such sale, assignment, participation or securitization may be to one or more financial institutions or other entities, to private investors, and/or into the public securities market, in Lender's sole discretion.  Grantor further agrees that Lender may disseminate to any such actual or potential purchaser(s), assignee(s) or participant(s) all documents and financial and other information heretofore or hereafter provided to or known to Lender with respect to:  (a) the Property and its operation; and/or (b) any party connected with the Loan (including, without limitation, Grantor, any partner or member of Grantor, or any constituent partner or member of Grantor).  In the event of any such sale, assignment, participation or securitization, Lender and the other parties to the same shall share in the rights and obligations of Lender set forth in this Deed of Trust as and to the extent they shall agree among themselves.  In connection with any such sale, assignment, participation or securitization, Grantor further agrees that this Deed of Trust shall be sufficient evidence of the obligations of Grantor to each purchaser, assignee or participant, and Grantor within fifteen (15) days after request by Lender, deliver an estoppel certificate verifying for the benefit of Lender and any other party designated by Lender the status and the terms and provisions of the Loan in form and substance acceptable to Lender, and enter into such amendments or modifications to this Deed of Trust as may be reasonably required in order to facilitate any such sale, assignment, participation or securitization without impairing Grantor's rights or increasing Grantor's obligations.  The indemnity obligations of Grantor under this Deed of Trust shall also apply with respect to any purchaser, assignee or participant.

6.24.  <u>ERISA</u>.

(a)  Grantor shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to constitute a "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) for which there is no applicable statutory or administrative exemption.

(b)  Grantor shall not (i) maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Grantor to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan that provides any benefits to any former employee (or the spouse or dependent of any such former employee) of the Grantor or any of its ERISA Affiliates after such employee's retirement or termination of employment (other than COBRA continuation coverage required to be provided pursuant to Sections 601 through 607 of ERISA or Section 4980B of the Code) or (ii) permit the assets of Grantor to become "plan assets" within the meaning of the Plan Asset Regulation.

(c)  Grantor shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender in its sole discretion, that (A) Grantor is not and does not maintain a Plan or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Grantor is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) the assets of Grantor do not constitute "plan assets" within the meaning of the Plan Asset Regulation.

ARTICLE 7

DEFAULT AND REMEDIES

7.1.  <u>Event of Default</u>.  An "**Event of Default**" occurs automatically upon the occurrence of any one or more of the following events:

29

Security Instrument
310704763.4

      (a)    <u>Monetary</u>.  Borrower or Grantor (as applicable) fails to, in any case:  (i) pay when due any sums that by their express terms require immediate payment without any grace period or sums that are payable on the Maturity Date hereunder or under any of the other Loan Documents secured by this Deed of Trust; or (ii) pay within five (5) days when due any other sums payable hereunder or under any of the other Loan Documents secured by this Deed of Trust, including, without limitation, any monthly payment due under the Note.

      (b)    <u>Borrower's Performance of Non-Monetary Obligations Under Other Loan Documents</u>.  If Borrower fails to observe, perform or discharge any of its obligations, covenants, conditions or agreements to Lender or any third person, other than Borrower's payment obligations, under any of the Loan Documents (excluding this Deed of Trust); provided that Borrower's breach or failure to perform obligations to a third person shall be a default hereunder only where such breach or failure may materially affect Borrower's assets or Borrower's ability to repay the Loan or perform its obligations under the Loan Documents.

      (c)    <u>Grantor's Performance of Non-Monetary Obligations Under Deed of Trust</u>.  Grantor fail to observe, perform or discharge any of Grantor's obligations, covenants, conditions or agreements, other than Grantor's payment obligations, under this Deed of Trust, other than as specifically provided in this Section 7.1, and (i) such failure shall remain uncured for thirty (30) days after written notice thereof shall have been given to Grantor, as the case may be, by Lender; or (ii) if such failure is of such a nature that it cannot be cured within such thirty (30) day period, Grantor shall fail to commence to cure such failure within such thirty (30) day period or shall fail to diligently prosecute such curative action thereafter or shall fail to cure such default within ninety (90) days after written notice thereof was first given to Grantor.

      (d)    <u>Representations and Warranties</u>.  Any representation, warranty, certificate or other statement (financial or otherwise) made or furnished by or on behalf of Grantor, if any, to Lender or in connection with any of the Loan Documents, or as an inducement to Lender to make the Loan or to take any action for the benefit of Grantor, in each case, is false, incorrect, incomplete or misleading in any material respect when made or furnished.  There shall be no cure period for any Event of Default arising from a breach of this Section 7.1(d).

      (e)    <u>Condemnation, Attachment</u>.  The condemnation, seizure or appropriation of any material portion (as reasonably determined by Lender) of the Property, or the sequestration or attachment of, or levy or execution upon any of the Property, the Collateral or any other collateral provided by Grantor under any of the Loan Documents, or any material portion of the other assets of Grantor, which sequestration, attachment, levy or execution is not released or dismissed within forty-five (45) days after its occurrence, or the sale of any assets affected by any of the foregoing.

      (f)    <u>Uninsured Casualty</u>.  The occurrence of an uninsured casualty with respect to any material portion (as determined by Lender) of the Property unless:  (i) no other Event of Default has occurred and is continuing at the time of such casualty or occurs thereafter; (ii) Grantor promptly notifies Lender of the occurrence of such casualty; and (iii) not more than forty-five (45) days after the occurrence of such casualty, Grantor delivers to Lender immediately available funds ("**Restoration Funds**") in an amount sufficient, in Lender's reasonable opinion, to pay all costs of the repair or restoration (including, without limitation, taxes, financing charges, insurance and rent during the repair period).  So long as no Event of Default has occurred and is continuing at the time of Lender's receipt of the Restoration Funds and no Event of Default occurs thereafter, Lender shall make the Restoration Funds available for the repair or restoration of the Property.  Notwithstanding the foregoing, Lender shall have no obligation to make any Restoration Funds available for repair or restoration of the Property unless and until all the conditions set forth in clauses (ii) and (iii) Section 6.11(b)(2) of this

Security Instrument
310704763.4

Deed of Trust have been satisfied.  Grantor acknowledges that the specific conditions described above are reasonable.

      (g)    <u>Adverse Financial Change</u>.  Any adverse change in the financial condition of Grantor, or any of their partners, or members, or any guarantor, or any other person or entity from the condition shown on the financial statements submitted to Lender and relied upon by Lender in making the Loan, and which change Lender determines will have a material adverse effect on (i) the business, operations or condition of the Property; or (ii) the ability of Grantor to pay or perform Grantor's obligations in accordance with the terms of this Deed of Trust, and the other Loan Documents.

      (h)    <u>Voluntary Bankruptcy, Insolvency, Dissolution</u>.  (i) Grantor's filing a petition for relief under the Bankruptcy Reform Act of 1978, as amended or recodified ("**Bankruptcy Code**"), or under any other present or future state or federal law regarding bankruptcy, reorganization or other relief to debtors (collectively, "**Debtor Relief Law**"); or (ii) Grantor's filing any pleading in any involuntary proceeding under the Bankruptcy Code or other Debtor Relief Law that admits the jurisdiction of a court to regulate Grantor or the Property or the petition's material allegations regarding Grantor's insolvency; or (iii) Grantor's making a general assignment for the benefit of creditors; or (iv) Grantor's applying for, or the appointment of, a receiver, trustee, custodian or liquidator of Grantor or any of its property; or (v) the filing by or against Grantor of a petition seeking the liquidation or dissolution of Grantor or the commencement of any other procedure to liquidate or dissolve Grantor.  There shall be no cure period for any Event of Default arising from a breach of this Section 7.1(h).

      (i)    <u>Involuntary Bankruptcy</u>.  Grantor's failure to effect a full dismissal of any involuntary petition under the Bankruptcy Code or other Debtor Relief Law that is filed against Grantor or in any way restrains or limits Grantor or Lender regarding the Loan or the Property, prior to the earlier of the entry of any order granting relief sought in the involuntary petition or forty-five (45) days after the date of filing of the petition.

      (j)    <u>Shareholders, Members and Partners</u>.

          (1)    If an event specified in Sections 7(h) or 7(i) hereof occurs as to Grantor or any general partner, shareholder or member of Grantor, there shall be no cure period for any Event of Default arising from a breach of this Section 7.1(j)(1).

          (2)    If all or any material part of the assets of Grantor, or any shareholder, director, general partner or manager of Grantor are attached, seized, subjected to a writ or levied upon by any court process and Grantor fails to cause such attachment, seizure, writ or levy to be fully released or removed within sixty (60) days after the occurrence of such event.  The cure provision contained in this Section 7.1(j)(2) shall be in lieu of, and not in addition to, any and all other cure periods contained in the Loan Documents.

          (3)    For the avoidance of doubt, the provisions of this Section 7.1(j) shall not be limited because a shareholder, member or general partner of Grantor, in each case, may also be a guarantor of the Loan; rather, in that instance, an Event of Default under this Section 7.1(j) shall exist regarding the condition of such shareholder, member or general partner of Grantor, and the provisions of Section 7.1(k) hereof shall apply regarding Grantor's duty to obtain an acceptable substitute

<div align="center">31</div>

Security Instrument
310704763.4

guarantor.  The cure provisions contained in this Section 7.1(j) shall be in lieu of, and not in addition to, any and all other cure periods contained in the Loan Documents.

(k)    <u>Guarantors</u>.

(1)    If any an event specified in Sections 7(h) or 7(i) hereof as to any guarantor of the Loan, remains uncured for at least forty-five (45) days, and Grantor fails to provide a substitute guarantor acceptable to Lender within sixty (60) days after the occurrence an event specified in Sections 7(h) or 7(i) hereof as to any guarantor of the Loan.

(2)    If all or any material part of the assets of any guarantor of the Loan are attached, seized, subjected to a writ or levied upon by any court process and Grantor fails to either (i) cause such attachment, seizure, writ or levy to be fully released or removed within sixty (60) days after the occurrence of such event or (ii) provide a substitute guarantor acceptable to Lender within sixty (60) days after all or any material part of the assets of any guarantor of the Loan are attached, seized, subjected to a writ or levied upon by any court process.

(3)    If any guarantor of the Loan dies and Grantor fails to provide a substitute guarantor of the Loan acceptable to Lender within sixty (60) days after the death of such guarantor; however, nothing in this Section 7.1(k)(3) may be construed to reduce or limit any rights and remedies Lender may have against the estate of or successors in interest to such guarantor of the Loan who has died, including, without limitation, any right to enforce a guarantee of the Loan against the estate of a guarantor of the Loan who has died.

(4)    For the avoidance of doubt, Grantor acknowledges that, in consideration of the Loan, Borrower and Grantor (as applicable) are required to provide a guarantor of the Loan acceptable to Lender, in Lender's sole discretion, and this Section 7.1(k) shall be construed consistent with such obligation of Grantor.  Nothing in this Section 7.1(k) may be construed to suggest that this Deed of Trust secures any obligations under any guarantee of the Loan (it being understood that this Deed of Trust does not secure any guarantee of the Loan).  The cure provisions contained in this Section 7.1(k) shall be in lieu of, and not in addition to, any and all other cure periods contained in the Loan Documents.

(l)    <u>Injunctions</u>.  If a court order is entered against Grantor or any shareholder, general partner, member or manager of Grantor enjoining the conduct of all or part of such person's business and Grantor fails to cause such injunction to be fully stayed, dissolved or removed within sixty (60) days after such order is entered.  The cure provision contained in this Section 7.1(l) shall be in lieu of, and not in addition to, any and all other cure periods contained in the Loan Documents.

(m)    <u>Dissolution</u>.  If Grantor or any shareholder, general partner, member or manager of Grantor is a corporation, partnership, limited liability company or trust, the dissolution,

32

Security Instrument
310704763.4

liquidation, or termination of existence of such person.  There shall be no cure period for any Event of Default arising from a breach of this Section 7.1(m).

        (n)    <u>Unauthorized Transfers and Assignments</u>.  Any Transfer made or attempted, in each case, in violation of to Section 6.14 hereof (For the avoidance of doubt, the term Transfer includes any Assignment, as defined in Section 6.14 hereof).  There shall be no cure period for any Event of Default arising from a breach of this Section 7.1(n).

        (o)    <u>Admission of New Partners, Members, or Shareholders</u>.  If applicable, unless Grantor is a publicly traded company listed on a nationally recognized stock exchange (a "**Public Company**") and the trading of shares in such Public Company or other transaction affecting such Public Company does not constitute a Transfer pursuant to Section 6.14 hereof, the admission to Grantor of any new member, partner, shareholder, or joint venturer, in each case, without having first having (i) informed Lender of the proposed admission of a new member, partner, shareholder, or joint venturer, in each case, and (ii) Grantor having received a written response from Lender regarding Lender's review and disposition of the request pursuant to this Section 7.1(o) and Section 6.14 hereof.  Any admission of a new member, partner, joint venturer contrary to this Section 7.1(o) shall be deemed a Transfer in violation of Section 6.14 hereof (For the avoidance of doubt, this Section 7.1(o) does not provide and shall not be construed to provide any Grantor that is a Public Company any right to make or participate in a Transfer in violation of Section 6.14 hereof).  There shall be no cure period for any Event of Default arising from a breach of this Section 7.1(o).

        (p)    <u>Death; Incompetency</u>.  If Grantor or any general partner, manager, or managing member of Grantor is an individual (i.e., a natural person), the death or incompetency of such person, except (i) where applicable law limits or prohibits Lender's declaration of a default based on such occurrences and (ii) in the case of the death or mental incompetence of a general partner, manager, or managing member, Grantor causes a substitute general partner, manager or managing member, as applicable, to be admitted to Grantor or appointed to such role and Lender, pursuant to Section 6.14 hereof, in good faith determines that the financial condition, credit history, character, experience, ability and expertise of such substitute general partner, manager, or managing member are comparable to the affected general partner or manager and that such substitute general partner or manager is otherwise acceptable to Lender (For the avoidance of doubt, any substitutions or Transfers contemplated by this Section 7.1(p) shall be made consistent with the terms of both Section 7.1(o) hereof and Section 6.14 hereof).

        (q)    <u>Impairment of Priority</u>.  If (i) the priority of this Deed of Trust or Lender's security interest under any of the other agreements securing any or all of the Secured Obligations is impaired for any reason; or (ii) the value of the Property has deteriorated, declined or depreciated as a result of any intentional tortious act or omission by Grantor.  There shall be no cure period for any Event of Default arising from a breach of this Section 7.1(q).

        (r)    <u>Condemnation</u>.  If all or any material part of the Property is transferred to any Governmental Authorities as a result of any condemnation proceeding or action with respect to all or any material part of the Property.  There shall be no cure period for any Event of Default arising from a breach of this Section 7.1(r).

        (s)    <u>Failure to Repair Casualty</u>.  If there is an uninsured casualty with respect to the Property, and Grantor (i) fails to commence repairs and reconstruction of the Property within ninety (90) days after such damage or (ii) thereafter fails to diligently prosecute such repairs and reconstruction to completion.  The cure provisions contained in this Section 7.1(s) shall be in lieu of, and not in addition to, any and all other cure periods contained in the Loan Documents.

Security Instrument
310704763.4

(t)    Licenses.  Grantor fails to do any act or execute any document at any time requested by Lender to provide it an assignment of all licenses necessary to operate the business for its intended use.  There shall be no cure period for any Event of Default arising from a breach of this Section 7.1(t).

(u)    Title.  Grantor's failure to comply with, observe, or perform any term or condition of Section 6.1(l) or Section 6.1(m).

7.2.    Acceleration.  Upon the occurrence of an Event of Default, Lender may, at its option, declare all sums owing to Lender under the Note and the other Loan Documents immediately due and payable.

7.3.    Rights and Remedies.  In addition to the rights and remedies in Section 7.2 above and as otherwise provided to Lender in this Deed of Trust, at any time after an Event of Default, Lender and Trustee shall each have all of the following rights and remedies:

(a)    Entry on Property.  With or without notice, and without releasing Grantor from any Secured Obligation, and without becoming a mortgagee in possession, to enter upon the Property from time to time and to do such acts and things as Lender or Trustee deem necessary or desirable in order to inspect, investigate, assess and protect the security hereof or to cure any Event of Default, including, without limitation:  (i) to take and possess all documents, books, records, papers and accounts of Grantor or the then owner of the Property that relate to the Property; (ii) to make, terminate, enforce or modify leases of the Property upon such terms and conditions as Lender deems proper; (iii) to make repairs, alterations and improvements to the Property necessary, in Trustee's or Lender's sole judgment, to protect or enhance the security hereof; (iv) to appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Lender or Trustee hereunder; (v) to pay, purchase, contest or compromise any encumbrance, charge, lien or claim of lien which, in the sole judgment of either Lender or Trustee, is or may be senior in priority hereto, the judgment of Lender or Trustee being conclusive, as between the parties hereto; (vi) to obtain insurance; (vii) to pay any premiums or charges with respect to insurance required to be carried hereunder; and/or (viii) to employ legal counsel, accountants, engineers, consultants, contractors and other appropriate persons to assist them;

(b)    Appointment of Receiver.  To apply to a court of competent jurisdiction for and obtain appointment of a receiver of the Property as a matter of strict right and without regard to:  (i) the adequacy of the security for the repayment of the Secured Obligations; (ii) the existence of a declaration that the Secured Obligations are immediately due and payable; or (iii) the filing of a notice of default; and Grantor consents to such appointment;

(c)    Judicial Foreclosure, Injunction.  To commence and maintain an action or actions in any court of competent jurisdiction to foreclose this instrument as a mortgage or to obtain specific enforcement of the covenants of Grantor hereunder, and Grantor agrees that such covenants shall be specifically enforceable by injunction or any other appropriate equitable remedy and that for the purposes of any suit brought under this subparagraph, Grantor waives the defense of laches and any applicable statute of limitations and shall not require Lender to post a point to seek an injunction or any other kind of specific performance;

(d)    Nonjudicial Foreclosure.  To execute a written notice of such an Event of Default and of the election to cause the Property to be sold to satisfy the Secured Obligations.  Trustee shall give and record such notice as applicable law then requires as a condition precedent to a trustee's sale.  When the minimum period of time required by law after such notice has elapsed, Trustee, without

34

Security Instrument
310704763.4

25-00240-WLH11    Doc 10    Filed 02/19/25    Entered 02/19/25 16:03:51    Pg 162 of 189    Exhibit - 48

notice to or demand upon Grantor except as required by applicable law, shall sell the Property at the time and place of sale fixed by it in the notice of sale, at one or several sales, either as a whole or in separate parcels and in such manner and order, all as Lender in its sole discretion may determine, at public auction to the highest bidder for cash, in lawful money of the United States, payable at time of sale. Neither Grantor nor any other person other than Lender has the right to direct the order in which the Property is sold. Subject to requirements and limits imposed by applicable law, Trustee may, from time to time postpone sale of all or any portion of the Property by public announcement at such time and place of sale previously stated, and from time to time, may also postpone the sale by public announcement at the time and place fixed by the preceding postponement. A sale of less than the whole of the Property or any defective or irregular sale made hereunder shall not exhaust the power of sale provided for herein. Trustee shall deliver to the purchaser at such sale a deed conveying the Property or portion thereof so sold, but without any covenant or warranty, express or implied from Lender. The recitals in the deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustee, Grantor or Lender may purchase at the sale;

Upon sale of the Property at any judicial or nonjudicial foreclosure, Lender may credit bid (as determined by Lender in its sole and absolute discretion) all or any portion of the Secured Obligations. In determining such credit bid, Lender may, but is not obligated to, take into account all or any of the following: (i) appraisals of the Property as such appraisals may be discounted or adjusted by Lender in its sole and absolute underwriting discretion; (ii) expenses and costs incurred by Lender with respect to the Property prior to foreclosure; (iii) expenses and costs that Lender anticipates will be incurred with respect to the Property after foreclosure, but prior to resale, including, without limitation, costs of structural reports and other due diligence, costs to carry the Property prior to resale, costs of resale (e.g., commissions, attorneys' fees, and taxes), costs of deferred maintenance, repair, refurbishment and retrofit, costs of defending or settling litigation affecting the Property, and lost opportunity costs (if any), including the time value of money during any anticipated holding period by Lender; (iv) declining trends in real property values generally and with respect to properties similar to the Property; (v) anticipated discounts upon resale of the Property as a distressed or foreclosed property; (vi) the existence of additional collateral (if any), for the Secured Obligations; and (vii) such other factors or matters that Lender (in its sole and absolute discretion) deems appropriate. In regard to the above, Grantor acknowledges and agrees that: (viii) Lender is not required to use any or all of the foregoing factors to determine the amount of its credit bid; (ix) this paragraph does not impose upon Lender any additional obligations that are not imposed by law at the time the credit bid is made; (x) the amount of Lender's credit bid need not have any relation to any loan-to-value ratios specified in the Loan Documents or previously discussed between Grantor and Lender; (xi) Lender's credit bid may be (at Lender's sole and absolute discretion) higher or lower than any appraised value of the Property; and (xii) Grantor acknowledges and understands that Lender has no duty to act in Grantor's best interest and expects that Lender will act in Lender's best interest, as determined by Lender, in Lender's sole discretion;

(e)    Multiple Foreclosures. To resort to and realize upon the security hereunder and any other security now or later held by Lender concurrently or successively and in one or several consolidated or independent judicial actions or lawfully taken nonjudicial proceedings, or both, and to apply the proceeds received upon the Secured Obligations all in such order and manner as Trustee and Lender or either of them determine in their sole discretion;

(f)    Rights to Collateral. To exercise all rights Trustee or Lender may have with respect to the Collateral under this Deed of Trust, the UCC or otherwise at law; and

Security Instrument
310704763.4

(g)     Other Rights.  To exercise such other rights as Trustee or Lender may have at law or in equity or pursuant to the terms and conditions of this Deed of Trust or any of the other Loan Documents.

In connection with any sale or sales hereunder, Lender may elect to treat any of the Property that consists of a right in action or that is property that can be severed from the Property (including, without limitation, any Improvements) without causing structural damage thereto as if the same were personal property or a fixture, as the case may be, and dispose of the same in accordance with applicable law, separate and apart from the sale of the Property.  Any sale of Collateral hereunder shall be conducted in any manner permitted by the UCC.

No specific right or remedy provided in this Section 7.3 may be construed, in each case, to create a duty for Lender to act or exercise any specific right or remedy or make Lender liable for any failure to exercise such right or remedy.  Without limiting the generality of the immediately preceding sentence, nothing in this Section 7.3 may be construed to make Lender responsible for the Property; its operation, maintenance, or condition; or any circumstances occurring on the Land, in each case, prior to Lender taking title to the Land.  No failure to exercise any right or remedy provided by this Section 7.3 may be construed as a waiver of such right or remedy by Lender or as any limitation on Lender's ability to exercise such right or remedy.  The provisions of this Article 7 are intended to benefit Lender and Lender's interests preserving and enforcing its security interest in the Property and obtaining full and timely repayment of the Secured Obligations, and thus, the parties hereto intend that such provisions are interpreted consistent with the best interests of Lender, in Lender's determination thereof, to the fullest extent permitted by applicable law.

7.4.     Application of Foreclosure Sale Proceeds.  If any foreclosure sale is effected, Trustee shall apply the proceeds of such sale in the following order of priority:  First, to the costs, fees and expenses of exercising the power of sale and of the sale, including, without limitation, the payment of the Trustee's fees and attorneys' fees; Second to the payment of the Secured Obligations that are secured by this Deed of Trust, in such order as Lender shall determine in its sole discretion; Third, to satisfy the outstanding balance of obligations secured by any junior liens or encumbrances in the order of their priority; and Fourth, to the Grantor or the Grantor's successor in interest, or in the event the Property has been sold or transferred to another, to the vested owner of record at the time of the Trustee's sale.

7.5.     Waiver of Marshaling Rights.  Grantor, for itself and for all parties claiming through or under Grantor, and for all parties who may acquire a lien on or interest in the Property, hereby waives all rights to have the Property and/or any other property, including, without limitation, the Collateral, which is now or later may be security for any Secured Obligation, marshaled upon any foreclosure of this Deed of Trust or on a foreclosure of any other security for any of the Secured Obligations.

7.6.     No Cure or Waiver.  Neither Lender's nor Trustee's nor any receiver's entry upon and taking possession of all or any part of the Property, nor any collection of rents, issues, profits, insurance proceeds, condemnation proceeds or damages, other security or proceeds of other security, or other sums, nor the application of any collected sum to any Secured Obligation, nor the exercise of any other right or remedy by Lender or Trustee or any receives cures or waives any Event of Default or notice of default under this Deed of Trust, or nullifies the effect of any notice of default or sale (unless all Secured Obligations then due have been paid or performed and Grantor has cured all other Events of Default hereunder, in each case, as determined by Lender), or impairs the status of the security, or prejudices Lender or Trustee in the exercise of any right or remedy, or may be construed as an affirmation by Lender of any tenancy, lease or option or a subordination of the lien of this Deed of Trust.

36

Security Instrument
310704763.4

7.7.    Power to File Notices and Cure Events of Default.  Grantor hereby irrevocably appoints Lender and its successors and assigns, as its attorney-in-fact, which power of attorney is coupled with an interest, to perform any obligation of Grantor hereunder upon the occurrence of an event, act or omission that, with notice or passage of time or both, would constitute an Event of Default; provided, however, (a) Lender as such attorney-in-fact shall only be accountable for such funds as are actually received by Lender; and (b) Lender shall not be liable to Grantor or any other person or entity for any failure to act under this Section 7.8.

7.8.    Remedies Cumulative.  All rights and remedies of Lender and Trustee provided hereunder are cumulative and are in addition to all rights and remedies provided by applicable law (including specifically, and without limitation, that of foreclosure of this Deed of Trust as though it were a mortgage) or in any other agreements between Grantor and Lender.  Lender may enforce any one or more remedies or rights hereunder successively or concurrently.

ARTICLE 8

INTENTIONALLY OMITTED

ARTICLE 9

GENERAL PROVISIONS

9.1.    Integration and Additional Provisions.  The Loan Documents contain the complete and entire agreement of the parties with respect to matters contemplated by the Loan Documents, and the Loan Documents supersede all prior and contemporaneous agreements, negotiations, communications, understandings, and discussions, in each case, whether written or oral.  The Loan Documents grant further rights to Lender and contain further agreements and affirmative and negative covenants by Grantor that apply to this Deed of Trust and to the Property and such further rights and agreements are incorporated herein by this reference.  Without limiting the generality of the preceding provisions of this Section 9.1.  IF THE GRANTOR IS ALSO THE BORROWER, THE PROVISIONS OF THIS SECTION 9.1 SHALL SURVIVE THE TERMINATION AND RELEASE OF THIS DEED OF TRUST, BUT SUCH PROVISIONS SHALL REMAIN SUBJECT TO ANY LIMITATIONS SET FORTH IN THE NOTE.

9.2.    Non-Waiver.  By accepting payment of any amount secured hereby after its due date or late performance of any other Secured Obligation, Lender shall not waive its right against any person obligated directly or indirectly hereunder or on any Secured Obligation, either to require prompt payment or performance when due of all other sums and obligations so secured or to declare default for failure to make such prompt payment or performance.  No exercise of any right or remedy by Lender or Trustee hereunder constitutes a waiver of any other right or remedy herein contained or provided by applicable law.  No failure by Lender or Trustee to exercise any right or remedy hereunder arising upon any Event of Default may be construed to prejudice Lender's or Trustee's rights or remedies upon, in each case, the continued existence of such Event of Default or occurrence of any other or subsequent Event of Default.  No delay by Lender or Trustee in exercising any such right or remedy may be construed to preclude Lender or Trustee from the exercise thereof at any time while that Event of Default is continuing.  No notice to or demand on Grantor shall by itself or the fact that was provided, in each case, entitle Grantor to any other or further notice or demand in similar or other circumstances.

9.3.    Consents and Approvals.  Wherever Lender's consent, approval, acceptance or satisfaction is required under any provision of this Deed of Trust or any of the other Loan Documents, unless either applicable law or a specific provision of one of the Loan Documents requires a different

37

Security Instrument
310704763.4

standard of Lender, such consent, approval, acceptance or satisfaction shall be in Lender's sole and absolute discretion.

9.4.    Permitted Contests.  After prior written notice to Lender, Grantor may contest, by appropriate legal or other proceedings conducted in good faith and with due diligence, the amount, validity or application, in whole or in part, of any lien, levy, tax or assessment, or any lien of any laborer, mechanic, materialman, supplier or vendor, or the application to Grantor or the Property of any law or the validity thereof, the assertion or imposition of which, or the failure to pay when due, would constitute an Event of Default, subject to the requirements that:  (a) Grantor pursues the contest diligently, in a manner that Lender determines is not prejudicial to Lender, and that does not impair the lien of this Deed of Trust; (b) the Property, or any part hereof or estate or interest therein, shall not be in any danger of being sold, forfeited, damaged, or lost by reason of such proceedings; (c) in the case of the contest of any law or other legal requirement, Lender shall not be in any danger of any civil or criminal liability; and (d) if required by Lender, Grantor deposits with Lender any funds or other forms of assurance (including a bond or letter of credit) satisfactory to Lender to protect Lender from the consequences of the contest being unsuccessful.  Grantor's right to contest pursuant to the terms of this provision shall not relieve Grantor of its obligations under the Loan or to make payments to Lender as and when due.

9.5.    Further Assurances.  Grantor shall, upon demand by Lender or Trustee, execute, acknowledge (if appropriate) and deliver any and all documents and instruments and do or cause to be done all further acts reasonably necessary or appropriate to effectuate the provisions hereof.

9.6.    Attorneys' Fees.  In the event it is necessary for Lender to retain the services of an attorney or any other party to enforce or to commence any legal action to enforce the terms of this Deed of Trust, or any of the other Loan Documents, or any portion hereof or thereof, Grantor agrees to pay to Lender, in addition to damages or other relief, any and all costs and expenses, including, without limitation, expert witness fees and reasonable attorney's fees incurred by Lender as a result thereof.

9.7.    Grantor and Lender Defined.  The term "**Grantor**" includes both the original Grantor including all persons executing this Deed of Trust as a trustor and any subsequent owner or owners of any of the Property; however, while any subsequent owner may have duties under this Deed of Trust by having taken title subject to this Deed of Trust, this Security Agreement does not affirmatively grant any rights against Lender to a subsequent owner who did not take title to the Property through a Transfer that fully complies with the terms of this Deed of Trust.  The term "**Lender**" includes the original Lender and any future owner or holder, including assignees, pledgees and participants, of the Note or any interest therein.  Nothing in this Section 9.7 may be construed to authorize Grantor to make or participate in a Transfer prohibited by the terms of this Deed of Trust, including, without limitation, the provisions of Section 6.14 hereof.

9.8.    Disclaimers.

(a)    Relationship.  The relationship of Grantor and Lender under this Deed of Trust and the other Loan Documents is, and shall at all times remain, solely that of Grantor and Lender; and Lender neither undertakes nor assumes any responsibility or duty to Grantor or to any third party with respect to the Property.  Notwithstanding any other provisions of this Deed of Trust and the other Loan Documents:  (i) Lender is not, and shall not be construed to be, a partner, joint venturer, member, alter ego, manager, controlling person or other business associate or participant of any kind of Grantor, and Lender does not intend to ever assume such status; (ii) Intentionally Omitted; and (iii) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Grantor; and

38

(b)     No Liability.  Lender shall not be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any person or property arising from any construction on, or occupancy or use of, the Property, whether caused by or arising from:  (i) any defect in any building, structure, grading, fill, landscaping or other improvements thereon or in any on-site or off-site improvement or other facility therein or thereon; (ii) any act or omission of Grantor or any of Grantor's agents, employees, independent contractors, licensees or invitees; (iii) any accident in or on the Property or any fire, flood or other casualty or hazard thereon; (iv) the failure of Grantor or any of Grantor's licensees, employees, invitees, agents, independent contractors or other representatives to maintain the Property in a safe condition; or (v) any nuisance made or suffered on any part of the Property.

9.9.     Severability.  Each representation, warranty, promise, covenant, or similar statement by the Grantor contained herein (in each case a "**Statement**") shall constitute a separate Statement upon which the Lender may rely.  Wherever possible, each Statement shall be interpreted in such manner as to be effective and valid under applicable law, but if any Statement of this Deed of Trust shall be prohibited by or invalid under applicable law, such Statement shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such Statement or the remaining Statements of this Deed of Trust.  If and only if a Statement cannot be interpreted in a manner to be valid under applicable law, such Statement deemed to be prohibited or invalid may be reformed to have the meaning as close as possible to the meaning provided in this Deed of Trust, as long as such reformed meaning is consistent with the intent and purpose of this Deed of Trust to benefit Lender's interests regarding (i) full and timely payment and performance of the Secured Obligations and (ii) Lender's protection of its interests in the Property and the Collateral.  Without limiting the preceding provisions of this Section 9.9, if any provision (for the avoidance of doubt, including not only Statements, but other terms of this Deed of Trust that would not be defined as "Statements") of this Deed of Trust is deemed, in a final non-appealable decision, by a competent court with jurisdiction over the parties and the subject matter to be prohibited or unenforceable under applicable law, the particular provision of this Deed of Trust shall be deemed modified so as to constitute a provision conforming as nearly as possible to the void or unenforceable provision while still remaining valid and enforceable under applicable law, and the remaining terms or provisions of this Deed of Trust shall not be affected thereby; however, if and only if, a provision is prohibited by or unenforceable under applicable law and cannot be reformed as contemplated by the preceding clauses of this Section 9.9, such void or unenforceable provision shall be ineffective to the extent it is void or unenforceable and be severed from the rest of this Deed of Trust without, in each case, invalidating this Deed of Trust; adversely affecting the other terms of this Deed of Trust; or limiting the enforceability of this Deed of Trust.

9.10.     Relationship of Articles.  The rights, remedies and interests of Lender under this Deed of Trust established by Article 1 and the security agreement established by Article 4 are independent and cumulative, and there shall not be a merger of any lien created by this Deed of Trust with any security interest created by any other pledge or security agreement, if any exists among the Loan Documents.  Lender may elect to exercise or enforce any of its rights, remedies or interests under either or both this Deed of Trust and any other security agreement, if any, as Lender may from time to time deem appropriate.  The Assignment of Rents and Leases established by Article 3 is similarly independent of and separate from this Deed of Trust and the Security Agreement and may be enforced separately without adversely affecting the priority or enforceability, in each case, of this Deed of Trust and the lien on the Property it creates.

9.11.     Merger.  No merger shall occur as a result of Lender's acquiring any other estate in, or any other lien on, the Property unless Lender consents to a merger in writing (signed by an officer of Lender holding the title of Executive Vice President or higher).

Security Instrument
310704763.4

9.12.  <u>Obligations of Grantor, Joint and Several</u>.  If more than one person has executed this Deed of Trust as "**Grantor**," the obligations of all such persons hereunder shall be joint and several.

9.13.  <u>Separate and Community Property</u>.  Any married person who executes this Deed of Trust as a Grantor agrees that any money judgment that Lender or Trustee obtains pursuant to the terms of this Deed of Trust or any other obligation of that married person secured by this Deed of Trust may be collected by execution upon any separate property or community property of that person.

9.14.  <u>Interpretation and Amendment</u>.  The Loan Documents shall not be modified except by written instrument executed by all parties, and in the case of Lender, to be binding upon Lender, such written instrument must be signed by an officer of Lender holding the title of Executive Vice President or higher.  With respect to this Deed of Trust, in addition to complying with the immediately foregoing sentence, to be valid, such amendment must also be recorded in the official records of the county in which the Land is situated, with Lender having expressly authorized such recording in writing.  Any reference in any of the Loan Documents to the Property or Collateral shall include all or any part of the Property or Collateral.  Any reference to the Loan Documents includes any amendments, renewals or extensions now or hereafter approved by Lender in writing pursuant to the terms hereof.  When the identity of the parties or other circumstances make it appropriate, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.  Article, section, and sub-section headings used herein are for convenience of reference only, are not part of this Agreement, and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.  This Agreement shall be construed without regard to which party drafted this Agreement (it being understood that the parties reject any rule of construction favoring a presumption against the drafter).

9.15.  <u>Capitalized Terms</u>.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan Documents.

9.16.  <u>Successors in Interest</u>.  The terms, covenants, and conditions herein contained shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties hereto.  The foregoing sentence shall not be construed to permit Grantor to Transfer the Loan, the Property, or any interest it has in either the Loan or the Property, in each case, except as otherwise permitted under this Deed of Trust or the other Loan Documents, including, without limitation, the terms of Section 6.14 hereof.

9.17.  <u>Governing Law</u>.  This Deed of Trust and the other Loan Documents and the obligations arising hereunder and thereunder shall be governed by, and construed in accordance with, the laws of the State of Washington applicable to contracts made and performed in Washington and any applicable federal law, including, to the extent, with respect to Lender's rights and obligations, that federal law preempts the laws of the State of Washington.  Except as provided in the immediately preceding sentence, Grantor hereby unconditionally and irrevocably waives, to the fullest extent permitted by law, any claim to assert that the law of any jurisdiction other than Washington governs this Deed of Trust and other Loan Documents.

9.18.  <u>Consent to Jurisdiction</u>.  Grantor irrevocably submits to the Jurisdiction of:  (a) any state or federal court sitting in the State of Washington over any suit, action, or proceeding, brought by Grantor against Lender, arising out of or relating to this Deed of Trust or the Loan; (b) any state or federal court sitting in the state where the Property is located or the state in which Grantor's principal place of business is located over any suit, action or proceeding, brought by Lender against Grantor, arising out of or relating to this Deed of Trust or the Loan; and (c) any state court sitting in the county of the state where the Property is located over any suit, action, or proceeding, brought by Lender to exercise its STATUTORY POWER OF SALE under this Deed of Trust or any action brought by Lender

40

Security Instrument
310704763.4

to enforce its rights with respect to the Collateral.  Grantor irrevocably waives, to the fullest extent permitted by law, any objection that Grantor may now or hereafter have to the laying of venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.

9.19.    Exhibits.  Any and all Exhibits are incorporated into this Deed of Trust by this reference.

9.20.    Addresses; Request for Notice.  All notices and other communications that are required or permitted to be given to a party under this Deed of Trust shall be in writing, refer to the Loan number, and shall be sent to such party, either by personal delivery, by overnight delivery service, or by certified first-class mail, return receipt requested to the addressee below.  All such notices and communications shall be effective upon receipt of such delivery, or if refused or deemed undeliverable, in each case, on the date the first delivery was attempted.  The addresses of the parties are set forth on page 1 of this Deed of Trust.  Grantor's principal place of business is at the address set forth on page 1 of this Deed of Trust.

Any Grantor whose address is set forth on page 1 of this Deed of Trust hereby requests that a copy of notice of default and notice of sale be delivered to it at that address.  Failure to insert an address shall constitute a designation of Grantor's last known address as the address for such notice.  Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by giving thirty (30) days' notice to the other parties in the manner set forth above.

9.21.    Counterparts.  This Deed of Trust may be executed in any number of counterparts, each of which, when executed and delivered, will be deemed an original and all of which taken together, will be deemed to be one and the same instrument.

9.22.    Time is of the Essence.  Time is of the essence with respect to all of Grantor's obligations and agreements hereunder regarding, in each case, (i) the payment of money; (ii) where any deadline or period for performance is provided; and (iii) where notice, reports, financial statements, information concerning the Property and its operation, or other information is required to be delivered to Lender.

9.23.    Customer Identification - USA Patriot Act Notice.  Lender hereby notifies Grantor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001), as amended (the "**Act**"), and Lender's policies and practices, Lender is required to obtain, verify and record certain information and documentation that identifies Grantor, which information includes the name and address of Grantor and such other information that will allow Lender to identify Grantor in accordance with the Act.

9.24.    **Waiver of Jury Trial and Dispute Resolution**.

(a)    TO THE FULLEST EXTENT PERMITTED BY LAW, GRANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE BY JURY AND WAIVES ANY RIGHT TO TRIAL BY JURY WITH REGARD TO THIS DEED OF TRUST OR ANY OTHER LOAN DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GRANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  BENEFICIARY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS

41

PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GRANTOR.

(b)     With respect to any Dispute (as defined below) which arises under the terms of this Deed of Trust, the following paragraphs ("**Dispute Resolution Provision**") concern the resolution of any and all controversies or claims between Grantor (including any persons claiming by or through Grantor) and Lender, whether arising in contract or tort or by statute, that arise out of or relate to (i) this Deed of Trust (including any renewals, extensions or modifications) or (ii) any of the other Loan Documents (collectively, a "**Dispute**"); provided, however, in no event may any Collection Action (as defined herein) by Lender be within the meaning of a Dispute.

(i)     As used herein, (i) the "**Act**" means the Federal Arbitration Act (Title 9, U.S. Code), and (ii) "**JAMS**" means JAMS (a/k/a JAMS Mediation, Arbitration, ADR Services) or any successor thereto.

(ii)     Intentionally Omitted.

(iii)     This Subsection (iii) of this Section 9.24(b) is itemized by paragraphs with numerals, as follows:

(1)     If and only if both Grantor and Lender so consent, any Dispute shall be resolved by binding arbitration in accordance with the Act.  The Act shall apply even though this Deed of Trust provides that it is governed by the law of a specified state; however, the decision of the arbitrators shall be consistent with applicable law, to the extent not preempted by the Act (whether by law or by this Deed of Trust's election of the Act).  Arbitration proceedings will be determined in accordance with the Act, the rules and procedures for the arbitration of financial services disputes of JAMS, and the terms of this Dispute Resolution Provision.  In the event of any inconsistency, the terms of this Dispute Resolution Provision shall control.

(2)     The arbitration shall be administered by JAMS and conducted in any U.S. state where real or tangible personal property collateral for the Loan is located.  All Disputes shall be determined by one arbitrator; however, if any Dispute exceeds FIVE MILLION AND 00/100 DOLLARS ($5,000,000.00), or if more than one Dispute is made at the same time and cumulatively the Disputes exceed FIVE MILLION AND 00/100 DOLLARS ($5,000,000.00), upon the request of any party, the Disputes shall be decided by three (3) arbitrators.  All arbitration hearings shall commence within ninety (90) days of the demand for arbitration and close within ninety (90) days of commencement, and the award of the arbitrator(s) shall be issued within thirty (30) days of the close of the hearing.  However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional sixty (60) days.  The arbitrator(s) shall provide a concise written statement of reasons for the award.  The arbitration award may be submitted to any court having jurisdiction to be confirmed and enforced.

(3)     The arbitrator(s) will have the authority to decide whether any Dispute is barred by the statute of limitations and, if so, to dismiss the arbitration on that basis.  For purposes of the application of the statute of limitations, the service on JAMS under applicable JAMS rules of a notice of Dispute is the equivalent of the filing of a lawsuit.  Any dispute concerning this arbitration provision or whether a Dispute is arbitrable shall be determined by the arbitrator(s).  The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this Deed of Trust.

Security Instrument
310704763.4

(c)      This Dispute Resolution Provision shall not limit the right of Lender, in each case, to (v) exercise self-help remedies, when permitted by applicable law, including, without limitation, setoff or acting as an attorney-in-fact to receive Accounts; (w) initiate judicial or non-judicial foreclosure against any real or personal property (e.g., without limitation, the Property and the Collateral, in each case); (x) exercise any judicial or power of sale rights, (y) act in a court of law to obtain an interim remedy, including, without limitation and in each case, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies, or (z) bring any action for payment. Each of the actions described in the foregoing subclauses (v) through (z) of this Section 9.24(d) shall constitute a "**Collection Action**."

(d)      The filing of a court action is not intended to constitute a waiver of the right of Lender, including, without limitation, on behalf of the suing party, to require thereafter submission of the Dispute to a referee.

ARTICLE 10

INTENTIONALLY OMITTED

ARTICLE 11

STATE-SPECIFIC PROVISIONS

11.1.    Principles of Construction.  In the event of any inconsistencies between the terms and conditions of this Article 11 and the other terms and conditions of this Deed of Trust, the terms and conditions of this Article 11 will control and be binding.

11.2.    Nonagricultural Use; Commercial Loan.    Borrower represents, warrants, and covenants to Lender that (a) the Property is not, and will not be, used principally for agricultural purposes, and (b) the Loan is made exclusively for commercial, investment, or business purposes and no portion thereof will be used for any consumer, personal, family or household purpose.

11.3.    Expenses During Redemption Period.  If this Deed of Trust is foreclosed as a mortgage and the Property sold at a foreclosure sale, the purchaser may during any redemption period allowed, make such repairs or alterations on the Property as may be reasonably necessary for the proper operation, care, preservation, protection and insuring thereof.  Any sums so paid together with interest thereon from the time of such expenditure at the lesser of the default rate set forth in the Note or the maximum rate permitted by law, will be added to and become a part of the amount required to be paid for redemption from such sale.

11.4.    Foreclosure Subject To Tenancies.  Lender will have the right at its option to foreclose, or cause the nonjudicial foreclosure of, this Deed of Trust subject to the rights of any tenant or tenants of the Property.

11.5.    Lender's And Trustee's Expenses.  Borrower will pay all of Lender's and Trustee's expenses incurred in any efforts to enforce any terms of this Deed of Trust, whether or not any suit is filed, including, without limitation, legal fees and disbursements, foreclosure costs, title charges, and expenses incurred in any bankruptcy, reorganization, liquidation, receivership or similar proceeding. All such sums, with interest thereon, will be additional indebtedness of Borrower secured by this Deed of Trust.  Such sums will be immediately due and payable and will bear interest from the date of

43

Security Instrument
310704763.4

disbursement at the lesser of the default rate set forth in the Note or the maximum rate permitted by law.

11.6.    Successor Trustee.  In accordance with applicable law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder.  Without conveyance of the Property, the successor trustee will succeed to all the title, power and duties conferred upon the Trustee herein and by applicable law.

11.7.    Lender's Powers.  Without affecting the liability of any person for payment or performance of the Secured Obligations or any of Lender's rights or remedies, Lender, at its option, may extend the time for payment of the Secured Obligations or any part thereof, reduce payment thereon, release anyone liable thereon, accept a renewal note or notes therefor, modify the terms and time of payment thereof, release the lien of this Deed of Trust on any part of the Property, take or release other or additional security, release or reconvey or cause to be released or reconveyed all or any part of the Property, or consent and/or cause Trustee to consent to the making of any map or plat of the Property, consent or cause Trustee to consent to the granting of any easement or creating any restriction on the Property, or join or cause Trustee to join in any subordination or other agreement affecting this Deed of Trust or the lien or charge hereof.  Borrower will pay Lender a reasonable service charge, together with such title insurance premiums and attorneys' fees as may be incurred at Lender's option, for any such action if taken at Borrower's request.

11.8.    Subdivision.  Borrower hereby consents to a subdivision of the Property, if Lender, in its sole discretion, determines that a subdivision of the Property is necessary or desirable to preserve the lien of this Deed of Trust, or to permit Lender to foreclose on only a portion of the Property.

11.9.    Agents.  In exercising any rights hereunder or taking actions provided for herein, Lender and Trustee may act through their respective employees, agents or independent contractors as authorized by Lender and Trustee.

11.10.    Protection Of Lender's Security.  Borrower will give notice to Lender of and will appear in and defend any action or proceeding that may affect the Property, the interests of Lender or Trustee therein, or the rights or remedies of Lender or Trustee under the Loan Documents.  If any such action or proceeding is commenced and there is an uncured Event of Default, or Borrower fails to perform any of the Secured Obligations, Lender or Trustee may, at their option, make any appearances, disburse any sums, pay or settle any claims that have resulted in or may result in a lien of any portion of the property, make any entries upon the Property and take any actions as may be necessary or desirable to (i) protect or enforce the security of this Deed of Trust, (ii) remedy Borrower's failure to perform the Secured Obligations (without waiving such default by Borrower), or (iii) otherwise protect Lender's or Trustee's interests.  Borrower will pay all losses, damages, fees, costs and expenses incurred by Lender and Trustee in taking such actions; including, without limitation, reasonable legal fees.

11.11.    Reimbursement Of Lender's And Trustee's Expenses.  All amounts disbursed by Lender and Trustee pursuant to Sections 11.5 and 11.10 or any other provision of this Deed of Trust or the other Loan Documents, with interest thereon at the default rate set forth in the Note from the date of disbursement until repaid, will constitute Secured Obligations secured by this Deed of Trust.  All such amounts will be immediately due and payable and bear interest from the date of disbursement at the lesser of the default rate set forth in the Note or the maximum rate permitted by law.

11.12.    Compliance With Laws.  Borrower agrees that it will not use, and will not allow any tenants or subtenants to use, the Property for any activity that violates any federal or state law.

44

Security Instrument
310704763.4

Borrower covenants and agrees that all future leases and modifications of existing leases will include a provision that prohibits the use of the Property for any activity that violates any federal or state law.

     11.13.  <u>Foreclosure</u>.  Lender may immediately commence an action to foreclose this Deed of Trust or to specifically enforce its provisions or any of the indebtedness secured hereby pursuant to the statutes in such case made and provided and sell the Property or cause the Property to be sold in accordance with the requirements and procedures provided by said statutes in a single parcel or in several parcels at the option of Lender.  In the event foreclosure proceedings are filed by Lender, all out of pocket expenses incident to such proceeding, including, but not limited to, reasonable attorneys' fees and costs, shall be paid by Borrower and secured by this Deed of Trust and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.  The secured indebtedness and all other obligations secured by this Deed of Trust, including, without limitation, interest at the Default Interest Rate (as defined in the Note) any prepayment charge, fee or premium required to be paid under the Note in order to prepay principal (to the extent permitted by applicable law), reasonable attorneys' fees and any other amounts due and unpaid to Lender under the Loan Documents, may be bid by Lender in the event of a foreclosure sale hereunder.  In the event of a judicial or nonjudicial foreclosure sale, it is understood and agreed that Lender or its assigns may become the purchaser of the Property or any part thereof.  This Deed of Trust shall continue and remain in full force and effect during any period of foreclosure or any redemption period with respect to the Property. Following a sale pursuant to the exercise of the Trustee's power of sale, as provided herein, Borrower and any indemnitor or guarantor of the loan secured hereby shall remain personally liable to the full extent provided by applicable law.

     11.14.  **Statutory Notice**.  **ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

[Signature page follows]

Security Instrument
310704763.4

IN WITNESS WHEREOF, Grantor has executed this Deed of Trust as of the day and year set forth above.

GRANTOR:

Amity Court LLC, a Washington limited liability company

By: X & C Holdings LLC, a Delaware limited liability company
Its Managing Member, Manager, and Governor

By: _____
Nanling Chen, Managing Member and Manager for X & C Holdings LLC

By: _____
Stanley Xu, Managing Member and Manager for X & C Holdings LLC

46

Security Instrument
310704763.4

STATE OF WASHINGTON        }
                           } SS.
COUNTY OF KING             }

This record was acknowledged before me on ___27___ day of __Sept.___, 2021 by
_Nanling Chen_ as _Manager_ of _X & C Holdings LLC_ .



_____
(Signature of notary public)

_____
(Title of office)

My Commission Expires: _4-9-24_
                        (Date)

(Stamp)

STATE OF WASHINGTON        }
                           } SS.
COUNTY OF KING             }

This record was acknowledged before me on ___27___ day of __Sept.___, 2021 by
_Stanley Xu_ as _Manager_ of _X & C Holdings LLC_ .



_____
(Signature of notary public)

_____
(Title of office)

My Commission Expires: _4-9-24_
                        (Date)

(Stamp)

47

Security Instrument
310704763.4

**EXHIBIT A**

LEGAL DESCRIPTION

That portion of the Southwest Quarter of the Northeast Quarter of Section 27, Township 25 North, Range 5 East, Willamette Meridian, in King County, Washington, described as follows:

Beginning on the East line of said subdivision at its intersection with the Northerly line of the Bellevue-Redmond Road;

Thence North 00°58'16" East along said East line 280.00 feet to the True Point of Beginning;
Thence North 88°16'05" West parallel to the North line of said section 150.00 feet;
Thence South 00°58'16" West parallel to the East line of said subdivision to the Northerly margin of Northup Road (Bellevue-Redmond Road);
Thence Easterly along said margin to the East line of said subdivision;
Thence North 00°58'16" East along said East line to the True Point of Beginning.

Situate in the County of King, State of Washington.

A-1

Security Instrument
310704763.4

# EXHIBIT D

## GUARANTY

This **GUARANTY** (this "*Guaranty*"), dated as of September 22, 2021, made by X & C Holdings LLC, a Delaware limited liability company, having an address at 1215 120th Ave NE, Suite 204, Bellevue, WA 98005, and Stanley Xu and Nanling Chen, a married couple, having an address at 8411 NE Juanita Dr., Kirkland, WA 98034 (collectively, "*Guarantor*"), in favor of AXOS BANK™, a federally chartered savings association (together with its successors and assigns, hereinafter referred to as "*Lender*"), having an address of 4350 La Jolla Village Drive, Suite 100, San Diego, California 92122.

R E C I T A L S:

A.    Pursuant to that certain Secured Promissory Note dated as of the date hereof (as the same may be amended, modified, supplemented or replaced from time to time, the "*Note*") between Amity Court LLC, a Washington limited liability company ( "*Borrower*"), and Lender, Lender has agreed to make a loan (the "*Loan*") to Borrower in an aggregate principal amount not to exceed $5,000,000.00, subject to the terms and conditions of the Note;

B.    As a condition to Lender's making the Loan, Lender is requiring that Guarantor execute and deliver to Lender this Guaranty; and

C.    Guarantor hereby acknowledges that Guarantor will materially benefit from Lender's agreeing to make the Loan;

**NOW, THEREFORE**, in consideration of the premises set forth herein and as an inducement for and in consideration of the agreement of Lender to make the Loan pursuant to the Note, Guarantor hereby agrees, covenants, represents and warrants to Lender as follows:

1.    **Definitions**.

(a)    All capitalized terms used and not defined herein shall have the respective meanings given such terms in the Note.

(b)    The term "*Guaranteed Obligations*" means:  (a) all indebtedness and obligations, of any nature whatsoever, of the Borrower under the Note and other Loan Documents and any and all extensions, renewals, substitutions, replacements, and modifications thereof, whether now in existence or hereafter created, including, without limitation, (i) all principal of and interest on the Note, and (ii) all fees, charges, costs, and other amounts payable by Borrower under the Note and the other Loan Documents; (b) the payment and performance of all obligations of Borrower under each Loan Document; and (c) all costs and expenses, including reasonable fees and out of pocket expenses of attorneys and expert witnesses, incurred by Lender in enforcing its rights under this Guaranty, the Security Instrument, and any other Loan Document.

(c)    The term "*Governmental Authority*" means, collectively (a) the United States; (b) the state, county, city, and any other political subdivision of the jurisdiction in which the Property is located; (c) all other governmental or quasi-governmental authorities, boards, bureaus, agencies, commissions, departments, administrative tribunals, and other instrumentalities or authorities including, without limitation all judicial authorities and public utilities having or exercising jurisdiction over Borrower or the Property.

2. **Guaranty**.

(a)     Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Lender the full, prompt and complete payment when due of the Guaranteed Obligations.

(b)     All sums payable to Lender under this Guaranty shall be payable on demand and without reduction for any offset, claim, counterclaim or defense.

(c)     Guarantor hereby agrees to indemnify, defend and save harmless Lender from and against any and all costs, losses, liabilities, claims, causes of action, expenses and damages, including reasonable attorneys' fees and disbursements, which Lender may suffer or which otherwise may arise by reason of Borrower's failure to pay any of the Guaranteed Obligations when due, irrespective of whether such costs, losses, liabilities, claims, causes of action, expenses or damages are incurred by Lender prior or subsequent to (i) Lender's declaring the unpaid principal, interest and other sums evidenced or secured by the Loan Documents to be due and payable, (ii) the commencement or completion of a judicial or non-judicial foreclosure of the Security Instrument or (iii) the conveyance of all or any portion of the Property by deed-in-lieu of foreclosure.

(d)     Guarantor agrees that no portion of any sums applied (other than sums received from Guarantor in full or partial satisfaction of its obligations hereunder), from time to time, in reduction of the Loan shall be deemed to have been applied in reduction of the Guaranteed Obligations until such time as the Loan has been paid in full, or Guarantor shall have made the full payment required hereunder, it being the intention hereof that the Guaranteed Obligations shall be the last portion of the Loan to be deemed satisfied.

(e)     Notwithstanding anything to the contrary herein or in the other Loan Documents, this Guaranty is and shall remain unsecured.

3. **Representations and Warranties**.  Guarantor hereby represents and warrants to Lender as follows (which representations and warranties shall be given as of the date hereof and shall survive the execution and delivery of this Guaranty):

(a)     **Execution**.  This Guaranty has been duly executed and delivered by Guarantor.

(b)     **Enforceability**.  This Guaranty constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

(c)     **No Violation**.  The execution, delivery and performance by Guarantor of its obligations under this Guaranty do not and will not violate any law, regulation, order, writ, injunction or decree of any court or governmental body, agency or other instrumentality applicable to Guarantor, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Guarantor pursuant to the terms of any mortgage, indenture, agreement, trust instrument, or other instrument to which Guarantor is a party or by which it or any of its properties is bound.  Guarantor is not in default under any other guaranty which it has provided to Lender.

(d)    **No Litigation**.  There are no actions, suits or proceedings at law or at equity, pending or threatened against or affecting Guarantor or which involve or might involve the validity or enforceability of this Guaranty or which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.  Guarantor is not in default beyond any applicable grace or cure period with respect to any order, writ, injunction, decree or demand of any Governmental Authority which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.

(e)    **Consents**.  All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, all Governmental Authorities (collectively, the "*Consents*") that are required in connection with the valid execution, delivery and performance by Guarantor of this Guaranty have been obtained and Guarantor agrees that all Consents required in connection with the carrying out or performance of any of Guarantor's obligations under this Guaranty will be obtained when required.

(f)    **Financial Statements and Other Information**.  All financial statements of Guarantor heretofore delivered to Lender are true and correct in all material respects and fairly present the financial condition of Guarantor as of the respective dates thereof, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof.  None of the aforesaid financial statements or any certificate or statement furnished to Lender by or on behalf of Guarantor in connection with the transactions contemplated hereby, and none of the representations and warranties in this Guaranty contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein or herein not misleading.  Guarantor is not insolvent within the meaning of the United States Bankruptcy Code or any other applicable law, code or regulation and the execution, delivery and performance of this Guaranty will not render Guarantor insolvent.

(g)    **Consideration**.  Guarantor is the owner, directly or indirectly, of certain legal and beneficial equity interests in Borrower, and will derive substantial benefit from Lender's making of the Loan.

4.    **Financial Reporting**.  Guarantor shall from time to time, upon request by Lender, deliver to Lender such financial statements as Lender may reasonably require, including as applicable as determined by Lender, a balance sheet, an income and expense statement, a personal financial statement including schedule of real estate and a statement of financial affairs, all in form and content acceptable to Lender.  Guarantor shall also furnish to Lender complete copies of all federal and state income tax returns (including accompanying schedules and related K-1's) filed by Guarantor within thirty (30) days after filing (provided that if returns are not filed on time then a copy of any applicable extension filings shall be made available for delivery to Lender upon Lender's request as provided above within thirty (30) days after the extension filing due date).  Upon request by Lender, all such tax returns must be prepared by an independent certified public accountant or attorney.  Each of the statements, schedules, documents, items and reports required by this paragraph shall be certified to be complete and accurate by Guarantor (or for an entity Guarantor, an individual having authority to bind Guarantor), and shall be in such form and contain such detail as Lender may reasonably require.  Lender may at Lender's discretion require that any statements, schedules or reports be audited at Borrower's expense by independent certified public accountants acceptable to Lender.  Guarantor acknowledges and agrees that (a) the reporting requirements of this paragraph apply to each Guarantor if more than one Guarantor is executing this Guaranty, and (b) that failure of any Guarantor to provide financial statements, information, documents or tax returns required by this paragraph within thirty (30) days of request

by Lender shall constitute a material Event of Default under the Loan. Guarantor acknowledges and agrees that Lender may from time to time (i) verify and re-verify any information contained in Borrower's application for the Loan, (ii) order additional credit reports from any credit reporting agency with respect to Borrower and Guarantor, and (iii) report Borrower's and Guarantor's name(s), account information and payment history to any credit reporting agency.

5. **Unconditional Character of Obligations of Guarantor**.

(a) The obligations of Guarantor hereunder shall be irrevocable, absolute and unconditional, irrespective of the validity, regularity or enforceability, in whole or in part, of the other Loan Documents or any provision thereof, or the absence of any action to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against Borrower, Guarantor or any other Person or any action to enforce the same, any failure or delay in the enforcement of the obligations of Borrower under the other Loan Documents or Guarantor under this Guaranty, or any setoff, counterclaim, and irrespective of any other circumstances which might otherwise limit recourse against Guarantor by Lender or constitute a legal or equitable discharge or defense of a guarantor or surety. Lender may enforce the obligations of Guarantor under this Guaranty by a proceeding at law, in equity or otherwise, independent of any loan foreclosure or similar proceeding or any deficiency action against Borrower or any other Person at any time, either before or after an action against the Property or any part thereof, Borrower or any other Person. **This Guaranty is a guaranty of payment and performance and not merely a guaranty of collection.** Guarantor waives diligence, notice of acceptance of this Guaranty, filing of claims with any court, any proceeding to enforce any provision of any other Loan Document, against Guarantor, Borrower or any other Person, any right to require a proceeding first against Borrower or any other Person, or to exhaust any security (including, without limitation, the Property) for the performance of the Guaranteed Obligations or any other obligations of Borrower or any other Person, or any protest, presentment, notice of default or other notice or demand whatsoever (except to the extent expressly provided to the contrary in this Guaranty).

(b) The obligations of Guarantor under this Guaranty, and the rights of Lender to enforce the same by proceedings, whether by action at law, suit in equity or otherwise, shall not be in any way affected by any of the following:

(i) any insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower, the Property or any part thereof, Guarantor or any other Person;

(ii) any failure by Lender or any other Person, whether or not without fault on its part, to perform or comply with any of the terms of the Note, or any other Loan Documents, or any document or instrument relating thereto;

(iii) the sale, transfer or conveyance of the Property or any interest therein to any Person, whether now or hereafter having or acquiring an interest in the Property or any interest therein and whether or not pursuant to any foreclosure, trustee sale or similar proceeding against Borrower or the Property or any interest therein;

(iv) the conveyance to Lender, any Affiliate of Lender or Lender's nominee of the Property or any interest therein by a deed-in-lieu of foreclosure;

(v)    the release of Borrower or any other Person from the performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law or otherwise; or

(vi)    the release in whole or in part of any collateral for any or all Guaranteed Obligations or for the Loan or any portion thereof.

(c)    Except as otherwise specifically provided in this Guaranty, Guarantor hereby expressly and irrevocably waives all defenses in an action brought by Lender to enforce this Guaranty based on claims of waiver, release, surrender, alteration or compromise and all setoffs, reductions, or impairments, whether arising hereunder or otherwise.

(d)    Lender may deal with Borrower and Affiliates of Borrower in the same manner and as freely as if this Guaranty did not exist and shall be entitled, among other things, to grant Borrower or any other Person such extension or extensions of time to perform any act or acts as may be deemed advisable by Lender, at any time and from time to time, without terminating, affecting or impairing the validity of this Guaranty or the obligations of Guarantor hereunder.

(e)    No compromise, alteration, amendment, modification, extension, renewal, release or other change of, or waiver, consent, delay, omission, failure to act or other action with respect to, any liability or obligation under or with respect to, or of any of the terms, covenants or conditions of, the Loan Documents shall in any way alter, impair or affect any of the obligations of Guarantor hereunder, and Guarantor agrees that if any Loan Document is modified with Lender's consent, the Guaranteed Obligations shall automatically be deemed modified to include such modifications.

(f)    Lender may proceed to protect and enforce any or all of its rights under this Guaranty by suit in equity or action at law, whether for the specific performance of any covenants or agreements contained in this Guaranty or otherwise, or to take any action authorized or permitted under applicable law, and shall be entitled to require and enforce the performance of all acts and things required to be performed hereunder by Guarantor. Each and every remedy of Lender shall, to the extent permitted by law, be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity.

(g)    No waiver shall be deemed to have been made by Lender of any rights hereunder unless the same shall be in writing and signed by Lender, and any such waiver shall be a waiver only with respect to the specific matter involved and shall in no way impair the rights of Lender or the obligations of Guarantor to Lender in any other respect or at any other time.

(h)    At the option of Lender, Guarantor may be joined in any action or proceeding commenced by Lender against Borrower in connection with or based upon any other Loan Documents and recovery may be had against Guarantor in such action or proceeding or in any independent action or proceeding against Guarantor to the extent of Guarantor's liability hereunder, without any requirement that Lender first assert, prosecute or exhaust any remedy or claim against Borrower or any other Person, or any security for the obligations of Borrower or any other Person.

(i)    Guarantor agrees that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment is made by Borrower or Guarantor to Lender and such payment is rescinded or must otherwise be returned by Lender (as determined

by Lender in its sole and absolute discretion) upon insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower or Guarantor, all as though such payment had not been made.

(j)     In the event that Guarantor shall advance or become obligated to pay any sums under this Guaranty or in connection with the Guaranteed Obligations or in the event that for any reason whatsoever Borrower or any subsequent owner of the Property or any part thereof is now, or shall hereafter become, indebted to Guarantor, Guarantor agrees that (i) the amount of such sums and of such indebtedness and all interest thereon shall at all times be subordinate as to lien, the time of payment and in all other respects to all sums, including unpaid principal and interest and other amounts, at any time owed to Lender under the Loan Documents, and (ii) Guarantor shall not be entitled to enforce or receive payment thereof until all principal, interest and other sums due pursuant to the Loan Documents have been paid in full.  Nothing herein contained is intended or shall be construed to give Guarantor any right of subrogation in or under the Loan Documents or any right to participate in any way therein, or in the right, title or interest of Lender in or to any collateral for the Loan, notwithstanding any payments made by Guarantor under this Guaranty, until the actual and irrevocable receipt by Lender of payment in full of all principal, interest and other sums due with respect to the Loan or otherwise payable under the Loan Documents.  If any amount shall be paid to Guarantor on account of such subrogation rights at any time when any such sums due and owing to Lender shall not have been fully paid, such amount shall be paid by Guarantor to Lender for credit and application against such sums due and owing to Lender.

(k)     Guarantor's obligations hereunder shall survive a foreclosure, deed-in-lieu of foreclosure or similar proceeding involving the Property and the exercise by Lender of any or all of its remedies pursuant to the Loan Documents.

(l)     Intentionally Omitted.

6.     **Entire Agreement/Amendments**.   This instrument represents the entire agreement between the parties with respect to the subject matter hereof.  The terms of this Guaranty shall not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by Lender and Guarantor.

7.     **Successors and Assigns**.  This Guaranty shall be binding upon Guarantor, and Guarantor's estate, heirs, personal representatives, successors and assigns, may not be assigned or delegated by Guarantor and shall inure to the benefit of Lender and its successors and assigns.

8.     **Applicable Law and Consent to Jurisdiction**.  This Guaranty shall be governed by, and construed in accordance with, the substantive laws of the state in which the Property is located.  Guarantor irrevocably (a) agrees that any suit, action or other legal proceeding arising out of or relating to this Guaranty may be brought in a court of record with jurisdiction in the county and state in which the Property is located, (b) consents to the jurisdiction of each such court in any such suit, action or proceeding and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.  Guarantor irrevocably consents to the service of any and all process in any such suit, action or proceeding by service of copies of such process to Guarantor at its address provided in Section 13 hereof.  Nothing in this Section 8, however, shall affect the right of Lender to serve legal process in any other manner

permitted by law or affect the right of Lender to bring any suit, action or proceeding against Guarantor or its property in the courts of any other jurisdictions.

**9. Section Headings**. The headings of the sections and paragraphs of this Guaranty have been inserted for convenience of reference only and shall in no way define, modify, limit or amplify any of the terms or provisions hereof.

**10. Severability**. Any provision of this Guaranty which may be determined by any competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, Guarantor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

**11. WAIVER OF TRIAL BY JURY**. GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

**12. Other Guaranties**. The obligations of Guarantor hereunder are separate and distinct from, and in addition to, the obligations of Guarantor now or hereafter arising under any other guaranties, indemnification agreements or other agreements to which Guarantor is now or hereafter becomes a party. In no event shall Guarantor be entitled to any credit against amounts due under this Guaranty by reason of amounts paid to Lender by Guarantor or any other Person under or by reason of the other guaranties, indemnification agreements or other agreements to which Guarantor is now or hereafter becomes a party.

**13. Notices**. All notices, consents, approvals and requests required or permitted hereunder (a "*Notice*") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by notice to the other party): If to Lender: Axos Bank, 4350 La Jolla Village Drive, Suite 100, San Diego, California 92122, Attention: Legal Department; if to Guarantor: Stanley Xu and Nanling Chen, 1215 120th Ave NE, Suite 204, Bellevue, WA 98005. A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or in the case of overnight delivery, upon the first attempted delivery on a Business Day; or in the case of facsimile, upon the confirmation of such facsimile transmission.

**14. Guarantor's Receipt of Loan Documents**. Guarantor by its execution hereof acknowledges receipt of true copies of all of the Loan Documents, the terms and conditions of which are hereby incorporated herein by reference.

Guaranty
310704893.3

15. **Interest; Expenses.**

(a) If Guarantor fails to pay all or any sums due hereunder upon demand by Lender, the amount of such sums payable by Guarantor to Lender shall bear interest from the date of demand until paid at the Default Rate in effect from time to time.

(b) Guarantor hereby agrees to pay all costs, charges and expenses, including reasonable attorneys' fees and disbursements, that may be incurred by Lender in enforcing the covenants, agreements, obligations and liabilities of Guarantor under this Guaranty.

16. **Joint and Several Obligations.** If there is more than one guarantor of the Guaranteed Obligations (either hereunder or pursuant to a separate guaranty), each such Person shall have joint and several liability for the Guaranteed Obligations.

17. **State Specific Provisions.**

(a) In the event of any inconsistencies between the terms and conditions of this Section 17, and the other terms and conditions of this Guaranty, the terms of this Section 17 will control and be binding.

(b) The obligations of Guarantor under this Guaranty are in addition to the obligations of all other guarantors of the Loan.

(c) Guarantor's obligations under this Guaranty are not secured by the Security Instrument granted by Borrower.

(d) Guarantor understands that a nonjudicial foreclosure of the Security Instrument granted by Borrower or any other deed of trust securing the indebtedness of Borrower to Lender granted by any person other than Guarantor could impair or eliminate any subrogation, reimbursement or contribution rights Guarantor may have against the grantor of such Security Instrument or other deed of trust; nevertheless, Guarantor waives and relinquishes any defense based upon the loss of such rights or any other defense that may otherwise arise out of RCW 61.24.100 or any other applicable anti-deficiency statute of another state. Guarantor understands and agrees that Lender may in its discretion nonjudicially foreclose one or more Security Instrument or other deeds of trust granted to it by Borrower, then collect from Guarantor a sum equal to the difference between the total amount of the Obligations and the amount of the successful bid at each trustee sale.

(e) Guarantor acknowledges that the loan which is the subject of this Guaranty is a "Commercial Loan" as that term is defined in RCW 61.24.005(4).

(f) The death of Guarantor will not revoke this Guaranty as to such decedent unless and until written notice is actually received by Lender and until all of the Guaranteed Obligations then existing are fully paid and discharged.

(g) Guarantor expressly agrees that this Guaranty is for the benefit of his or her marital community and that recourse may be had against Guarantor's separate property and all of the community property of Guarantor and his or her spouse for all of Guarantor's obligations hereunder.

(h)     Payments made by the Borrower or by any other indemnitor or guarantor shall not deemed to be payments made by or on behalf of the Guarantor.  Any payments received by the Lender from or on behalf of the Guarantor shall be accompanied by a written direction from the Guarantor as to whether such payment is to be applied to amounts due under this Guaranty or to amounts owing under the Note or any other Loan Document.  In the absence of any such written direction, the Lender may, in its sole and absolute discretion, (i) apply such payment to any amounts due under this Guaranty, (ii) apply such payment to amounts owing under the Note or any other Loan Document, or (iii) return such payment to the Guarantor.  The acceptance and application of any such payment pursuant to clause (ii) above shall not reduce the obligations of the Guarantor under this Guaranty.  Absent such written direction from the Guarantor, Lender shall not be deemed to have knowledge or any reasonable basis to conclude that any payment from the Guarantor is intended to be applied against the obligations of the Guarantor under this Guaranty.

**Statutory Notice**.  **ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

[*Signature Page Follows.*]

Guaranty
310704893.3

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the date first above written.  Where applicable law so provides, Guarantor intends that this Guaranty shall be deemed to be signed and delivered as a sealed instrument.

**GUARANTOR**

X & C Holdings LLC, a Delaware limited liability company

By: _____
Nanling Chen, Managing Member and Manager for X & C Holdings LLC

By: _____
Stanley Xu, Managing Member and Manager for X & C Holdings LLC

_____
Nanling Chen, as an individual person, in his/her individual capacity as Guarantor

_____
Stanley Xu, as an individual person, in his/her individual capacity as Guarantor

# EXHIBIT E

| ACCOUNT | Feb 11-28 2025 | Mar 2024 | Apr 2024 | May 2024 | Jun 2024 | Jul 2024 | Total |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| **INCOME** | | | | | | | |
| Rent-Commercial | 23,352.02 | 33,670.28 | 33,670.28 | 33,670.28 | 33,670.28 | 33,670.28 | 191,703.42 |
| Parking | 1,600.50 | 2,425.00 | 2,425.00 | 2,425.00 | 2,425.00 | 2,425.00 | 13,725.50 |
| **TOTAL INCOME** | **24,952.52** | **36,095.28** | **36,095.28** | **36,095.28** | **36,095.28** | **36,095.28** | **205,428.92** |
| | | | | | | | |
| **OPERATION EXPENSES** | | | | | | | |
| Repair | 4,970.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 17,470.00 |
| Janitorial | 963.00 | 1,543.00 | 1,562.00 | 1,532.00 | 1,525.00 | 1,509.00 | 8,634.00 |
| HVAC | 370.00 | 425.00 | 425.00 | 870.00 | 2,250.00 | 1,980.00 | 6,320.00 |
| Gardening | 87.00 | 132.00 | 132.00 | 132.00 | 132.00 | 132.00 | 747.00 |
| Advertising | 50.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 425.00 |
| Property Tax | 3,519.00 | 5,331.22 | 5,331.22 | 5,331.22 | 5,331.22 | 5,331.22 | 30,175.10 |
| Property Insurance | 271.00 | 410.00 | 410.00 | 410.00 | 410.00 | 410.00 | 2,321.00 |
| Software Fees | 145.00 | 0.00 | 220.40 | 0.00 | 220.40 | 0.00 | 585.80 |
| Electricity | 3,000.00 | 4,543.44 | 3,700.00 | 1,800.00 | 1,800.00 | 4,500.00 | 19,343.44 |
| Water and Sewer | 0.00 | 920.00 | 0.00 | 920.00 | 0.00 | 920.00 | 2,760.00 |
| Trash Disposal | 278.00 | 420.00 | 420.00 | 420.00 | 420.00 | 420.00 | 2,378.00 |
| Bank Fees | 10.00 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 85.00 |
| UST Fees | 0.00 | 0.00 | 650.00 | 0.00 | 0.00 | 650.00 | 1,300.00 |
| Management Fees | 1,248.00 | 1,804.76 | 1,804.76 | 1,804.76 | 1,804.76 | 1,804.76 | 10,271.80 |
| **TOTAL OPERATION EXPENSES** | **14,911.00** | **18,119.42** | **17,245.38** | **15,809.98** | **16,483.38** | **20,246.98** | **102,816.14** |
| | | | | | | | |
| **NET OPERATION INCOME** | **10,041.52** | **17,975.86** | **18,849.90** | **20,285.30** | **19,611.90** | **15,848.30** | **102,612.78** |

25-00240-WLH11    Doc 10    Filed 02/19/25    Entered 02/19/25 16:03:51    Pg 189 of 189